RECEIVED
AUG 04 2003
KENNETH J. MURPHY, Clerk
DAYTON, OHIO

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

WALTER RAGLIN,                          :

   Petitioner,              :    Case No.  C-1-00-767

 vs.                                 :    Judge Walter H. Rice

BETTY MITCHELL, WARDEN,                  :    Magistrate Judge Michael R. Merz

   Respondent.              :    **PETITIONER IS UNDER A**
            **SENTENCE OF DEATH**

            :

## FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS
## PURSUANT TO 28 U.S.C. §2254

James D. Owen (#0003525)
Cloud & Owen
5354 North High St., Suite 3D
Columbus, Ohio 43214
Telephone:  (614) 436-3211
Fax:  (614) 436-6788

Counsel for Petitioner Raglin

TABLE OF CONTENTS

## **TABLE OF CONTENTS**

TABLE OF CONTENTS ............................................................................................... i

I. STATEMENT OF THE CASE ................................................................................. 1

II. STATEMENT OF FACTS ...................................................................................... 2

    A. Pretrial ............................................................................................................ 2

    B. Trial Phase ...................................................................................................... 5

        1. Voir Dire ................................................................................................... 6

        2.   Opening Statements, Presentation of the Evidence, and Closing
           Arguments ............................................................................................... 9

    C. Mitigation Phase .......................................................................................... 11

        1. Defense Presentation of Evidence ......................................................... 11

        2. State's Presentation of Evidence ............................................................ 15

        3. Mitigation Phase Jury Instructions ........................................................ 16

    D. Prosecutorial Misconduct ............................................................................ 18

IV. GROUNDS FOR RELIEF .................................................................................... 21

    **Issues Related to Ineffective Assistance of Trial Counsel** ............................... 21

    First Ground for Relief:  Walter Raglin was denied his right to the effective
    assistance of counsel at the pretrial and trial phases of his capital trial in
    violation of the Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments. ........... 21

    A. Petitioner abandons this portion of the First Ground for Relief designated
    as A1, A2, A3 and A4. ...................................................................................... 22

    B. Trial counsel was ineffective for failing to conduct voir dire in a manner
    sufficient to choose a fair and impartial jury ...................................................... 22

        1.   Petitioner abandons this portion of the First Ground for Relief
           designated as B1 ..................................................................................... 22

TABLE OF CONTENTS

2.   Petitioner abandons this portion of the First Ground for Relief
designated as B2..........................................................................................23

3.   Petitioner abandons this portion of the First Ground for Relief
designated as B2..........................................................................................23

4. Failure to adequately voir dire and remove Juror Veesart...........................23

C. Trial counsel was ineffective for repeatedly conceding Mr. Raglin's guilt
and then after such concession presenting conflicting arguments to the jury ......................24

1. Trial counsel's concession of Mr. Raglin's guilt........................................24

2. Conflicting arguments presented to the jury...............................................26

D. Trial counsel was ineffective for failing to adequately present a defense,
including failing to support counsel's request for a manslaughter instruction
with evidence sufficient to warrant the instruction, failing to secure the
assistance of experts, and failing to object to prosecutorial misconduct................27

1. Failure to put on evidence in support of manslaughter instruction..............27

2. Failure to secure the assistance of an expert...............................................28

3. Failure to object to prosecutorial misconduct.............................................29

Second Ground for Relief:   Walter Raglin was denied his right to the
effective assistance of counsel at the mitigation phase of his capital trial in
violation of the Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments. ............................30

A.   Petitioner abandons this portion of the Second Ground for Relief
designated as A. ....................................................................................30

B.   Petitioner abandons this portion of the Second Ground for Relief
designated as B. ....................................................................................30

C.   Petitioner abandons this portion of his Second Ground for Relief
designated as C. ....................................................................................30

D.   Trial Counsel failed to adequately investigate and present significant
evidence of remorse.................................................................................30

Third Ground for Relief: Walter Raglin was denied his right to the effective
assistance of counsel under the Fifth, Sixth, Eighth, Ninth and Fourteenth

# TABLE OF CONTENTS

Amendments when his attorneys failed to object and properly preserve numerous errors. ....................................................................................................34

Fourth Ground for Relief: Walter Raglin was denied his right to the effective assistance of counsel on his direct appeals in violation of the Sixth and Fourteenth Amendments to the United States Constitution. ..................................................36

**Suppression Issues** ............................................................................................38

Fifth Ground for Relief: Petitioner hereby abandons this ground for relief in its entirety. ....................................................................................................38

Sixth Ground for Relief: Walter Raglin's rights under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution were violated when the trial court failed to suppress his statement made to members of the Cincinnati Police Department on January 3, 1996, because his statement was made during a custodial interrogation following an unfulfilled request for counsel. *Miranda v. Arizona*, 384 U.S. 436 (1966); *Edwards v. Arizona*, 451 U.S. 477 (1981); *Minnick v. Mississippi*, 489 U.S. 146 (1990)...........................................38

Seventh Ground for Relief: Petitioner hereby abandons this ground for relief in its entirety. ....................................................................................................41

**Jury Instructions** ..............................................................................................42

**I. Trial Phase Instructions** ............................................................................42

Eighth Ground for Relief: Walter Raglin's Fifth, Sixth, Seventh, Eighth, and Fourteenth Amendment Rights were violated when the judge refused to instruct the jury at the end of the trial phase that it could find Mr. Raglin guilty of involuntary manslaughter, a lesser included offense of aggravated murder..........................................................................................................42

Ninth Ground for Relief: Walter Raglin's Fifth, Sixth, Seventh, Eighth, and Fourteenth Amendment rights were violated when the judge erroneously instructed the jury at the end of the trial phase on the issues of causation, forseeability, intent, and purpose.....................................................................43

Tenth Ground for Relief: Petitioner hereby abandons this ground for relief in its entirety. ....................................................................................................45

**II Mitigation Phase Instructions.**.................................................................45

## TABLE OF CONTENTS

Eleventh Ground for Relief: Petitioner abandons this ground for relief in its entirety. ........................................................................................................................45

Twelfth Ground for Relief: Walter Raglin's Fifth, Sixth, Seventh, Eighth and Fourteenth Amendment rights were violated when the judge failed to properly instruct the jury at the end of the mitigation phase as to the definition of reasonable doubt. ..........................................................................................45

Thirteenth Ground for Relief: Walter Raglin's Fifth, Sixth, Seventh, Eighth and Fourteenth Amendment rights were violated when the judge instructed the jury at the end of the mitigation phase that it should consider all the evidence admitted during the trial phase of the proceedings with respect to its deliberations following the mitigation phase of the trial. ......................................................46

Fourteenth Ground for Relief: Walter Raglin's Fifth, Sixth, Seventh, Eighth and Fourteenth Amendment rights were violated when the judge failed to properly instruct the jury at the end of the mitigation phase as to the definition of the mitigating circumstances that the jury should consider during its deliberations. ..........................................................................................47

Fifteenth Ground for Relief: Walter Raglin's Fifth, Sixth, Seventh, Eighth and Fourteenth Amendment rights were violated when the judge instructed the jury at the end of the mitigation phase that it could consider any other factors that are relevant to the issue of whether it should recommend that Walter Raglin by sentenced to death. ..........................................................................................47

    A.  The trial court's mitigation phase instructions violated Mr. Raglin's rights by permitting the jury to consider any factor it desired in determining the appropriate penalty in his case. ..........................................................47

    B. The trial court's mitigation phase instructions violated Ohio's statutory death penalty scheme. ..........................................................48

Sixteenth Ground for Relief: Walter Raglin's Fifth, Sixth, Seventh, Eighth and Fourteenth Amendment rights were violated when the judge instructed the jury at the end of the mitigation phase that it could consider the killing itself as a factor relevant to the issue of whether it should recommend that Walter Raglin be sentenced to death and by instructing the jury that the killing itself was an aggravating circumstance. ..........................................................49

Seventeenth Ground for Relief:  Walter Raglin's Fifth, Sixth, Seventh, Eighth and Fourteenth Amendment rights were violated when the judge instructed the jury at the end of the mitigation phase in such a manner that the jury

iv

## TABLE OF CONTENTS

could conclude that it had to consider and reject a recommendation as to the imposition of death before it could consider either life sentence option. ...............................50

Eighteenth Ground for Relief: Walter Raglin's Fifth, Sixth, Seventh, Eighth and Fourteenth Amendment rights were violated when the judge instructed the jury at the end of the mitigation phase that it could consider the nature and circumstances of the offense as a mitigating factor in its determination of whether it should recommend that Walter Raglin be sentenced to death. ..............................50

Nineteenth Ground for Relief: Walter Raglin's Fifth, Sixth, Seventh, Eighth and Fourteenth Amendment rights were violated when the judge refused to instruct the jury at the end of the mitigation phase that it could consider Walter Raglin's remorse, residual doubt and cooperation with law enforcement as mitigating factors it could consider in its determination of whether it should recommend that Walter Raglin be sentenced to death. ..............................51

Twentieth Ground for Relief: Petitioner hereby abandons this ground for relief in its entirety. ................................................................................................52

**Issues related to right to trial by an impartial jury** ..........................................52

Twenty-First Ground for Relief: Walter Raglin was denied his rights to an impartial and disinterested jury due to the bias of Juror Tara Veesart in violation of the Fifth, Sixth and Fourteenth Amendments to the United States Constitution. ................................................................................................52

Twenty-Second Ground for Relief: Petitioner hereby abandons this ground for relief in its entirety. ......................................................................................53

**Issues related to prosecutorial misconduct** .........................................................53

fair and impartial trial under the Fifth, Sixth, Seventh, Eighth, Ninth and Fourteenth Amendments as a result of prosecutorial misconduct during both phases of his capital proceedings. .....................................................................53

Twenty-Fifth Ground for Relief: Walter Raglin was denied his rights under the Due Process and Equal Protection Clauses of the Fifth and Fourteenth Amendments and the "Fair Cross Section" requirement of the Sixth Amendment to the United States Constitution because the process of selecting grand jurors, grand jury forepersons, and petit jurors in Hamilton County was tainted in 1996 due to consideration of the factor of race in the drawing, selection and impanelment of grand jurors and petit jurors; and due to consideration of the factors of race and gender in the selection of grand jury forepersons. ....................................................................................57

TABLE OF CONTENTS

Twenty-Sixth Ground for Relief: Petitioner abandons this ground for relief in its entirety. ...................................................................................................................62

**Issues related to trial court errors**...........................................................................62

Twenty-Seventh Ground for Relief: Walter Raglin's constitutional rights as guaranteed by the Fifth, Sixth, Seventh, Eighth, Ninth and Fourteenth Amendments were violated when the trial court, in its decision to impose a sentence of death, improperly considered and weighed invalid or improper aggravating circumstances; failed to specify the reasons why aggravation outweighs mitigation beyond a reasonable doubt; and failed to consider and weigh valid mitigating factors presented by the defense.; and when such error was not properly addressed on appeal. ..............................................................62

A.    The trial court improperly considered an uncharged and unproven statutory aggravating factor in sentencing Mr. Raglin to death...............................62

B.    The trial court's failure to state reasons why aggravation outweighed mitigation......................................................................................................................64

C.    The trial court failed to consider and weigh valid mitigating factors presented by the defense..........................................................................................65

Twenty-Eighth Ground for Relief: Petitioner abandons this ground for relief in its entirety. .................................................................................................................67

Twenty-Ninth Ground for Relief: Walter Raglin was denied his constitutional rights to a fair trial and impartial jury under the Fifth, Sixth, Seventh, Eighth, Ninth and Fourteenth Amendments during the mitigation phase because the trial court permitted the prosecutor to introduce irrelevant and highly prejudicial evidence from the trial phase of the capital proceedings.....................................67

Thirtieth Ground for Relief: Walter Raglin was denied his constitutional rights under the Fifth, Sixth, Seventh, Eighth, Ninth and Fourteenth Amendments during the mitigation phase because the trial court permitted the prosecutor to introduce inadmissible rebuttal evidence that was unfairly prejudicial to Mr. Raglin's rights to a fair trial and impartial jury. ........................................68

Thirty-First Ground for Relief: Petitioner abandons this ground for relief in its entirety. ...................................................................................................................70

Thirty-Second Ground for Relief: Walter Raglin's rights as guaranteed by the Fifth, Sixth, Seventh, Eighth, Ninth and Fourteenth Amendments were

## TABLE OF CONTENTS

violated when the trial court committed multiple errors during the pretrial, trial and mitigation phases of his capital case. ....................................................................70

**Systemic Issues Related to the Unconstitutional Application of the Death Penalty** ...........................................................................................................................71

Thirty-Third Ground for Relief:  Petitioner abandons this ground for relief in its entirety. ...............................................................................................................71

Thirty-Fourth Ground for Relief: Walter Raglin's death sentence is constitutionally infirm because Ohio's capital punishment system operates in an arbitrary, capricious and discriminatory manner in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments.  Additionally, Walter Raglin's death sentence is constitutionally infirm because within Hamilton County, Ohio, the death penalty is selectively imposed, rendering the penalty as applied in Hamilton County, arbitrary and capricious on the one hand and the product of racial discrimination on the other. ......................................................................71

Thirty-Fifth Ground for Relief: Petitioner abandons this ground for relief in its entirety. ...............................................................................................................76

**Cumulative Errors** ..........................................................................................................76

Thirty-Sixth Ground for Relief:   Walter Raglin's conviction and death sentence are invalid under the federal constitutional guarantees of due process, equal protection, the effective assistance of counsel, and a reliable sentence due to the cumulative errors in the admission of evidence and instructions, and gross misconduct of state officials in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. ......................76

**Brady Violation** .............................................................................................................77

Thirty-Seventh Ground for Relief: Brady Claim. ..................................................77

**Giglio Violation** ............................................................................................................79

Thirty-Eighth Ground for Relief:  Giglio Claim. ...................................................79

VI. PRAYER FOR RELIEF ...............................................................................................82

CERTIFICATE OF SERVICE ...........................................................................................83

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION AT DAYTON**

WALTER RAGLIN,                                    :

     Petitioner,                              :    Case No. C-1-00767

vs.                                              :    Judge Walter H. Rice

BETTY MITCHELL, WARDEN,                           :    Magistrate Judge Michael R. Merz

     Respondent.                              :    **PETITIONER IS UNDER A**
                                                **SENTENCE OF DEATH**
                                                 :

**PETITION FOR WRIT OF HABEAS CORPUS**
**PURSUANT TO 28 U.S.C. §2254**

Petitioner Walter Raglin is currently confined on Ohio's death row in the Mansfield

Correctional Institution. Petitioner Raglin, through counsel, respectfully files this petition

pursuant to 28 U.S.C. § 2241 and § 2254 requesting the issuance of a writ of habeas corpus.

### I. STATEMENT OF THE CASE

Walter Raglin was indicted by a Hamilton County Grand Jury and charged with

aggravated murder with a death penalty specification for the death of Michael Bany that occurred

on December 29, 1995. Count Four of the indictment charged Mr. Raglin with purposely

causing the death of Bany during the commission of an aggravated robbery. Count Four of the

indictment also carried an O.R.C. § 2929.04(A)(7) death penalty specification. Count Three of

the indictment charged Mr. Raglin with the aggravated robbery of Bany. Counts One and Two

of the indictment charged Mr. Raglin with certain offenses that were unrelated to the robbery and

killing of Bany. Counts Two, Three, and Four carried a firearm specification. Mr. Raglin

eventually entered a plea of no contest to the charge set forth in Count One of the indictment and

1

the specification in connection with that count. Additionally, the state of Ohio eventually dismissed Count Two.

Mr. Raglin was tried, convicted, and sentenced to death. *State v. Raglin*, No. B9600135, Hamilton C.P. (Convicted October 24, 1996; Sentenced November 6, 1996). Mr. Raglin pursued a direct appeal in the Ohio Supreme Court in which relief was denied. *State v. Raglin*, 83 Ohio St.3d 253 (1998), *cert. denied Raglin v. Ohio*, 525 U.S. 1180 (1999). Mr. Raglin pursued post-conviction relief which was denied. *State v. Raglin* No. B-9600135 (Hamilton C.P. April 17, 1998) *aff'd State v. Raglin*, No. C-980425, 1999 Ohio App. LEXIS 2876 (1st Dist. Ct. App. June 25, 1999) *juris. denied State v. Raglin*, 87 Ohio St. 3d 1430 (1999). Mr. Raglin was scheduled to be executed on May 9, 2000. This Court stayed that execution on April 6, 2000. (Dkt. #6).

## II. STATEMENT OF FACTS

### A.    Pretrial

At approximately 2:20 a.m. on December 29, 1995 in the Over the Rhine district of Cincinnati, Hamilton County, Ohio, Michael Bany was walking to his car, which was parked in a lot on East Liberty Street at Main Street. Mr. Bany was carrying musical instrument cases. A witness, watching from the window of her nearby apartment, saw two men approach Mr. Bany. She then saw the flash of a gunshot, after two men fled. The witness ducked from the window to avoid any errant gunshot, and called police. (Tr. 1169-1177). Mr. Bany was discovered in the parking lot by a fellow musician and was later pronounced dead at the scene by the coroner. (Tr. 1317).

On January 3, 1996, at 7:20 p.m. Cincinnati Police Officer Stacie A. Huellemeier Cincinnati police officer Michael Neville handcuffed Walter Raglin, placed him under arrest, and

2

transported him to the Cincinnati Police Department located at 824 Broadway where he arrived at approximately 8:00 p.m. and was photographed and fingerprinted.

At 8:35 p.m. Cincinnati Police Officers Daniel Argo and Bill Couch began a custodial interrogation of Mr. Raglin in a fifth floor interview room. Mr. Raglin informed the officers that he had been drinking alcohol and smoking marijuana all day long. (Tr. 56). Mr. Raglin also informed the officers that he only had an eighth grade education. (Tr. 56).

The taped statement commenced at approximately 10:57 p.m. with a recitation of *Miranda* warnings. As officer Couch recited *Miranda* warnings, Walter Raglin exercised his Fifth and Sixth Amendment rights by requesting to speak to an attorney. During the tape recorded portion of the custodial interrogation, Walter Raglin requested counsel on seven separate occasions without a cessation of the interrogation.

Officer Couch informed Mr. Raglin that he could "have an attorney at any point in time that you wish one." Mr. Raglin immediately invoked his *Miranda* right to counsel by asking: "Can I, can I just talk to one? I mean just for a minute?"

Instead of terminating custodial interrogation of Mr. Raglin, however, officer Couch persisted by initiating further custodial interrogation. Officer Couch stated to Mr. Raglin in response to the request for counsel: "We came in here to take a statement from you." In response to this further interrogation, Mr. Raglin replied: "Right."

Officer Couch nevertheless again persisted in further custodial interrogation by stating to Mr. Raglin that he was seeking a statement "basically on what you had told us earlier." In response to this further interrogation Mr. Raglin again replied : "Right."

3

Instead of terminating the interrogation, however, officer Couch persisted by stating "If you would rather talk to an attorney now uh." Mr. Raglin then invoked his *Miranda* right to counsel a second time by stating: "But I just want to talk to one, you know."

Officer Couch acknowledged Mr. Raglin's unequivocal request for legal counsel by stating: "We realize that. Uhm that, that is your decision."

Mr. Raglin then reiterated that it was his decision to request legal counsel by stating: "Right." He thereby invoked his *Miranda* right to counsel a third time.

However, instead of terminating the interrogation, officer Couch replied: "If you want an attorney we will end this conversation and we will let you uh make an attempt and or get an attorney." Mr. Raglin interrupted officer Couch by stating: "Right." Mr. Raglin thereby invoked his *Miranda* right to counsel a fourth time.

Officer Couch persisted by stating: "Uh but that is, that is totally your decision." Mr. Raglin then invoked his *Miranda* right to counsel a fifth time by stating: "I just want talk to one , that is all."

Officer Couch stated : "I understand that." Mr. Raglin then invoked his *Miranda* right to counsel a sixth time by stating: "You know, I just want to just talk to one, that is all."

Officer Couch, however, did not terminate the discussion, but rather asked: "So you are telling me that you want an attorney at this time? Mr. Raglin responded by invoking his *Miranda* right to counsel a seventh time. He stated: "I mean, I just want to yeah I want to talk to one."

Officer Couch then turned off the tape recorder. It was 11:02 p.m. when the recorder was turned off. However, instead of terminating the interrogation, officers Couch and Argo persisted by keeping Mr. Raglin in the interrogation room and telling him that they would get him a

4

telephone book and that he could find an attorney. Approximately three minutes later, Mr. Raglin said he changed his mind. The tape recorder was then turned back on and the interrogation continued with Mr. Raglin making a complete statement admitting culpability in the December 29, 1995 robbery and homicide of Michael Bany.

In his statement, Mr. Raglin explained that he and Darnell Lowery[1] stopped Mr. Bany. Lowery acted as lookout while Mr. Raglin demanded Mr. Bany's money. Mr. Bany handed over the case he had. Mr. Raglin said he then asked Mr. Bany whether his car had an automatic or standard transmission, to which Mr. Bany did not reply. Instead, Mr. Bany reached down for one of the cases. Mr. Raglin fired the gun once, resulting in a fatal gunshot wound to Mr. Bany's neck. Mr. Raglin stated the he did not know what was in the instrument case, he denied any purpose to kill, and he stated that at the time, he was as scared as Mr. Bany.

In the same statement, Mr. Raglin admitted that he and Lowery, (nicknamed "Bubba"), had met earlier in the day. They decided that in order to get some money they would rob someone, using Bubba's gun. Bubba and Walter considered, and then rejected the idea of robbing "dope boys," (street drug dealers), because they carried guns. They similarly rejected the idea of robbing a cab driver for the same reason. After the shooting involving Mr. Bany, Mr. Raglin and Bubba fled. Bubba Lowery took the gun back from Mr. Raglin after the offense and gave it to another youth.

## B.    Trial Phase

---

[1] Lowery was tried as an adult and the case was heard by a jury. He was found guilty of aggravated murder and aggravated robbery with specifications. The trial court sentenced him to life imprisonment on the aggravated murder charge and to ten to twenty-five years on the aggravated robbery charge. The sentences were to be served consecutively, with three years on the specification to the aggravated murder charge to be served first. Lowery's conviction and sentence were affirmed. *State v. Lowery*, 1998 Ohio App. LEXIS 954 (1st Dist. Ct. App. March 13, 1998) *juris. denied* 82 Ohio St. 3d 1450 (1998).

The charges and specifications relating to the aggravated robbery and aggravated murder of Mr. Bany (i.e., Counts Three and Four and related specifications) proceeded to trial by jury.

The following persons were seated as jurors in Mr. Raglin's case:

1.  Christopher Stenger

2.  Tara Veesart

3.  Brian Murrie

4.  Deborah Krabbe

5.  Abby Schwartz

6.  Kevin Moe

7.  Donna Roschke

8.  Diana Steel

9.  Edward Marks

10. Mike Maggard

11. Thomas Robinson

12. Cheryl Stutson

**1.     Voir Dire**

> **a.     Trial counsel's statement to jurors that Raglin was guilty of capital murder.**

The voir dire in Mr. Raglin's case consisted primarily of trial counsel conceding Mr. Raglin's guilt to the venire and was accurately summarized by alternate Maureen Bedel. During her voir dire, in response to a question from the prosecutor, she made the following unsolicited comment:

> This gentleman here [referring to Mr. Raglin's trial counsel], I thought I understood him to say that we would probably –if you're on this jury you

6

> would probably go to the second step of the trial which leads me to feel
> like this feels like his client is guilty and that's been in my mind.
>
> . . .
>
> No. I felt that they feel he's guilty and therefore if they feel he's guilty,
> then he must be. I know because they're defending him. I have that
> question in my mind.

(Tr. 1070, 1072). During voir dire questioning by trial counsel, Ms. Bedel went on to state:

> Because that really bothered me. I thought, well, if you know, if you think
> he's guilty, then why are we here.
>
> . . .
>
> Can I just ask one more question here? Now if he has said that he had
> done this, then why does he want a jury trial? I mean why doesn't he just--
> if he's accepted the fact that he's done it and he's pleading guilty, why
> does he want a jury trial?

(Tr. 1080, 1077). Ms. Bedel's comments illustrate the prejudicial impact of trial counsel's

repeated concessions of Mr. Raglin's guilt during the jury selection process.

Each of the prospective jurors was advised, during the group voir dire, that Mr. Raglin's

counsel believed that the case would proceed to the penalty or mitigation phase. (Tr. 391-392).

Counsel conceded Mr. Raglin's guilt to the venire from which the jury would be drawn.

Trial counsel also conceded Mr. Raglin's guilt to a number of the juror's eventually

selected to serve on the jury during individual voir dire. During the voir dire of Juror Stenger,

trial counsel informed Stenger that the "critical issue here is capital punishment." (Tr. 433).

During the voir dire of Juror Murrie trial counsel again projected Mr. Raglin "as in fact guilty as

charged." (Tr. 493). During the voir dire of Juror Schwartz (the foreperson of the jury during

both the trial and mitigation phases) "if I were to assure you or indicate to you you're going to be

involved in a second phase or mitigation phase, if you will?" (Tr. 545).

7

During the voir dire of Juror Kevin Moe, Raglin's counsel informed Moe that "We will probably get to a second phase in this trial." (Tr. 564).

During the voir dire of Juror Edward Marks, trial counsel informed him "you understand now that there will be two separate trials?" (Tr. 634).

During the voir dire of Juror Tara Veesart trial counsel stated "you obviously know at this point that there are two separate trials potentially that we're talking about." (Tr. 777).

During the voir dire of Juror Thomas Robinson he was informed by trial counsel that "[w]e have to have the first phase to get to the second phase." (Tr. 801). "I guess what I'm trying to get at and make sure you follow is when we get to the second phase you've already found him guilty, okay." (Tr. 802).

In the voir dire of Juror Donna Roschke, she was told by trial counsel, "you've been told now that they're (sic) going to be or there very well may be two separate trials." (Tr. 822).

During the voir dire of Juror Donna Steel, trial counsel opined, "[y]ou understand, and we've talked about these two separate trials. The first trial being on the merits, whether or not it was an aggravated robbery and a murder? . . . And then you'll be in that second phase which in this case. . ." (Tr. 866-67).

In the voir dire of Juror Cheryl Stutson, trial counsel stated, "Neither Mr. Keller or I are here to lie to you. We feel we will probably get to a second phase in this case." (Tr. 953).

During the voir dire of Deborah Krabbe counsel stated, "And you understand we've been talking about the fact that there are going to be two separate trials here?" (Tr. 969).

### b.    Other voir dire errors by trial counsel

Trial counsel failed to pursue a comprehensive voir dire of Juror Tara Veesart. Ms. Veesart was personally acquainted with a waitress who worked at Tommy's Bar, where Mr.

8

Bany was performing the night of his murder. (Tr. 765). Moreover, Ms. Veesart frequented the

bar and had left only ten minutes prior to Mr. Bany's murder. (Tr. 766). Ms. Veesart's

boyfriend worked at Tommy's Bar. (Tr. 766). Ms. Veesart's boyfriend's brother telephoned her

the night of Mr. Bany's murder to inquire about her safety. (Tr. 766). Ms. Veesart admitted that

she had been following news accounts of Mr. Raglin's case and that she and her friends had

"lots" of discussions about the fact that Mr. Bany's murder occurred outside a bar which they

frequented. (Tr. 767, 777). In spite of Ms. Veesart's obvious exposure to and feelings about the

case, trial counsel failed to explore in any depth Ms. Veesart's reasons or motive for wanting to

sit as a juror in Mr. Raglin's capita trial. Further, trial counsel failed to explore in any depth

whether Ms. Veesart had been affected by these factors or was prejudiced against Mr. Raglin.

### 2.    Opening Statements, Presentation of the Evidence, and Closing Arguments[2]

At the trial phase, during the prosecutor's opening statement, the prosecutor presented

argument pertaining to the character of Michael Bany. (Tr. 1153). However, trial counsel failed

to object. Trial counsel's explanation for failing to object indicates that he had not reviewed the

applicable law. (Tr. 1192).

During trial counsel's opening, counsel again informed the jury that there would be two

trials, thus continuing counsel's concession of Mr. Raglin's guilt. In an abrupt reversal,

however, defense counsel informed the jury that on the night of Mr. Bany's murder Mr. Raglin

was drinking and doing drugs. (Tr. 1165). Counsel also told the jury that the shooting of Mr.

Bany was a result of Mr. Raglin becoming panic stricken when Mr. Bany bent over to pick up his

bag. (Tr. 1166). Defense counsel then challenged the jury by arguing "[i]t will be incumbent

---

[2] The facts pertaining to prosecutorial misconduct are so extensive that they merit
individual detail and are set forth in paragraph D, below.

9

upon you to make the state prove its case, this purposeful killing and the aggravated robbery

beyond a reasonable doubt." (Tr. 1167). Apparently, trial counsel now wanted to present a case

that Mr. Bany's shooting was in the nature of an accident resulting from Mr. Raglin's ingestion

of drugs and alcohol and his becoming panic stricken.

Trial counsel's sudden departure from his repeated concessions of Mr. Raglin's guilt to

the crimes charged against him could only have confused the jury and the jury's initial reaction

would have been to believe that counsel was insincere. It was therefore urgent that counsel

support these assertions with evidence. This, trial counsel failed to do.

Trial counsel also failed to obtain expert assistance to rebut or refute the testimony of

Robert Lehnhoff, a firearms examiner with the Hamilton County Coroner's office. Mr. Lehnhoff

described his expertise in the following manner:

> [T]he primary function of a firearm's examiner is to determine if a specific
> fired bullet or discharged cartridge case came from a specific firearm. We
> also do range of fire determination and serial number restoration, gun
> predictions from fired bullets and so forth.

(Tr. 1278). Mr. Lehnhoff's stated area of expertise, notwithstanding, the prosecutor proceeded to

elicit testimony that established that the trigger pull on the Jennings .380 semi-automatic pistol

was such that it could not have been accidentally fired, i.e. the weapon did not have a "hair

trigger." (Tr. 1290). On cross-examination, trial counsel failed to even question Mr. Lehnhoff

on this issue. The prosecutor, in closing argument, however, repeatedly referred to Lehnhoff's

testimony regarding the trigger pull of the weapon in order to emphasize that the shooting was

purposeful and not accidental. (Tr. 1427-1429).

During the closing argument, trial counsel argued to the jury that the shooting of Mr.

Bany was not purposeful, that Mr. Raglin did not intend to kill Mr. Bany, and that the shooting

was a product of Mr. Raglin's panic and fear. (Tr. 1433, 1435).

10

Not surprisingly, the jury found Mr. Raglin guilty of these charges and specifications. With regard to the Oh. Rev. Code §2929.04(A)(7) death penalty specification, the jury found that Mr. Raglin was the principal offender in the commission of the aggravated murder.

## C.    Mitigation Phase

### 1.    Defense Presentation of Evidence

At the mitigation phase, the defense presented five witnesses, including Mr. Raglin's two sisters, Tabatha (Tr. 1554-1574) and LaSonya Raglin (Tr. 1579-1596), his father, who was incarcerated, by videotape deposition, (Tr. 1574-1579) a youth counselor, John Hale from Lexington, Ky., (Tr. 1596-1616) and psychologist Kathleen Burch, (Tr. 1646-1732) who examined and tested Walter Raglin.  Mr. Raglin also made an unsworn statement to the jury. (Tr. 1643-1644).

Through these witnesses, trial counsel attempted to present evidence regarding the horrendous family and cultural environment in which Walter Raglin developed as a child.  Mr. Raglin was born into an initially stable family situation.  He had two older sisters, Tabitha and LaSonya and later had two younger brothers.  His father worked at the Federal Correctional Facility in Lexington, Kentucky while his mother worked at the Veteran's Hospital in Lexington. They all enjoyed a normal family life until Mr. Raglin was about two years old when the parents divorced and the children stayed with their mother.  Both parents deteriorated.  The father became involved in drug sales and his mother in carousing, drinking and doing drugs.  Mr. Raglin's father was incarcerated and testified at the mitigation phase from his Kentucky prison. From the time he was two until he was about 12 or 13, Mr. Raglin lived with his mother and sisters in numerous places.

11

The homes were characterized by extreme filth and inadequate facilities. Mr. Raglin's sisters described vermin infested "homes," some without plumbing, privacy or electricity. When Mr. Raglin's mother started taking up with race track workers, she, Mr. Raglin, and the current boyfriend would live in "tack rooms," without any utilities, bathrooms, kitchens, and sometimes without doors. (Tr. 1588). The "homes" were invested with various vermin, rats, mice, and roaches. (Tr. 1585). Mr. Raglin's mother was seen by his sister LaSonya "shooting up" cocaine, leaving blood all over the room (including the ceilings), which LaSonya had to clean up so the younger children, including Mr. Raglin, would not see it. (Tr. 1585). Parental discipline and leadership did not exist.

Violence existed in the Raglin home, as well. On one occasion, in the presence of the children, Mr. Raglin's father was shot by his mother. (Tr. 1656). On another occasion, after Mr. Raglin, at his mother's direction, stole $800 from LaSonya's drug dealer boyfriend, someone fired a shotgun into the home where the mother and children were living. (Tr. 1586). Mr. Raglin was in his mother's auto when it was rammed repeatedly by his father in his own car. (Tr. 1656). Firearms were in the home. (Tr. 1656).

All of these conditions affected Mr. Raglin. At the age of nine, he was drinking, smoking and stealing upon his mother's command. His mother used the proceeds, (along with her income from ADC and prostitution), to buy drugs. (Tr. 1568). When he was older, Mr. Raglin accompanied his mother during her drug purchasing forays, to provide security. (Tr. 1568). Later, when Tabitha had become an adult and had custody of Mr. Raglin, their mother would appear and encourage him to engage in improper behavior, over the objections of his sister. (Tr. 1567).

12

Mr. Raglin also engaged in self-destructive behavior. He hurt himself on several occasions, jumping from third-story windows, put firecrackers in his shoes, cut himself, put his hand through a glass window while drunk at age 11 and, on one occasion, shot himself. (Tr. 1566, 1589).

Throughout his childhood, Mr. Raglin developed into a problem child, and was placed in several youth detention facilities in Kentucky, including Mayfield, Greenbrier, the House of the Innocents and Norton's Children's Hospital (for psychiatric evaluation at age 11). (Tr. 1566-1567, 1591). On one occasion, Mr. Raglin's mother smuggled him out of Fayette County Kentucky in the trunk of a car and brought him to Cincinnati. The authorities listed him as a runaway. (Tr. 1568). He was gone from his sisters and brothers for one year. While in Cincinnati, he was living with his mother and her pimp and also in cars in the junkyard that was owned by the pimp. (Tr. 1568-1569). Mr. Raglin was about 13 at the time. When Mr. Raglin was 15, he was forced to scavenge for food, frequently eating out of garbage cans. (Tr. 1658). By this time, Mr. Raglin and his mother drank together and "did" drugs together. (Tr. 1659).

John A. Hale, a law enforcement officer with the Fayette County, Kentucky public schools testified that he met the Raglin family in connection with his position as a social worker when Mr. Raglin was 12 or 13. Mr. Hale recalled that while he had met Mr. Raglin's father he had never met his mother, as Mr. Raglin was then in Tabitha's custody. On his first home visit, he saw 7-8 people smoking marijuana at a table; he stated that, with Mr. Raglin in Tabitha's custody it was a situation of a child raising a child. (Tr. 1600).

Mr. Hale described Mr. Raglin as "street smart," and that he bonded easily with Mr. Raglin, stating that "I'm here for the kids. Even in law enforcement." (Tr. 1604). He testified that Mr. Raglin was big for his age but "is still a kid." (Tr. 1606). Mr. Hale testified that Mr.

13

Raglin had never been challenged, had no self-worth, was mentally and emotionally immature, and has had no love in his life. Nevertheless, Mr. Hale testified that Mr. Raglin has probably "more potential and value than anybody I have ever seen." (Tr. 1606).

Essentially, Walter was presented as a nomadic child of the streets who was forced to live in junked cars and eat out of garbage cans. (Tr. 1559, 1569, 1658). It was clear that the abuse and horrors visited upon him at home left him little choice.

The prosecutor, in closing argument during the mitigation phase referred to Mr. Raglin's life on the street and transformed it into a negative factor to be held against him. (Tr. 1899).

Kathleen Burch conducted extensive interviews with Mr. Raglin and family members, engaged in a full battery of psychological and neuro-psychological testing as well as record review pertaining to Mr. Raglin's background. (Tr. 1652-1653, 1694, 1700, 1701).

During cross-examination of Dr. Burch, the prosecutor introduced the hearsay statement of Andre Buffington in an attempt to impeach her testimony that Mr. Raglin was remorseful over the shooting and death of Mr. Bany. (Tr. 1714-1715). Buffington's statement depicts Mr. Raglin as boastful and joking regarding the shooting of Mr. Bany. (Tr. 1714-1715). The prosecutor had given Mr. Buffington's name to counsel in discovery but counsel simply failed to investigate what he had to say and whether he was accurate. (Tr. 1714-1715).

Trial counsel failed to investigate and interview crucial witnesses who would have testified as to Raglin's remorseful behavior directly following the homicide. Natasha Lowery stated that Raglin was distraught, crying and vomiting in her apartment after the homicide. Ronnell Mumphrey who was also present with Ms. Lowery and Andre Buffington, stated that Raglin asked if God would forgive him, and was crying. Although Natasha Lowery and Ronnell Mumphrey were listed as potential State's witnesses in discovery, trial counsel failed to speak

14

with them.  As a result, trial counsel was unable to offer independent eyewitness testimony of

Mr. Raglin's remorse and unable to discredit Andre Buffington's recollection of Mr. Raglin's

behavior immediately following the crime.

Trial counsel failed to object when the prosecution characterized psychologist Dr.

Kathleen Burch as a hired gun during closing argument at the mitigation phase.  (Tr. 1844).  The

effect of the failure was multiplied when the trial court instructed the jury that it was to consider

the arguments of counsel in the jury's mitigation phase deliberations.  (Tr. 1916).

Finally, the jury heard Mr. Raglin' unsworn statement that did not want the death penalty.

(Tr. 1643-1646).  Mr. Raglin did express remorse for killing Mr. Bany.  (Tr. 1644).  Other

defense witness also testified that Mr. Raglin was remorseful for the killing.  (Tr. 1571, 1593,

Deposition of Walter Raglin, Sr., p. 23).

### 2.    State's Presentation of Evidence

In the State's case during the mitigation phase, the prosecutors produced two corrections

officers from the Hamilton County Justice Center who testified, over objection, as to Mr.

Raglin's statements and actions in jail while he awaited trial.  (Tr. 1785-1820).  The trial court

overruled trial counsel's objections to the testimony of the corrections officers.  (Tr. 1770, 1794).

Following the testimony, trial counsel moved to strike the testimony and for a mistrial.  Both

motions were denied.  (Tr. 1921-1822).

The prosecutors sought to justify the admission of the following testimony on the basis of

decisions of the Ohio Supreme Court.  As will be seen, this highly prejudicial, irrelevant

evidence served merely to inject evidence of a non-statutory aggravating circumstance, future

dangerousness, which is not a permissible aggravating circumstance under Ohio law, and for

which he was neither indicted nor convicted.

15

Corrections Officer Higgs testified that, while Mr. Raglin was incarcerated and awaiting trial in this case, when asked to move to another area while on the phone with a family member, became belligerent with the officer, stating, "Fuck that. I ain't got to listen to you," and later threatened to kill the officer as he was being subdued. (Tr. 1788). Officer Brown testified that he was working in the maximum security area on the fifth floor of the Justice Center where Mr. Raglin was housed and that on August 15, 2996, at approximately noon, a window as being replaced by workmen. When the window was removed, Mr. Raglin ran to the window and dove head first through the opening, from the fifth floor. (Tr. 1805). Mr. Raglin held onto the scaffold for a moment and then dropped, landing feet first on a lower roof on the third floor, injuring himself. Officer Brown, with the help of the fire department, went to the roof where Mr. Raglin submitted to arrest. Mr. Raglin was then transported to the hospital for treatment of the injuries he received in the fall. (Tr. 1812).

### 3. Mitigation Phase Jury Instructions

The trial court used, over objection by the defense, the statutory definition of "reasonable doubt" as defined in O.R.C. §2901.05(D). (Tr. 1910). The court charged the jury that "[r]easonable doubt is present when the jurors, after they have carefully considered and compared all the evidence, cannot say they are <u>firmly convinced of the truth of the charge</u>." (Tr. 1910) (emphasis added). This instruction shifted the burden of proof on the issue of punishment and prevented the jury from making its constitutionally required finding of the appropriateness of the death penalty. Moreover, this instruction established a conclusive presumption of the propriety of the death penalty following Mr. Raglin's conviction of aggravated murder with death penalty specifications. Since the death sentence is logically and conclusively required by

16

the instruction, the jury was prevented from determining whether or not death was the appropriate punishment.

In addition to these errors, the trial court erred in several other respects when instructing the jury in the mitigation phase. The trial court instructed the jury that they should consider all evidence admitted at the guilt-innocence phase of the proceedings, including the photos of the body of the deceased, to which trial counsel objected. (Tr. 1909, 1911, 1916).

The trial court defined beyond a reasonable doubt as that state of mind where the jury is firmly convinced of the charge, rather than reasonable doubt is where the jury is not firmly convinced that the aggravating circumstance outweighed the mitigating factors. Trial counsel requested such an instruction without success. (Tr. 1766).

The trial court failed to define mitigating circumstances, merely advising the jury which mitigating factors were to be considered. Not advising the jury of the definition of a mitigating factor renders it impossible to comply with the constitutional requirement that jurors be advised to consider all relevant mitigating evidence.

The trial court's mitigation phase instructions also included in its definition of aggravating circumstances, the killing itself. Again, trial counsel requested a proper instruction that the killing itself was not an aggravating factor. (Tr. 1520, 1764, 1921).

The trial court instructed the jury that any life verdict it returned would be binding upon the trial court, also instructing the jury, in effect, that the trial court could overrule a death verdict.

The trial court instructed the jurors to consider as a mitigating factor the nature and circumstances of the offense although that factor was not advanced by Mr. Raglin in mitigation.

17

The trial court refused trial counsel's requests for instructions as to the mitigating factors of remorse, residual doubt and cooperation with police. (Tr. 1765).

Following the mitigation hearing, the jury deliberated and recommended that Mr. Raglin be sentenced to death for the aggravated murder of Mr. Bany. The trial court accepted the jury's recommendation and imposed the sentence of death. For the aggravated robbery of Bany (Count Three), for the matter to which Mr. Raglin had pled no contest (Count One), and for the firearm specification in connection with Count Three, the trial court sentenced Mr. Raglin in accordance with law.

## D.    Prosecutorial Misconduct

Walter Raglin's trial was replete with prosecutorial misconduct. (Tr. 1418-1432, 1443,-1460, 1826-1850, 1893-1906). For example, the prosecutors made expressions as to what the opinions of Mr. Raglin's counsel might be and denigrated defense counsel as being disingenuous with regard to their arguments. (Tr. 1447). The prosecutors frequently stated their opinion as to Mr. Raglin's state of mind during the shooting, without any evidentiary foundation. (Tr. 1450, 1457). The prosecutors also sarcastically mis-characterized Mr. Raglin's statement that the gun went off accidentally. (Tr. 1451).

Prosecutors also stated that trial counsel was asking them to not follow the law. (Tr. 1896). The prosecutors made impermissible statements of personal opinion to the jury. (Tr. 1900, 1901, 1904). The prosecutors consistently substituted emotion for reasoned advocacy in their closing arguments. (Tr. 1419-1420, 1427, 1428, 1457-1460). The prosecutors also repeatedly referred to Mr. Raglin's silence as well as to facts that were not in evidence. (Tr. 1420, 1450-1454, 1838, 1839, 1896, 1901).

The prosecutors blamed the need for a trial on Mr. Raglin's unwillingness to plead guilty. (Tr. 1424, 1431). The prosecutors attempted to reduce the state's burden of proof by arguing that jurors should not "make this case more difficult than it is." (Tr. 1444). The prosecutors assured the jury that the case really was that simple and that they could "sit on a hundred more cases" and they would never find one as easy to decide as this one. (Tr. 1444-1445).

In the prosecutor's closing argument during the trial phase, trial counsel failed to object to the portion where the prosecutor picked up the alleged murder weapon, a semi-automatic piston, began waving it around, removed the clip, took the safety off, pulled the slide back and proceeded to reenact the shooting. The prosecutor stated:

> Now that's all been done when we approach Michael Bany.
>
> . . .
>
> And what do we know when he fired it? Basically like this. Basically a level shot.

(Tr. 1428-1429). The prosecutor's theatrics prompted the trial judge, no doubt out of concern for the safety of the jurors from this wild display, to inquire if the gun was loaded. (Tr. 1428).

In the prosecutor's closing argument, during the mitigation phase, trial counsel failed to object when the prosecutor asked the jury to speculate on facts not in evidence and proceeded to introduce evidence into his argument that had not been presented during the proceedings. The prosecutors attacked Walter Raglin's unsworn statement in which he expressed remorse. (Tr. 1847-48, 1898, 1904-05). Specifically, the prosecutor invited the jury to look at Walter Raglin and, with respect to the hours following Mr. Bany's murder "see him bragging and laughing and about it and bragging about it." (Tr. 1900). However, the prosecutor's assertions about lack of remorse were false, and they knew it; Walter Raglin was extremely distraught concerning the victim's death. On January 4, 1996, Natasha Lowery told Police Officer Bill Couch of the

19

Cincinnati Police Department's Homicide Unit that Walter Raglin came to here apartment immediately after the homicide, told her what happened became sick, and was crying about it. That same day, Ronnell Mumphrey reported to Police Officer Bill Couch and Police Specialist Dan Argo that he was also present in Natasha's apartment on the morning of the robbery and shooting of Mr. Bany. Mumphrey confirmed that Walter Raglin was crying and throwing up. Ronnell added, "He [Raglin] came to me and asked me like Ronnell do you think the Lord will forgive me."

These statements were provided by the police to the Hamilton County Prosecutor's Office, but were never turned over to the defense during discovery. They were not discovered by Raglin's attorneys until after Raglin petitioned this Court for federal habeas relief.

The prosecutor also invited the jury to speculate on where Mr. Raglin would have gone or what he would have done if he had escaped from the Hamilton County Justice Center. (Tr. 1904). The prosecutor then told the jury that Walter Raglin would have committed more murders if his escape from the Hamilton County Justice Center had been successful.

> [I]s he going to the Baneys to apologize? Is that why he jumped out that window? He's back on the streets. Back hustling again. He's going to get some more and he's going to do what he has to do to take it.

(Tr. 1904). Until the same prosecutor told the jury that he was personally asking for the death penalty, trial counsel remained silent in the face of this prosecutorial misconduct. (Tr. 1905-1906).

20

## IV. GROUNDS FOR RELIEF

### Issues Related to Ineffective Assistance of Trial Counsel

**First Ground for Relief: Walter Raglin was denied his right to the effective assistance of counsel at the pretrial and trial phases of his capital trial in violation of the Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments.**

#### ABANDONED ARGUMENTS

Petitioner hereby abandons the portion of his First Ground for Relief designated as subsection A, and its subparts, A1, A2, A3 and A4. Petitioner abandons subpart B1, B2 and B3 in subsection B. Petitioner also abandons D2b, in subsection D.

#### INTRODUCTION

Trial counsel have certain basic duties in every capital case. Some of these duties are unique to capital cases, while others are not. The Sixth Amendment to the United States Constitution guarantees to the criminal defendant the right to the effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668 (1984). This right is violated when counsel's performance falls below an objective standard of reasonableness and the client is prejudiced by counsel's breach of the duty. *Strickland*, 466 U.S. at 690, 696.

Walter Raglin's trial attorneys failed to adhere to even basic, minimally reasonable expectations in a multitude of respects during the pretrial and trial phases of the case: Counsel failed to conduct voir dire in a manner to choose a fair and impartial jury, failed to obtain Mr. Raglin's consent to concede his guilt, after conceding his guilt, presented conflicting arguments to the jury, failed to adequately present a defense, including failing to support counsel's request for a manslaughter instruction with evidence sufficient to warrant the instruction, failed to secure the assistance of an expert, and failed to object to prosecutorial misconduct.

21

As a result of these failures, Mr. Raglin's right to the effective assistance of counsel was violated when counsel's performance fell below an objective standard of reasonableness and he was prejudiced by counsel's breach of the duty. *Strickland*, 466 U.S. at 690, 696.

Respondent alleged that this claim for relief is procedurally defaulted because it was not raised on direct appeal and was barred by the doctrine of <u>res judicata</u> in post-conviction proceedings. Return, p. 45. For the reasons set forth in Petitioner's traverse, pages 47-51, this claim is not procedurally defaulted.

> **A.** **Petitioner abandons this portion of the First Ground for Relief designated as A1, A2, A3 and A4.**
>
> **B.** **Trial counsel was ineffective for failing to conduct voir dire in a manner sufficient to choose a fair and impartial jury**

There are many aspects of voir dire that are purely stylistic and/or are dictated by the circumstances of the moment. Taking this into account, there remain standards of conduct required in order to adequately protect the accused's right to a fair trial. Minimally, the voir dire must not be perfunctory, but must be designed to create the opportunity for jurors to reveal their biases and to provide sufficient information for the intelligent exercise of peremptory challenges. Indeed, counsel must ask questions directed to specific areas of bias likely to arise in the case, give the prospective jurors an opportunity to respond to his inquiries and listen to those responses, and be informed of the law in order to safeguard his client's interest by objecting to improper voir dire procedures of the court or opposing counsel and in order to exercise challenges for cause. Following these minimal standards will result in professionally reasonable decisions regarding the exercise of peremptory challenges.

> **1.** **Petitioner abandons this portion of the First Ground for Relief designated as B1.**
>
> **2.** **Petitioner abandons this portion of the First Ground for Relief**

22

designated as B2.

3.    **Petitioner abandons this portion of the First Ground for Relief
designated as B2.**

4.    **Failure to adequately voir dire and remove Juror Veesart**

Trial counsel failed to fully expose Juror Tara Veesart's bias and request her removal for cause or, if not removed for cause, then subjected to a peremptory challenge. Ms. Veesart was personally acquainted with a waitress who worked at Tommy's Bar, where Mr. Bany was performing the night of his murder. (Tr. 765).

Moreover, Ms. Veesart frequented the bar and had left only ten minutes prior to Mr. Bany's murder. (Tr. 766). Ms. Veesart's boyfriend worked at Tommy's Bar. (Tr. 766). Ms. Veesart's boyfriend's brother telephoned her the night of Mr. Bany's murder to inquire about her safety. (Tr. 766). Ms. Veesart admitted that she had been following news accounts of Mr. Raglin's case and that she and her friends had "lots" of discussions about the fact that Mr. Bany's murder occurred outside a bar which they frequented. (Tr. 767, 777).

In spite of Ms. Veesart's obvious exposure to and feelings about the case, trial counsel failed to explore in any depth Ms. Veesart's reasons or motive for wanting to sit as a juror in Mr. Raglin's capita trial. Further, trial counsel failed to explore in any depth whether Ms. Veesart had been affected by these factors or was prejudiced against Mr. Raglin.

Trial counsel failed to adequately protect Mr. Raglin's right to an impartial jury because of this omission.

**C.    Trial counsel was ineffective for repeatedly conceding Mr. Raglin's guilt and then after such concession presenting conflicting arguments to the jury**

### 1.    Trial counsel's concession of Mr. Raglin's guilt[3]

Trial counsel's concession of Mr. Raglin's guilt and the impact it had on the jury is illustrated by alternate Maureen Bedel's comments. During her voir dire, in response to a question from the prosecutor, she made the following unsolicited comment:

> This gentleman here [referring to Mr. Raglin's trial counsel], I thought I understood him to say that we would probably –if you're on this jury you would probably go to the second step of the trial which leads me to feel like this feels like his client is guilty and that's been in my mind.
>
> . . .
>
> No. I felt that they feel he's guilty and therefore if they feel he's guilty, then he must be. I know because they're defending him. I have that question in my mind.

(Tr. 1070, 1072). During voir dire questioning by trial counsel, Ms. Bedel went on to state:

> Because that really bothered me. I thought, well, if you know, if you think he's guilty, then why are we here.
>
> . . .
>
> Can I just ask one more question here? Now if he has said that he had done this, then why does he want a jury trial? I mean why doesn't he just– if he's accepted the fact that he's done it and he's pleading guilty, why does he want a jury trial?

(Tr. 1080, 1077).

Each of the prospective jurors was advised, during the group voir dire, that Mr. Raglin's counsel believed that the case would proceed to the penalty or mitigation phase. (Tr. 391-392). Counsel conceded Mr. Raglin's guilt to the venire from which the jury would be drawn.

---

[3] Trial counsel did not obtain Mr. Raglin's consent to concede is guilt.

Trial counsel also conceded Mr. Raglin's guilt to a number of the juror's eventually selected to serve on the jury during individual voir dire. During the voir dire of Juror Stenger, trial counsel informed Stenger that the "critical issue here is capital punishment." (Tr. 433). During the voir dire of Juror Murrie trial counsel again projected Mr. Raglin "as in fact guilty as charged." (Tr. 493). During the voir dire of Juror Schwartz (the foreperson of the jury during both the trial and mitigation phases) "if I were to assure you or indicate to you you're going to be involved in a second phase or mitigation phase, if you will?" (Tr. 545).

During the voir dire of Juror Kevin Moe, Raglin's counsel informed Moe that "We will probably get to a second phase in this trial." (Tr. 564).

During the voir dire of Juror Edward Marks, trial counsel informed him "you understand now that there will be two separate trials?" (Tr. 634).

During the voir dire of Juror Tara Veesart trial counsel stated "you obviously know at this point that there are two separate trials potentially that we're talking about." (Tr. 777).

During the voir dire of Juror Thomas Robinson he was informed by trial counsel that "[w]e have to have the first phase to get to the second phase." (Tr. 801). "I guess what I'm trying to get at and make sure you follow is when we get to the second phase you've already found him guilty, okay." (Tr. 802).

In the voir dire of Juror Donna Roschke, she was told by trial counsel, "you've been told now that they're (sic) going to be or there very well may be two separate trials." (Tr. 822).

During the voir dire of Juror Donna Steel, trial counsel opined, "[y]ou understand, and we've talked about these two separate trials. The first trial being on the merits, whether or not it was an aggravated robbery and a murder? . . . And then you'll be in that second phase which in this case. . ." (Tr. 866-67).

25

In the voir dire of Juror Cheryl Stutson, trial counsel stated, "Neither Mr. Keller or I are here to lie to you. We feel we will probably get to a second phase in this case." (Tr. 953).

During the voir dire of Deborah Krabbe counsel stated, "And you understand we've been talking about the fact that there are going to be two separate trials here?" (Tr. 969).

A defendant is "deprived the effective assistance of counsel when his own lawyer admitted his client's guilt, without first obtaining his client's consent to this strategy." *Wiley v. Sowders*, 647 F.2d 642, 650 (6th Cir. 1081), *cert. denied*, 454 U.S. 1091 (1981); *See also Francis v. Spraggins*, 720 F.2d 1190 (11th Cir. 1983), *cert. denied*, 470 U.S. 1059 (1985). Mr. Raglin, "in pleading not guilty, was entitled to have the issue of his guilt or innocence presented to the jury as an adversarial issue. Counsel's complete concession of petitioner's guilt nullified the adversarial qualify of this fundamental issue." *Wiley*, 647 F.2d at 650.

Mr. Raglin's "guilt or innocence was the only issue to be decided at the earlier phase of the trial and was obviously critical." *Spraggins*, 720 F.2d at 1195. Mr. Raglin's "'counsel's ineffectiveness caused actual and substantial disadvantage to the conduct of [his] defense.'" *Id.* quoting *Washington v. Strickland*, 693 F.2d 1243, 1250 (5th Cir. Unit B 1982) (en banc).

### 2.    Conflicting arguments presented to the jury

Trial counsel fell below a minimum standard of reasonable legal representation by presenting conflicting arguments to the jury. First, trial counsel conceded Mr. Raglin's guilt to the aggravated murder charge, as set forth in part C.1., above. Then, during closing argument, trial counsel argued that the State had failed to prove purpose beyond a reasonable doubt.

In addition to the comments made in voir dire, set forth above, trial counsel made the following concessions in his opening statement:

> There's no dispute there was an aggravated robbery. There is no dispute there was a murder.

26

. . .

> This is the first of presumably two trials.

(Tr. 1164).  More telling is the fact that in his opening statement, trial counsel never asks the jury

to find Mr. Raglin not guilty of aggravated murder.  (Tr. 1163-1168).

Subsequently, in closing argument, trial counsel argued that Mr. Raglin had not acted

with purpose in killing Michael Bany and was thus not guilty of aggravated murder.  He stated:

"What I would suggest to you is that when you do that and the Judge gives you the instructions

you are going to be hard pressed to find that there was purpose to take the life."  (Tr. 1439-1440).

By abandoning trial counsel's earlier concessions of guilt and arguing suddenly for

acquittal in closing argument, trial counsel lost all credibility with the jury and failed to provide

Mr. Raglin with his constitutionally guaranteed right to the effective assistance of counsel.  *See*

*Magill v. Dugger*, 824 F.2d 879, 888 (11th Cir. 1987)(counsel ineffective for "failure to explain

that, although Magill killed the victim, his alleged lack of premeditation would preclude a

conviction for first degree murder.").

**D.    Trial counsel was ineffective for failing to adequately present a defense, including failing to support counsel's request for a manslaughter instruction with evidence sufficient to warrant the instruction, failing to secure the assistance of experts, and failing to object to prosecutorial misconduct.**

**1.    Failure to put on evidence in support of manslaughter instruction**

Trial counsel fell below a minimum standard of reasonable legal representation by failing

to put on evidence in support of trial counsel's request for a manslaughter instruction.  After the

State rested in the trial phase, Mr. Raglin's counsel rested his case without presenting any

evidence.  (Tr. 1389).  The next day, prior to closing arguments, defense counsel moved the

court to include an instruction on the lesser included charge of involuntary manslaughter, arguing

27

that the only difference between aggravated murder and involuntary manslaughter is the issue of

purpose. (Tr. 1401-1404). In support of the request, trial counsel cited *Beck v. Alabama*, 447

U.S. 625, 627 (1980) where the United States Supreme Court held that a sentence of death may

not be imposed after a jury verdict of guilt of a capital offense when the jury was not permitted

to consider a verdict of guilt of a lesser included non-capital offense and where the evidence

would have supported such a verdict. The trial court summarily overruled the request. (Tr.

1410).

Although Mr. Raglin submits that the trial court erred in denying his request for the

instruction on the lesser included offense of involuntary manslaughter,[4] he nevertheless submits

that his trial counsel was ineffective for failing to put on evidence to support the request for the

manslaughter instruction.

### 2.    Failure to secure the assistance of an expert

Trial counsel fell below the minimum standard of reasonable legal representation by

failing to secure the assistance of a firearms expert during the trial phase of the capital

proceedings.

### a.    Firearms expert

Trial counsel failed to obtain expert assistance to rebut or refute the testimony of Robert

Lehnhoff, a firearms examiner with the Hamilton County Coroner's office. Mr. Lehnhoff

described his expertise in the following manner:

> [T]he primary function of a firearm's examiner is to determine if a specific
> fired bullet or discharged cartridge case came from a specific firearm. We
> also do range of fire determination and serial number restoration, gun
> predictions from fired bullets and so forth.

---

[4]  See Mr. Raglin's Eighth Ground for Relief.

(Tr. 1278). Mr. Lehnhoff's stated area of expertise, notwithstanding, the prosecutor proceeded to elicit testimony that established that the trigger pull on the Jennings .380 semi-automatic pistol was such that it could not have been accidentally fired, i.e. the weapon did not have a "hair trigger." (Tr. 1290). On cross-examination, trial counsel failed to even question Mr. Lehnhoff on this issue. The prosecutor, in closing argument, however, repeatedly referred to Lehnhoff's testimony regarding the trigger pull of the weapon in order to emphasize that the shooting was purposeful and not accidental. (Tr. 1427-1429).

Trial counsel should have presented a firearms expert to rebut Mr. Lehnhoff's testimony. A firearms expert could have given detailed testimony regarding the ease and frequency with which handguns are fired without intent or purpose. Trial counsel's failure to obtain a firearms expert fell below the minimum standard of reasonable legal representation.

> ### 1. Petitioner abandons this portion of the First Ground for Relief designated as D2b.

### 3. Failure to object to prosecutorial misconduct

Trial counsel ineffectively and prejudicially failed to object to the portion of the prosecutor's closing argument in which the prosecutor re-enacted the shooting. Specifically, in the prosecutor's closing argument, trial counsel failed to object to the portion where the prosecutor picked up the alleged murder weapon, a semi-automatic piston, began waving it around, removed the clip, took the safety off, pulled the slide back and proceeded to reenact the shooting. (Tr. 1428-1429). The prosecutor stated:

> Now that's all been done when we approach Michael Bany.
>
> . . .
>
> And what do we know when he fired it?  Basically like this.  Basically a level shot.

29

(Tr. 1428-1429). The prosecutor's theatrics prompted the trial judge, no doubt out of concern for the safety of the jurors from this wild display, to inquire if the gun was loaded. (Tr. 1428).

The prosecutor's theatrics constituted egregious misconduct, designed to inflame the jurors against Mr. Raglin. The prosecutor's charade was geared to frighten the jurors and to prejudice Mr. Raglin. This type of theatrical prosecutorial argument, in which the prosecutor improperly utilizes an exhibit offered as the purported murder weapon, has been condemned by Ohio courts. *See State v. Keenan*, 66 Ohio St. 3d 402, 408 (1993). Trial counsel's failure to object, therefore, was objectively unreasonable and prejudiced Mr. Raglin.

**Second Ground for Relief: Walter Raglin was denied his right to the effective assistance of counsel at the mitigation phase of his capital trial in violation of the Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments.**

### ABANDONED ARGUMENTS

Petitioner hereby abandons the portion of his Second Ground for Relief designated as A, B, and C.

### NEW ARGUMENT

Petitioner hereby adds an additional basis for his Second Ground for Relief designated as subsection D. This new argument is based on newly discovered evidence, obtained as a result of Court ordered discovery in this habeas proceeding.

- **A.** **Petitioner abandons this portion of the Second Ground for Relief designated as A.**

- **B.** **Petitioner abandons this portion of the Second Ground for Relief designated as B.**

- **C.** **Petitioner abandons this portion of his Second Ground for Relief designated as C.**

- **D.** **Trial Counsel failed to adequately investigate and present significant evidence of remorse.**

Part of trial counsel's strategy during mitigation was to show that Mr. Raglin was remorseful of his actions the night of Mr. Bany's homicide. Nonetheless, due to trial counsel's failure to investigate, they did not discover important evidence of Mr. Raglin's remorsefulness.

Immediately following the homicide, Mr. Raglin fled to Natasha Lowery's home. In a statement given to Cincinnati police on January 4, 1996, Ms. Lowery described Mr. Raglin's behavior at that time. As soon as Mr. Raglin entered her apartment, he took off his jacket and confessed to Ms. Lowery what had occurred. Then he began vomiting outside of the window. According to Ms. Lowery, Mr. Raglin was vomiting, crying and unable to sleep all night.

Ronnell Mumphrey was also with Mr. Raglin in Ms. Lowery's apartment immediately following the homicide. In his statement to the Cincinnati police on January 5, 1996, he described Mr. Raglin's behavior:

> An 'um he started he started qu.... He started askin' questions like what am I gonna do. I'm scared ya all. Started cryin', started throwin' up. Still lookin' out the windows. He came to me an' asked me like Ronnell do you thing the Lord will forgive me. I told 'im no cause the Lord should [sic] the Lord said though shall not kill. He started worrying some more. An' that's was basically all he said.

Both Natasha Lowery's statement and Ronnell Mumphrey's statement contain important evidence that Mr. Raglin was remorseful for the murder of Michael Bany. However, defense counsel failed to present this evidence despite the fact that one of the major themes during mitigation was Mr. Raglin's remorsefulness. Mr. Raglin testified during the mitigation phase that he was sorry for what he had done. (Tr. 1644). Mr. Raglin's family members also testified that he was remorseful. (Tr. 1571 (Tabatha Raglin); Tr. 1593 (Lasonya Raglin); Deposition of Walter Raglin, Sr., p. 23). There could have been no strategic reason to omit eyewitness testimony of Mr. Raglin immediately after the homicide describing him as crying, vomiting, and

31

asking for God's forgiveness. Mr. Raglin's behavior provided by two disinterested eyewitnesses directly after the murder was strong independent evidence of remorse. As such, it was of a quality unmatched by what trial counsel actually presented at trial – bare allegations by Mr. Raglin and family members that he was sorry for what he had done.

During cross-examination of trial counsel's psychologist, Kathleen Burch, the prosecution sought to discredit Mr. Raglin's allegations of remorse. The prosecution introduced a statement by Andre Buffington, a person who was in Natasha Lowery's apartment with Ronnell Mumphrey and Mr. Raglin immediately following the murder. (Tr. 1714). According to this statement by Andre Buffington, Mr. Raglin was laughing when he told them he shot someone. (Tr. 1715). Trial counsel's objection to the introduction of this hearsay evidence was overruled. (Tr. 1714). Because of their failure to investigate, trial counsel were not able to refute or even impeach this evidence.

Natasha Lowery, Ronnell Mumphrey, and Andre Buffington were listed as potential witnesses in the State's response to trial counsel's demand for discovery. JA Vol. V, pp. 41-44. Had trial counsel conducted a reasonable investigation of the State's potential witnesses, they would have discovered that Buffington's account of Mr. Raglin's behavior immediately following the crime, is directly at odds with Mumphrey's statement and Lowery's statement. In fact, Natasha Lowery attributes laughing and joking about the homicide to her own brother, Darnell Lowery, Mr. Raglin's co-defendant. In contrast, she and Mumphry both described Mr. Raglin as distraught, sick and crying. Because of counsel's failure to investigate they were unable to discredit or rebut the State's introduction of this hearsay evidence.

There could be no strategic reason not to present this evidence of remorse. The apparent reason why trial counsel did not present this evidence could only be that they failed to investigate

32

by talking to potential witnesses listed in the State's discovery.   A failure to investigate constitutes the ineffective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 690-91 (1984). "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." Id. at 691.  Trial counsel's failure to investigate was unprofessional, unreasonable and constituted a breakdown of the adversary system. See id. at 690 ("[T]he court should keep in mind that counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case.")  The hearsay evidence that Mr. Raglin was laughing about the murder went to the jury, without impeachment or effective rebuttal by defense counsel.

Mr. Raglin was prejudiced by trial counsel's abdication of their duty to conduct reasonable investigations.  In reviewing the death sentence in this case, the Ohio Supreme Court assigned very little weight to the evidence of remorse that was presented at trial. *State v. Raglin*, 83 Ohio St. 3d 253, 273 (1998); JA Vol. VII, p. 1062.  Had the independant eyewitness testimony of Raglin's remorse been presented, the Ohio Supreme Court would have granted it greater weight.  See e.g., *State v. White*, 85 Ohio St.3d 433, 456 (1999) (evidence of remorse was given "significant" weight by the Ohio Supreme Court).  Nonetheless, the Court observed that the "combined mitigating factors... are stronger than the mitigation we typically see in some appeals involving the death penalty." Id. at 274; JA Vol. VII, p. 1063.  Had the independent evidence of Mr. Raglin's remorse been presented, there is a reasonable likelihood that the death verdict in this case would have been different.  The failure of trial counsel to discover and present the independent eyewitness testimony that Mr. Raglin exhibited substantial remorse undermines confidence in the verdict of death.

33

This portion of the Second Ground for Relief was not raised in state court proceedings

because Petitioner received the Natasha Lowery interview and the Ronnell Mumphrey interview

as a result of conducting discovery in this habeas corpus action.

**Third Ground for Relief: Walter Raglin was denied his right to the effective assistance of counsel under the Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments when his attorneys failed to object and properly preserve numerous errors.**

*Strickland v. Washington*, 466 U.S. 668 (1984), sets forth the standard governing

ineffective assistance of counsel claims. First, a defendant must show that counsel's

performance was deficient. *Id.* at 687. Second, he must show that the deficient performance

prejudiced his case. This degree of prejudice requires a demonstration of the existence of a

reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding

would have been different. The Court defined "reasonable probability" as a probability

sufficient to undermine confidence in the outcome of the case.

In Mr. Raglin's case, counsel was deficient when they failed, at several critical stages, to

object to serious and prejudicial actions by the trial court and the prosecutor, as set forth in this

petition. These issues present numerous instances in which Walter Raglin was denied his

fundamental constitutional rights at trial and sentencing. These violations were not harmless;

they seriously prejudiced Mr. Raglin and materially affected the outcome of his case.

For example, counsel failed to object to a myriad of instances of egregious prosecutorial

misconduct. In the prosecutor's closing argument, during the mitigation phase, trial counsel

failed to object when the prosecutor asked the jury to speculate on facts not in evidence and

proceeded to introduce evidence into his argument that had not been presented during the

proceedings. Specifically, the prosecutor invited the jury to look at Walter Raglin and, with

34

respect to the hours following Mr. Bany's murder "see him bragging and laughing and about it
and bragging about it." (Tr. 1900).

Even more egregious than this conduct, is when the prosecutor invited the jury to
speculate on where Mr. Raglin would have gone or what he would have done if he had escaped
from the Hamilton County Justice Center. (Tr. 1904). The prosecutor compounded this
misconduct by telling the jury that Walter Raglin would have committed more murders if his
escape from the Hamilton County Justice Center had been successful.

> [I]s he going to the Baneys to apologize? Is that why he jumped out that
> window? He's back on the streets. Back hustling again. He's going to
> get some more and he's going to do what he has to do to take it.

(Tr. 1904). Until the same prosecutor told the jury that he was personally asking for the death
penalty, trial counsel remained silent in the face of this prosecutorial misconduct. (Tr. 1905-
1906).

The failure to properly preserve these issues, as well as the numerous others that occurred
during the trial proceedings, falls below the objective standard of reasonableness for attorneys
who try capital cases. Failure to preserve these issues prejudices capital defendants by
preventing them from receiving a fair trial. If these errors exist, then they are grounds for
reversal and remand for either a new trial or re-sentencing. If these errors exist but trial counsel
failed to properly preserve them for review, then the confidence in Mr. Raglin's conviction and
death sentence is certainly undermined.

Failure to preserve these important issues is a substantial and prejudicial violation of
defense counsel's duties to his client. These violations denied Mr. Raglin his right to a fair trial
and to the effective assistance of counsel as guaranteed by the Sixth and Fourteenth
Amendments. The Court should grant relief on this Ground.

35

**Fourth Ground for Relief:  Walter Raglin was denied his right to the effective assistance of counsel on his direct appeals in violation of the Sixth and Fourteenth Amendments to the United States Constitution.**

Attorneys H. Fred Hoefle and David J. Boyd represented Walter Raglin on direct appeal to the Hamilton Count Court of Appeals and on direct appeal to the Supreme Court of Ohio.[5]

At the time of Mr. Raglin's direct appeal, Ohio law provided an appeal of right to the Supreme Court of Ohio on direct review in capital cases.  Thus, Ohio must provide the effective assistance of counsel in accordance with the Due Process Clause of the Fourteenth Amendment on direct appeal to the Supreme Court of Ohio.

The two prong test for determining appellate ineffectiveness is as follows: (1) did counsel's performance fail to meet the prevailing standards of practice; and (2) did that deficient performance prejudice the client in that there was a reasonable probability that the result of the appeal would have been different. *Strickland v. Washington*, 466 U.S. 668 (1984).

A single error of omission by appellate counsel can be sufficiently egregious and prejudicial to violate a defendant's right to the effective assistance of counsel.

In Mr. Raglin's case, appellate counsel failed to raise numerous meritorious issues. Specifically, these omitted issues were:

1.      Walter Raglin was denied the effective assistance of counsel when his counsel failed to challenge a prospective juror for cause or utilize a peremptory challenge to remove a juror who had personal knowledge of the crime alleged and personal relationships with those affected by the crime alleged.

---

[5]    Mr. Raglin's appellate counsel pursued a direct appeal in the First District Court of Appeals, Hamilton County, however, the notice of appeal was struck because the appellate court ruled that it lacked jurisdiction to consider Mr. Raglin's appeal from the imposition of the death penalty. The Ohio Supreme Court held that Mr. Raglin was convicted of an offense committed after January 1, 1995 and therefore had no direct appeal to the court of appeals. *See State v. Raglin*, 83 Ohio St.3d 253, 261 (1998) *citing State v. Smith*, 80 Ohio St.3d 89 (1997).

2.    Walter Raglin was denied the effective assistance of counsel when, without his consent, counsel repeatedly conceded the issue of guilt at the trial phase of his capital trial, thereby voiding the state's burden of proof and eviscerating the defendant's right to confront witnesses.

3.    Walter Raglin was denied the effective assistance of counsel when defense counsel repeatedly conceded the issue of guilt to the charged aggravated murder during voir dire and opening statement, but then inconsistently argued in closing that the state failed to prove the element of purpose beyond a reasonable doubt.

4.    Walter Raglin was denied the effective assistance of counsel when his counsel failed to exercise his rights to procure reasonable and necessary experts to present forensic evidence essential to an effective defense, including, but not limited to, an expert to rebut the state's suspect evidence regarding the operability of the alleged murder weapon when that evidence bore directly on the element of intent central to the capital offenses alleged.

5.    Walter Raglin was denied the effective assistance of counsel when his counsel failed to put on a defense case-in-chief targeting a lesser included offense in a situation where the need for such defense is clearly indicated by the facts and necessary to rebut the state's suspect evidence regarding the element of intent.

6.    Walter Raglin was denied the effective assistance of counsel when his counsel failed to investigate and present substantial mitigating evidence of remorse during the sentencing phase hearing.

7.    Walter Raglin was denied the effective assistance of appellate counsel when his counsel failed to raise as error, trial instructions which undermine the state's burden of proof beyond a reasonable doubt and which shift the burden of proof to the defendant.

8.    Walter Raglin was denied the effective assistance of counsel when his counsel failed to object to a prosecutor's closing argument that is presented in a manner to inflame the jurors against the defendant.

Appellate counsel have two equally important duties when representing a capital client on direct appeal. The first is to persuade the appellate courts. The second, which is critically

37

important in Ohio given the state supreme court's extreme reluctance to reverse capital cases, is to preserve issues for later review in the federal courts.

Rule 20 of the Rules of Superintendence for Courts of Ohio requires that at least two attorneys with requisite experience and specialized training be appointed to represent the client on every capital case appeal. Sup. 20, Section II (B). This rule reflects the determination that capital appeals are sufficiently complex and time-consuming that two qualified attorneys are necessary for effective representation.

This is a case where appellate counsel's failure to raise the issues discussed in this Ground for Relief cannot be presumed to be the result of a reasonable, strategic decision.

The appellate attorneys' failure to raise the issues discussed in this Ground for Relief was objectively unreasonable. It was also prejudicial, because if these issues were raised on appeal, there is a reasonable probability that Walter Raglin's conviction and/or death sentence would have been reversed. The Court should grant relief on this Ground.

### Suppression Issues

**Fifth Ground for Relief**: Petitioner hereby abandons this ground for relief in its entirety.

**Sixth Ground for Relief: Walter Raglin's rights under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution were violated when the trial court failed to suppress his statement made to members of the Cincinnati Police Department on January 3, 1996, because his statement was made during a custodial interrogation following an unfulfilled request for counsel. *Miranda v. Arizona*, 384 U.S. 436 (1966); *Edwards v. Arizona*, 451 U.S. 477 (1981); *Minnick v. Mississippi*, 489 U.S. 146 (1990).**

After locating Walter Raglin in the fourth floor of an apartment building in the Laurel Homes apartment complex, Cincinnati police officer Michael Neville handcuffed Walter Raglin, placed him under arrest, and transported him to the Cincinnati Police Department located at 824 Broadway where he arrived at approximately 8:00 p.m. and was photographed and fingerprinted. At 8:35 p.m. Cincinnati Police Officers Daniel Argo and Bill Couch began a custodial

38

interrogation of Mr. Raglin in a fifth floor interview room. During the custodial interrogation, Mr. Raglin made a complete statement admitting culpability in the December 29, 1995 robbery and homicide of Michael Bany. Walter Raglin's statement to the police was tape-recorded and played at trial. The taped statement commenced at approximately 10:57 p.m. with a recitation of *Miranda* warnings. As officer Couch recited *Miranda* warnings, Walter Raglin exercised his Fifth and Sixth Amendment rights by requesting to speak to an attorney.

Officer Couch informed Mr. Raglin that he could "have an attorney at any point in time that you wish one." Mr. Raglin immediately invoked his *Miranda* right to counsel by asking: "Can I, can I just talk to one? I mean just for a minute?"

Instead of terminating custodial interrogation of Mr. Raglin, however, officer Couch persisted by initiating further custodial interrogation. Officer Couch stated to Mr. Raglin in response to the request for counsel: "We came in here to take a statement from you." In response to this further interrogation, Mr. Raglin replied: "Right."

Officer Couch nevertheless again persisted in further custodial interrogation by stating to Mr. Raglin that he was seeking a statement "basically on what you had told us earlier." In response to this further interrogation Mr. Raglin again replied : "Right."

Instead of terminating the interrogation, however, officer Couch persisted by stating "If you would rather talk to an attorney now uh." Mr. Raglin then invoked his *Miranda* right to counsel a second time by stating: "But I just want to talk to one, you know."

Officer Couch acknowledged Mr. Raglin's unequivocal request for legal counsel by stating: "We realize that. Uhm that, that is your decision."

Mr. Raglin then reiterated that it was his decision to request legal counsel by stating: "Right." He thereby invoked his *Miranda* right to counsel a third time.

39

However, instead of terminating the interrogation, officer Couch replied: "If you want an attorney we will end this conversation and we will let you uh make an attempt and or get an attorney." Mr. Raglin interrupted officer Couch by stating: "Right." Mr. Raglin thereby invoked his *Miranda* right to counsel a fourth time.

Officer Couch persisted by stating: "Uh but that is, that is totally your decision." Mr. Raglin then invoked his *Miranda* right to counsel a fifth time by stating: "I just want talk to one , that is all."

Officer Couch stated : "I understand that." Mr. Raglin then invoked his *Miranda* right to counsel a sixth time by stating: "You know, I just want to just talk to one, that is all."

Officer Couch, however, did not terminate the discussion, but rather asked: "So you are telling me that you want an attorney at this time? Mr. Raglin responded by invoking his *Miranda* right to counsel a seventh time. He stated: "I mean, I just want to yeah I want to talk to one."

Officer Couch then turned off the tape recorder. It was 11:02 p.m. when the recorder was turned off. However, instead of terminating the interrogation, officers Couch and Argo persisted by keeping Mr. Raglin in the interrogation room and telling him that they would get him a telephone book and that he could find an attorney. Approximately three minutes later, Mr. Raglin said he changed his mind. The tape recorder was then turned back on and the interrogation continued with Mr. Raglin making a complete statement admitting culpability in the December 29, 1995 robbery and homicide of Michael Bany.

In *Edwards v. Arizona*, 451 U.S. 477 (1981), the Supreme Court held that invocation of the right to counsel bars further interrogation without counsel unless the accused himself initiates further communication, exchanges, or conversations with the police. Interrogation must cease

40