Case No. 1:00-767

═══════════════════════════

# In The
# United States District Court
# For the Southern District of Ohio

───────────────

## Walter Raglin
*Petitioner*

v.

## Betty Mitchell, Warden
*Respondent*

───────────────

# Amended Return Of Writ

───────────────

Jim Petro
Attorney General of Ohio

Henry G. Appel
Assistant Attorney General
Capital Crimes Section
30 East Broad Street, 23rd Floor
Columbus, Ohio 43215-3428
happel@ag.state.oh.us
(614) 728-7055 (614) 728-8600 (fax)

Counsel For Respondent

═══════════════════════════

# I.    Introduction

Walter Raglin is an Ohio inmate who has been sentenced to death for the

1995 robbery and murder of Michael Bany.

## II.    Statement Of The Warden

Respondent Betty Mitchell (hereinafter "the Warden") denies each and every allegation contained in the instant petition for writ of habeas corpus, except as may be expressly admitted in this return and any attachments hereto. The Warden currently has custody of Walter Raglin by virtue of a journal entry of sentence issued by the Court of Common Pleas in Hamilton County, Case No _____ issued on November 6, 1996.

# III.   The Ohio Supreme Court's Findings of Fact

The Ohio Supreme Court has made the following findings of fact.  Under 28 U.S.C. §2254(e)(1), these findings of fact are presumed to be correct unless rebutted with clear and convincing evidence.

> During the early morning hours of December 29, 1995, appellant, Walter Raglin, and appellant's friend, Darnell "Bubba" Lowery, were looking for someone to rob.  Appellant was wearing dark clothes and a black ski mask and was armed with a .380 semiautomatic pistol he had obtained from Lowery.  The two men considered robbing a "dope boy," i.e., a drug dealer, but decided against it for fear that such a person could be armed.  They also discussed the possibility of robbing a taxicab driver, but appellant suggested that it might be safer for the two men to rob a more vulnerable victim.
>
> Meanwhile, at approximately 1:30 a.m., Michael Bany, [FN1] a musician, concluded an engagement at a bar on Main Street in Cincinnati.  At approximately 1:45 a.m., Bany left the bar carrying a bass guitar and a black bag or suitcase with music equipment and headed toward the parking lot where he had parked his car. Appellant and Lowery saw Bany and decided to rob him. While Bany was attempting to unlock the door to his vehicle, appellant approached him from behind, pulled out the .380 semiautomatic pistol, and demanded Bany's money. Bany handed appellant three $20 bills.  Appellant then asked Bany whether Bany's car had an automatic or manual transmission since appellant planned to steal the car if it was an automatic.  Bany did not reply to appellant's question.  Appellant repeated the question, but Bany remained silent.  At some point, Bany bent down to pick up his guitar case and/or his music equipment and turned to face appellant.  While appellant and Bany were looking at each other, appellant shot Bany once in the side of the neck, killing him.  The projectile entered through the left side of Bany's neck, just below the earlobe, and exited through the right side.  The path of the projectile indicated that appellant and Bany were not standing face-to-face at the time of the shooting.  Additionally, the record indicates that the shot was fired at the victim from a distance of more than three feet.
>
> > FN1. There is some confusion in the record concerning the spelling of the victim's last name. The printed transcript uses the spelling "Baney,"

whereas other portions of the record (including the indictment) reflect that the spelling is "Bany." We have been forced to elect between the alternate spellings for purposes of our opinion in this case. If the spelling we have chosen is incorrect, we extend our deepest apologies to anyone who may take issue with that matter. We certainly intend no disrespect for the memory of the decedent.

Following the killing, appellant and Lowery ran to a house several blocks away from the scene of the murder.  There, appellant cleaned the pistol of fingerprints and gave it to Lowery.  Appellant told Lowery that he (appellant) had received only $20 from the victim. Later, appellant spent the $60 he had taken from Bany to purchase marijuana.

On January 3, 1996, Cincinnati police received an anonymous telephone call  identifying appellant as a suspect in the murder. Appellant was apprehended by police and was taken to an interview room for questioning.   There, appellant voluntarily agreed to speak with police after being advised of his Miranda rights.  See Miranda v. Arizona (1966), 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694.

During questioning, appellant lied to the police and denied any involvement in the murder.  When police informed appellant that they had received telephone calls naming appellant as a suspect, appellant changed his story and admitted that he had been at the scene of the murder.  Appellant told police that he had been paid $25 for being a lookout for Lowery, and that Lowery had robbed and killed Bany. The police officers then left the interview room. A short time later, appellant summoned an officer back to the room and admitted that he had shot Bany. Appellant then confessed to robbing and killing Bany and gave police a detailed account of the murder.

After giving a full confession to police, appellant agreed to repeat his statement on tape.  Appellant was once again advised of his Miranda rights. At that time, appellant indicated that he wanted to speak to an attorney.   Therefore, police stopped the recorder, ceased their interrogation of appellant, and offered to bring appellant a telephone book and to assist him in obtaining counsel. Appellant stated that he did not want to inconvenience the officers, but police assured him that his request for counsel was not an inconvenience.   Nevertheless, despite these assurances, appellant told police that he had changed his mind concerning his request for

counsel and that he wished to continue with his statement. At that point, police resumed the interview and once again advised appellant of his rights. After ensuring that appellant fully understood his right to counsel and had freely and intelligently abandoned his known rights, police resumed the interrogation and tape recording of appellant's statement, and appellant reiterated the details of the robbery and killing.

In January 1996, appellant was indicted by the Hamilton County Grand Jury for the aggravated murder of Bany. Count Four of the indictment charged appellant with purposely causing the death of Bany during the commission of an aggravated robbery. Count Four of the indictment also carried an R.C. 2929.04(A)(7) death penalty specification. Count Three of the indictment charged appellant with the aggravated robbery of Bany. Counts One and Two of the indictment charged appellant with certain offenses that were unrelated to the robbery and killing of Bany. Counts Two, Three, and Four carried a firearm specification. Appellant eventually entered a plea of no contest to the charge set forth in Count One of the indictment and the specification in connection with that count. Additionally, the state of Ohio eventually dismissed Count Two.

The charges and specifications relating to the aggravated robbery and aggravated murder of Bany (i.e., Counts Three and Four and related specifications) proceeded to trial by jury. The jury found appellant guilty of these charges and specifications. With regard to the R.C. 2929.04(A)(7) death penalty specification, the jury found that appellant was the principal offender in the commission of the aggravated murder. Following a mitigation hearing, the jury recommended that appellant be sentenced to death for the aggravated murder of Bany. The trial court accepted the jury's recommendation and imposed the sentence of death. For the aggravated robbery of Bany (Count Three), for the matter to which appellant had pled no contest (Count One), and for the firearm specification in connection with Count Three, the trial court sentenced appellant in accordance with law.

In case No. 96-2872, appellant directly appeals his convictions and sentences for aggravated murder and aggravated robbery (and for the associated firearm specifications) from the trial court to this court pursuant to Section 2(B)(2)(c), Article IV of the Ohio Constitution, as amended in 1994. See, also, R.C. 2953.02. Appellant also filed a notice of appeal in the court of appeals. However, the court of appeals issued an entry striking the notice of appeal because the appellate court lacked jurisdiction to consider

appellant's appeal from the imposition of the death penalty.  See
Sections 2(B)(2)(c) and 3(B)(2), Article IV of the Ohio
Constitution, and R.C. 2953.02.  In case No. 97-141, appellant
appeals from the court of appeals' decision striking the notice of
appeal.  Upon motion, we consolidated the two cases.

*State v. Raglin*, 83 Ohio St. 3d 253, 253-56 (1998).

## IV.   Legal Standards

### A.       Overview of the AEDPA

On April 24, 1996 President Clinton signed the Antiterrorism and Effective Death Penalty Act, (hereinafter "AEDPA") Pub. L. 104-132, 110 Stat. 1214 into law. Specifically, Section 104 of the AEDPA modified 28 U.S.C. §2254(d) as follows:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Because the Petitioner filed his petition after April 24, 1996, this current action is governed by the AEDPA. *Williams v. Coyle*, 167 F.3d 1036 (6th Cir. 1999).

### B.       State Court Decisions are Entitled to Substantial Deference

On its face, the AEDPA made a significant change in habeas corpus law by providing a specific requirement of deference to state court *decision*s. As the United States Supreme Court stated recently: "The federal habeas scheme leaves primary responsibility with the state courts for these judgments, and authorizes

federal-court intervention only when a state-court decision is objectively

unreasonable." *Woodford v. Visciotti*, 537 U.S. 19, 27 (2002).

Before a writ may issue under the AEDPA on a claim that was evaluated

by the state courts, the federal court must declare that the state court's

adjudication of a question of law or mixed question of law and fact was "contrary

to or an unreasonable application of clearly established federal law, as determined

by the Supreme Court."  28 U.S.C. §2254(d)(1).  This deference is due, in large

part, to the "presumption that state courts know and follow the law." *Woodford v.

Visciotti*, 537 U.S. 19, 24 (2002).  Because of this "highly deferential standard for

evaluating state-court rulings … state court decisions must be given the benefit of

the doubt." *Id.* (citation and punctuation omitted).

The AEDPA standard of review set forth in §2254(d) applies even where

there is no state court decision on the merits to evaluate.  *Harris v. Stovall*, 212

F.3d 940, 943 (2000).  Thus, even when the state court does not explain its

decision, the independent review by a federal court in such a situation is "not a

full, *de novo* review of the claims, but remains deferential because the court

cannot grant relief unless the state court's result is not in keeping with the

strictures of the AEDPA." *Id*. at 943.  Instead, the court is "obligated to conduct

an independent review of the record and applicable law to determine whether the

state court decision is contrary to federal law, unreasonably applies clearly

established law, or is based on an unreasonable determination of the facts in light

of the evidence presented." *Id*. at 943 (citations omitted).  *See also Early v.

Packer*, 537 U.S. 3, 8 (2002) ("Avoiding the pitfalls [of the AEDPA requires that]

neither the reasoning nor the result of the state-court decision" be contrary to, or an unreasonable application of, clearly established United States Supreme Court case law).

Pursuant to §2254(e)(1), factual determinations by the state courts are presumed to be correct unless rebutted with clear and convincing evidence. *Wiggins v. Smith,* 123 S.Ct. 2527, 2539 (2003). The presumption of correctness attaches to the factual findings of a state appellate court based on the state trial record. *Bowling v. Parker*, 344 F.3d 487, 497 (6th Cir. 2003).

## C. Decisions Must Be Contrary to, or an Unreasonable Application of, Clearly Established United States Supreme Court Case Law

### 1. Clearly Established United States Supreme Court Case Law

In addition to requiring deference to state court decisions, Congress limited the source of law for habeas relief to United States Supreme Court cases. Thus, Congress expressly intended that the correctness of state court decisions be assessed with reference to the decisions of the U.S. Supreme Court at the time the state court was evaluating the claim. As a result, federal courts are not permitted to rely on any decision released after the state court's decision became final, nor may they rely on any court other than the United States Supreme Court in evaluating the state court's decision. *Williams v. Coyle*, 260 F.3d 684, 703 (6th Cir. 2001).

Because the AEDPA requires that a state court decision be evaluated on *clearly established* United States Supreme Court case law, Federal courts are

restricted in the relief that they may grant.  No relief is available for a claim where the legal basis for that claim was "an 'open question' in the jurisprudence of the Supreme Court . . . at the time Petitioner's case was heard[.]"  *Smith v. Hofbauer*, 312 F.3d 809, 816 (6th Cir. 2002).  *See also Mitchell v. Esparza*, 540 U.S. 12, 17 (2003) ("A federal court may not overrule a state court for simply holding a view different from its own, when the precedent from this Court is, at best, ambiguous.")

Nor may courts grant relief based on United States Supreme Court cases which do not "purport[] to interpret any provision of the Constitution."  *Early v. Packer*, 537 U.S. 3, 10 (2002).

### 2.    "Contrary To"

There are two ways in which a state court decision can be "contrary to" federal law: (1) if it fails to apply the correct Supreme Court authority; or (2) it if applies the correct Supreme Court authority to a case involving facts "materially indistinguishable" from the facts involved in the controlling Supreme Court case, but the state court reached a different result.  *Williams v. Taylor*, 529 U.S. 362, 406 (2000).

However, the failure to rely expressly on United States Supreme Court precedent does not, by itself, constitute a decision that is "contrary to" established United States Supreme Court case law.  "Avoiding the pitfalls [of the AEDPA] does not require citation of our cases – indeed, it does not even require *awareness* of our cases, so long as neither the reasoning nor the result of the state-court

decision contradicts them." *Early v. Packer*, 537 U.S. 3, 10 (2002) (emphasis in original).

### 3.    "Unreasonable Application"

When a state court's application of governing federal law is challenged, a habeas petitioner must show that the application was "not only erroneous, but objectively unreasonable." *Yarborough v. Gentry,* 540 U.S. 1 (2003)

A state court's decision will be objectively unreasonable when "the state court identifies the correct legal principle from [the Supreme] Court's decision but unreasonably applies that principle to the facts of the prisoner's case." *Williams v. Taylor*, 529 U.S. 362, 413 (2000).  When viewing the objective reasonableness of the state decision, federal courts may not find an unreasonable application merely because it finds that state-court decision to be erroneous or incorrect.  *Id*. at 411.

The United States Supreme Court has recently reversed several habeas corpus cases where the Court concluded that a federal court imposed its independent judgment, rather than evaluating the reasonableness of a state court decision.  *See Bell v. Cone*, 535 U.S. 685 (2002); *Woodford v. Visciotti*, 537 U.S. 19 (2002); *Early v. Packer*, 537 U.S. 3 (2002); *Yarborough v. Gentry,* 540 U.S. 1 (2003); *Mitchell v. Esparza*, 540 U.S. 12 (2003).

## D.    Standards of Review for Procedural Default

### 1.    Overview

It is well established that a habeas petitioner must generally seek review of any supposed errors in the state courts.  If a habeas petitioner has failed to do so, or has failed to comply with a clearly established state court procedural rule, the

claim will be procedurally defaulted. *Wainwright v. Sykes*, 433 U.S. 72 (1977); *Engle v. Isaac*, 456 U.S. 107 (1982); *Murray v. Carrier*, 477 U.S. 478 (1986); *Harris v. Reed*, 489 U.S. 255, 263 (1989).

In reviewing an assertion of procedural default, a federal court is required to examine the last reasoned opinion by a state court to determine whether that court clearly and expressly rejected the claim on an adequate and independent state law ground. *Harris v. Reed*, 489 U.S. 255, 263 (1989). Where the last state court rendering a judgment is silent in its reasoning, the federal habeas court looks through that decision to the last reasoned decision. *Ylst v. Nunnemaker*, 501 U.S. 797 (1991). The burden is on the petitioner to show cause for not complying with the procedural rule and actual prejudice from the claimed constitutional error. *Engle v. Isaac*, 456 U.S. at 129-30; *Maupin v. Smith*, 785 F.2d 135, 138-39 (6th Cir. 1986). Failure to demonstrate cause and prejudice is excused only "where a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray v. Carrier*, 477 U.S. at 496.

In the Sixth Circuit, procedural default is analyzed under a four-part test: (1) whether the petitioner failed to comply with an applicable state procedural rule; (2) whether the state courts actually enforced the procedural sanction; (3) whether the state procedural bar is an adequate and independent state ground on which the state can foreclose federal review; and (4) whether the petitioner can demonstrate cause for and actual prejudice resulting from the procedural default. *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986). *See also Coleman v. Mitchell*, 244 F.3d 533, 538-39 (6th Cir. 2001) (applying *Maupin* four part test).

However, the Sixth Circuit has stated that it has not always applied the "*Maupin*" test per se, and the test essentially is identical to the basic procedural default rule established by the United States Supreme Court, i.e., that a petitioner must demonstrate "cause and prejudice" where the state decision rejecting a habeas corpus claim is based on an independent and adequate state ground. *See Scott v. Mitchell*, 209 F. 3d 854, 863 n.4 (6th Cir. 2000).

### 2. Common Types of Procedural Default From Ohio Convictions

### a. The Claim Was Not Raised At All In State Court

The clearest form of procedural default occurs where a habeas petitioner has failed to raise a claim at all. In such a case, the last reviewing state court does not need to make a "clear and express" statement, because no such statement is necessary, *Harris v. Reed*, 489 U.S. 255, 263 n9 (1989). *See also Buell v. Mitchell*, 274 F.3d 337, 349 (6th Cir. 2001) ("a petitioner's failure to raise his claims in Ohio courts is an adequate and independent state law ground for upholding the petitioner's conviction and sentence.")

### b. *Res Judicata*

Under Ohio's doctrine of *res judicata*, constitutional issues cannot be considered in post-conviction proceedings where they were or could have been litigated on direct appeal. *State v. Perry*, 10 Ohio St. 2d 175 (1967). The Ohio Supreme Court has stated that the purpose of the rule is to encourage the assertion of claims at the first available opportunity. *See State v. Roberts*, 1 Ohio St. 3d 36, 38-39 (1982). The *Perry* rule applies to "on the record" claims of ineffective

assistance of counsel, where the appellant is represented by new counsel on appeal. *State v. Cole*, 2 Ohio St. 3d 112 (1982); *Seymour v. Walker*, 224 F.3d 542 (6th Cir. 2000). Where a defendant has failed to attach documentation to support a claim in a post-conviction petition that constitutes a "forfeiture" of the claim. *Mapes v. Coyle*, 171 F.3d 408, 421-22 (6th Cir. 1999).

The Sixth Circuit Court of Appeals has held repeatedly that the Ohio courts' application of *res judicata* to bar merits review of constitutional claims in post-conviction constitutes an adequate and independent state basis of decision which will support a procedural default holding in federal habeas corpus. Accordingly, the Sixth Circuit has held that claims not presented on direct appeal, and subsequently dismissed as *res judicata* in state post-conviction proceedings, are barred from merits review in federal habeas corpus. *See Seymour v. Walker*, 224 F.3d 542 (6th Cir. 2000); *Coleman v. Mitchell*, 244 F.3d 533, 538 (6th Cir. 2001); *Byrd v. Collins*, 209 F.3d 486, 520-22 (6th Cir. 2000); *Mapes v. Coyle*, 171 F.3d 408, 421 (6th Cir. 1999).

### c.    Contemporaneous Objection Rule

Under Ohio law, to preserve an error at trial, a defendant must raise a timely objection. *State v. Long*, 53 Ohio St. 2d 91 (1978).

Federal courts have routinely applied procedural default where an Ohio defendant failed to comply with Ohio's contemporaneous objection rule. In *Engle v. Isaac*, 456 U.S. 107 (1982), the United States Supreme Court held that a defendant's failure to comply with Ohio's contemporaneous objection rule constituted a procedural default which precluded federal habeas corpus review of

an allegedly unconstitutional instruction.  The United States Court of Appeals for the Sixth Circuit has likewise recently held that Ohio's contemporaneous objection rule constituted an adequate and independent state ground to bar federal habeas corpus review.  *Scott v. Mitchell*, 209 F.3d 854, 865-68 (2000); *Hinkle v. Randle*, 271 F.3d 239 (6th Cir. 2001).

Some petitioners have suggested that a federal bar is inappropriate where an Ohio court rejects a claim based on the contemporaneous objection rule, and then performs plain error analysis on the claim.  The Sixth Circuit has soundly rejected the argument that plain error review will save an otherwise barred claim from review.  *Seymour v. Walker*, 224 F.3d 542, 557 (6th Cir. 2000); *Scott v. Mitchell*, 209 F.3d 854, 877 (6th Cir. 2000); *Campbell v. Coyle*, 260 F.3d 531, 557 (6th Cir. 2001).

### d.    Claims That Have Not Been Fairly Presented To The Ohio Courts

It is well settled that "federal courts do not have jurisdiction to consider a claim in a habeas petition that was not 'fairly presented' to the state courts." *McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000) (citing *Franklin v. Rose*, 811 F.2d 322, 324-25 (6th Cir. 1987)).  To fairly present a claim, a petitioner must present both the legal arguments and the factual basis of the claim to the state courts.  *Alley v. Bell*, 307 F.3d 380, 386 (6th Cir. 2002).  A claim will not be fairly presented where the petitioner's state court briefing "does not even contain a factual description supporting the claim." *Baldwin v. Reese*, __ U.S. __, 124 S.Ct. 1347, 1351 (2004).

A petitioner has four ways in which he can fairly present a legal argument: "(1) reliance upon federal cases employing constitutional analysis; (2) reliance upon state cases employing federal constitutional analysis; (3) phrasing the claim in terms of constitutional law or in terms sufficiently particular to allege a denial of a specific constitutional right; or (4) alleging facts well within the mainstream of constitutional law." *Newton v. Million*, 349 F.3d 873, 877 (6th Cir. 2003) (citation omitted). General allegations of the denial of a "fair trial" or "due process" are usually insufficient to fairly present federal constitutional claims. *Id.* *See also Blackmon v. Booker*, __ F.3d __, 2004 U.S. App. LEXIS 27061, *4 (6th Cir. 2004) (claim not fairly presented where the "only citations to federal authority in his state briefs were (1) claims in his brief headings and conclusions that admission-of-evidence errors and prosecutorial misconduct violated his rights to a fair trial and due process, and (2) secondary citations to federal cases to support his state-based evidentiary and misconduct claims.")

A legal claim will not be fairly presented when the petitioner relied upon a different legal theory during state court. *See Buell v. Mitchell*, 274 F.3d 337, 361 (6th Cir. 2001); *Lorraine v. Coyle*, 291 F.3d 416, 425 (6th Cir. 2002); *Williams v. Bagley*, 380 F.3d 932, 969 (6th Cir. 2004). Nor will a claim be fairly presented when the petitioner relied on different facts to the state court. *Lott v. Coyle*, 261 F.3d 594, 618-619 (6th Cir. 2001).

### e.    Failure to Meet The Standards For Filing A Second Or Successive Post-Conviction Action

Under Ohio law, inmates who have been sentenced to death must file any post-conviction action 180 days after the trial transcript is filed in the Ohio Supreme Court.  O.R.C. §2953.21(A)(2).  That provision states, in its entirety:

> A petition under division (A) (1) of this section shall be filed no later than one hundred eighty days after the date on which the trial transcript is filed in the court of appeals in the direct appeal of the judgment of conviction or adjudication or, if the direct appeal involves a sentence of death, the date on which the trial transcript is filed in the supreme court. If no appeal is taken, the petition shall be filed no later than one hundred eighty days after the expiration of the time for filing the appeal.

Ohio courts routinely dismiss post-conviction petitions that do not meet the standards found under §2953.21(a)(2).  *See e.g.s State v. Halliwell*, 134 Ohio App.3d 730 (8th Dis. Ohio 1999); *State v. Beaver*, 131 Ohio App.3d (11th Dis. Ohio 1998); *State v. Hill*, 129 Ohio App.3d 658 (1st Dis. 1998).[1]

Ohio has a provision to permit a defendant to file an untimely or successive post-conviction petition.  Section 2953.23(A) allows for a defendant to file a second or untimely post-conviction petition under limited circumstances. An Ohio defendant can file an untimely post-conviction petition if he can show that the following two requirements are met:

(1)    Either of the following applies:

(a)    The petitioner shows that the petitioner was unavoidably prevented from discovery of the facts upon which the petitioner must rely to present the claim for relief.

> (b)    Subsequent to the period prescribed in division (A) (2) of section 2953.21 of the Revised Code or to the filing of an earlier petition, the United States Supreme Court recognized a new federal or state right that applies

---

[1] In addition to these reported cases there are literally dozens of unreported Ohio appellate cases which have rejected untimely petitions due to the time frames set forth in §2953.21(A)(2).

retroactively to persons in the petitioner's situation, and the petition asserts a claim based on that right.

(2)     The petitioner shows by clear and convincing evidence that, but for constitutional error at trial, no reasonable factfinder would have found the petitioner guilty of the offense of which the petitioner was convicted or, if the claim challenges a sentence of death that, but for constitutional error at the sentencing hearing, no reasonable factfinder would have found the petitioner eligible for the death sentence.

Thus, to receive relief under §2953.23, a defendant must show that he is actually innocent of his crime (or of the death penalty), *and* that there are either new facts or new law available.

If a defendant is unable to meet the standards found under §2953.23, the Ohio courts have no jurisdiction to entertain an untimely or second post-conviction action. Every Ohio appellate district to examine this issue has concluded that Ohio's post-conviction limits are jurisdictional. *See State v. Hill*, 129 Ohio App.3d 658, 661 (1st Dis. Ohio 1998); *State v. Ayers*, 1998 Ohio App. LEXIS 5725 (2nd Dis. Ohio, 1998); *State v. Thompson*, 1998 Ohio App. LEXIS 4970 (3rd Dis. Ohio, 1998); *State v. Sturbois*, 1999 Ohio App. LEXIS 4705 (4th Dis. Ohio, 1999); *State v. Brown*, 1998 Ohio App. LEXIS 3093 (5th Dis. Ohio 1998); *State v. Patton*, 1998 Ohio App. LEXIS 1827 (6th Dis. 1998); *State v. Halliwell*, 134 Ohio App.3d 730, 734 (8th Dis. Ohio 1999); *State v. Flowers*, 1998 Ohio App. LEXIS 5396 (9th Dis. Ohio, 1998); *State v. Hanks*, 1998 Ohio App. LEXIS 2843 (10th Dis. Ohio, 1998); *State v. Furcron*, 1999 Ohio App. LEXIS 488 (11th Dis. Ohio 1999). *See also Bird v. Hurst*, 2004 U.S. App. LEXIS 16559, *7 (6th Cir. 2004) (holding that Ohio's jurisdictional limits under §§2953.21 and .23 constitute a clearly established procedural rule for *Maupin*).

## V.    Brief Procedural History[2]

### A.    Trial

On January 16, 1996, the Grand Jury of Hamilton County, Ohio, indicted Raglin for aggravated murder of Michael Bany in violation of Ohio Revised Code Section 2903.01(B).    The indictment included a capital felony murder specification under §2929.04(A)(7).    Specifically, the indictment alleged that Raglin killed Michael Bany during the course of committing aggravated robbery, and was either the principal offender or committed the murder with prior calculation and design.

On October 17, 1996, Raglin was found guilty as charged. Apx. at Vol. VI, p. 651-653.  The jury recommended the imposition of the death penalty and the judge adopted the jury's recommendation of death. Apx. at Vol. VI, p.705.

### B.    Direct Appeal

Raglin appealed his conviction and death sentence directly to the Ohio Supreme Court.  The Ohio Supreme Court affirmed Raglin's conviction and death sentence on September 30, 1998.  Apx. at Vol. VII, p. 1038-1068. *State v. Raglin,* 83 Ohio St.3d 253 (1998).

Raglin sought certiorari from the United States Supreme Court.  The Supreme Court denied certiorari on March 1, 1999.  Apx. at Vol. VII, p. 1072-1073. *Raglin v. Ohio*, 525 U.S. 1180 (1999).

### C.    Raglin's First Post-Conviction Proceedings

---

[2] A complete procedural history is attached hereto as Exhibit A.

On February 2, 1998, Raglin filed a post conviction petition in the Hamilton County Court of Common Pleas. Apx. at Vol. VII, p. 1164. The State filed a Motion to Dismiss Raglin's Post-Conviction Petition on April 3, 1998 Apx. at Vol. IX, p 2320. Raglin opposed the motion to dismiss. Apx. at Vol. IX, p. 2356. On April 17, 1998, the trial court issued its Findings of Fact, Conclusions of Law and Entry Dismissing Petition to Vacate. Apx. at Vol. IX, p. 2411.

Raglin appealed. The First District Court of Appeals affirmed on June 25, 1999. Apx. at Vol. X, p. 2644. *State v. Raglin*, [**insert citation**] The Ohio Supreme Court denied jurisdiction to hear the appeal. *State v. Raglin*, 87 Ohio St.3d 1430 (1999).

## D.    Murnahan Litigation

Raglin filed an application to reopen his direct appeal, claiming ineffective assistance of appellate counsel. Raglin alleged that his appellate counsel were ineffective in failing to raise fifteen "meritorious claims" of legal error. Apx. at Vol. XI, p. 2799. On March 3, 1999, the Ohio Supreme Court denied Raglin's application. Apx. at Vol. XI, p. 3006. *State v. Raglin*, 85 Ohio St.3d 1407 (1999).

## VI.  Responses To Raglin's Claims of Ineffective Assistance of Trial Counsel and Appellate Counsel

### A.  Legal Standards

#### 1.  These Arguments Are Governed By *Strickland v. Washington*

This claim is governed by *Strickland v. Washington*, 466 U.S. 668 (1984). In *Strickland,* the United States Supreme Court held that in order to show that counsel was ineffective, a habeas petitioner must meet a two prong test:  the petitioner must show (1) deficient performance and (2) prejudice.  If a petitioner fails to meet either prong, a court need not evaluate the other prong, because relief will not be available.  *Id*. at 697.  The Warden will address each prong in turn.

#### 2.  Standards For Demonstrating Deficient Performance

To show deficient performance, an inmate must demonstrate that his attorneys failed to provide adequate legal assistance.  More specifically, the inmate must demonstrate that "counsel's representation fell below an objective standard of reasonableness."  *Id.* at 688.  This is measured by examining whether counsel's actions were reasonable "under prevailing professional norms."  *Id.*

However, to succeed, the inmate has substantial hurdles to leap.  There is a "strong presumption" that an attorney's actions were sound trial strategy.

> Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."

*Id.* at 689 (citation omitted). An inmate bears the burden of overcoming this presumption.

The United States Supreme Court has recently explained that this "presumption has particular force where a petitioner bases his ineffective-assistance claim solely on the trial record[.]" *Yarborough v. Gentry*, 540 U.S. 1, 8 (2003). The *Gentry* Court explained that it is particularly difficult to overcome the burden because a reviewing court "may have no way of knowing whether a seemingly unusual or misguided action by counsel had a sound strategic motive." *Id.* (quotation omitted).

Second, an inmate must demonstrate that his counsel's performance was deficient *at the time that the attorney did the actions*. It is not enough that, in hindsight, an attorneys' actions were not well chosen. "[E]very effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689. In other words, the court must put itself into the attorney's shoes, and evaluate the attorneys actions with the information and resources available at the time.

An inmate's challenge is even more difficult where a defense attorney has completed a "thorough investigation of law and facts relevant to plausible options[.]" *Id.* at 690. In this situation, the attorney's strategic decisions are "virtually unchallengeable." *Id. See e.g. Darden v. Wainwright*, 477 U.S. 168 (1986) (concluding that trial counsel reasonably decided to rely solely on a request for mercy at penalty phase of capital trial because any other strategy

would have opened the door to the defendant's extensive criminal history). An attorney need not investigate a defense if they reasonably believe that such an investigation would be "fruitless or even harmful[.]" *Strickland,* 466 U.S. at 691. *See also Burger v. Kemp*, 483 U.S. 776 (1987) (concluding that trial counsel reasonably chose not to present potentially mitigating evidence because he felt that the evidence would have been counterproductive).

In assessing an attorney's actions, courts may inquire into attorney-client communications. "Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant." *Strickland,* 466 U.S. at 691.

Finally, it must be kept in mind that the standards are meant to protect the integrity of the system, and "not to grade counsel's performance." *Id.* at 697.

### c.    Standards For Demonstrating Prejudice

In order to succeed on a claim of ineffective assistance, an inmate must demonstrate that his attorneys' deficiencies caused him prejudice. It is not enough for the inmate to show that the errors had some conceivable effect on the outcome of the proceeding. Instead, the *Strickland* Court imported the standards for materiality for claims under *Brady v. Maryland*, 373 U.S. 83 (1963). In order to show prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

In making this determination, the court must presume that the trier of fact acted according to law. *Id. See also Nix v. Whiteside*, 475 U.S. 157, 175-176 (1986) (there is no prejudice from a "failure" to introduce perjured testimony, even if it is assumed that the jury would have believed the false testimony). The court must also consider the "totality of the evidence" in making the assessment. That is, the court must examine the evidence that was influenced not by any ineffectiveness in making any conclusions about prejudice. *Strickland,* 466 U.S. at 695.

After evaluating the totality of the evidence, "a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors." *Id.* at 696. When a defendant is claiming that his trial counsel were deficient at the mitigation phase of a capital case, the court must determine "whether there is a reasonable probability that, absent the errors, the sentencer … would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Id.* at 695.

## B.    Failure to Adequately Voir Dire (First Ground for Relief)

### 1.    Overview

Raglin asserts that his trial counsel erred in two ways during the voir dire: his attorneys generally failed to voir dire, and specifically failed to voir dire and remove Juror Tara Vessart.

### 2.    Last Reasoned State Court Decision

Raglin raised this claim for the first time during post-conviction. The last reasoned state court decision on this matter was issued by the First District Court of Appeals. It concluded that Raglin's claim was barred by the doctrine of *res judicata*.

> Raglin contended, in this tenth claim for relief, that his trial counsel was ineffective because he failed to challenge a specific juror for cause or to use a peremptory challenge. Because this claim challenged conduct that was evident in the record, it should have been brought on direct appeal. Raglin's attempt to support the claim with evidence dehors the record, such as Porter's affidavit and newspaper articles, did not change this fact. Accordingly, the trial court correctly dismissed the claim under the doctrine of res judicata.

Apx. at Vol. X, p. 2651; *State v. Raglin*, 1999 Ohio App. LEXIS 2876, *13 (1st Dis. Ohio 1999).

### 3.    Procedural Posture

This claim is procedurally defaulted because the last reviewing court held that this claim was barred by the doctrine of *res judicata*. *See Seymour v. Walker*, 224 F.3d 542 (6th Cir. 2000); *Coleman v. Mitchell*, 244 F.3d 533, 538 (6th Cir. 2001); *Byrd v. Collins*, 209 F.3d 486, 520-22 (6th Cir. 2000); *Mapes v. Coyle*, 171 F.3d 408, 421 (6th Cir. 1999).

### 4.    Merits Analysis

#### a.    Ms. Veesart Was Reluctant To Impose The Death Penalty

The Warden submits that Raglin has failed to demonstrate why his attorneys were deficient, nor has he shown prejudice from his attorney's handling of the voir dire. At the outset, it must be noted that Raglin is not claiming that his

attorneys failed to engage in any voir dire of Tara Veesart. Nor is he claiming that his attorneys did not ask about Ms. Veesart's relationship with Tommy's bar or the witness who was there. He cannot do so, because his attorneys unmistakably did voir dire on these. Instead, Raglin claims that his attorneys failed to "properly" voir dire Ms. Veesart on these issues.

In point of fact, Ms. Veesart was quite open with both defense attorneys and prosecutors. She was quite willing to admit any concerns that she would have about her ability to be fair and impartial.

Before going on, the Warden wishes to emphasize an important issue about this case. This was not a situation where Raglin's counsel could reasonably claim that their client was completely innocent. Raglin had confessed to the murder, and despite their attorneys' best efforts, had failed to have the confession suppressed. Thus, his attorneys clearly made a decision that this was a case that would be fought during mitigation. This means that Raglin's attorneys were looking for jurors who showed hesitance to impose a death sentence.

Ms. Veesart fit the bill perfectly.

During the prosecutor's voir dire, Ms. Veesart expressed considerable ambivalence about the death penalty. Ms. Veesart told the prosecutor that "I definitely sway back and forth" about the death penalty. Apx. at Vol. II, pp. 768-769. When the prosecutor sought elaboration, Ms. Veesart indicated that she viewed the issue as a "gray area." Quite notably, Ms. Veesart expressed strong feeling against the death penalty. "Actually I've been kind of that gray area now for a few years. Sometimes I don't think that we as human beings have the right

to decide on something so large as someone's life." Apx. at Vol. II, p. 769. But Ms. Veesart also indicated that this opinion would waiver when she heard about "horrendous mass murder stories and just really horrible things[.]" Apx. at Vol. II, p. 769.

The prosecutor later asked Ms. Veesart if she could "actually take pen in hand and sign a death verdict form." Her answer: "I don't know." Apx. at Vol. II, p. 773. In the end, Ms. Veesart indicated that she would follow the law. The prosecutor passed for cause. Apx. at Vol. II, p. 775.

During Raglin's voir dire, his counsel focused on Ms. Veesart's willingness to defend her position on the death penalty during deliberations.

> Q.    Okay.  Can you maintain your position, you know, if your convinced after partaking and doing all this and you happen to be contra to the other eleven – let's suggest, and I know its hypothetical and it really is tough to know because you're not there yet so you haven't done this, but can you imagine yourself swimming up stream [sic] so to speak?
>
> A.    Um-hum.
>
> Q.    And doing that?
>
> A.    And standing my ground you mean?
>
> Q.    Yeah.
>
> A.    Yes.

Apx. at Vol. II, pp. 778-779.

Raglin's counsel followed up by asking Ms. Veesart about her job as a manager. Raglin's counsel concluded that Ms. Veesart was "pretty much of a leader." Apx. at Vol. II, p. 779.

In short, Raglin's counsel had a pure mitigation case, and found a potential juror who expressed considerable reluctance to impose the death penalty except for "horrible mass murderers" and showed signs that she would not buckle under to the pressure of other jurors.

### b.    Ms. Veesart Stated That Her Connections With "Tommy's" Bar Would Have No Influence On Her Impartiality

During voir dire, both the prosecutor and defense attorney asked Ms. Veesart numerous questions about her connections to "Tommy's" bar.  At the outset of the voir dire, Ms. Veesart was asked about her relationship with "Lisa Starkey" – a waitress who worked at the bar where this murder took place.  Apx. at Vol. II, p. 765.  Ms. Veesart was told that the waitress was "out of the country" and that "she won't be called as a witness."  Apx. at Vol. II, p. 765.

When asked if Ms. Veesart's relationship would effect her in any way, Ms. Veesart answered unequivocally that she would not be effected.

> Q.    … The fact that you know her, would that cause you to favor one side over the other in this case?
>
> A.    No.
>
> Q.    She's not going to testify.  I'll tell you that right now.  The fact that you know her, will that influence you to reach a verdict one way or another in this case?
>
> A.    No.
>
> Q.    Okay.  Can you still decide this case just on the evidence that you're going to hear?
>
> A.    Yes.

Apx. at Vol. II, p. 765.

Ms. Veesart stated that she had been at the bar earlier on the evening of the murder, but did not know any members of the band that played that evening. Apx. at Vol. II, p. 766. Ms. Veesart was asked point blank whether this would effect her ability to be fair.

> Q. Okay. Let me ask you this: And it's not often we get a prospective juror that's near the scene of a crime near the time that the crime was committed. Would that affect your ability to be fair and impartial in this case?
>
> A. I've thought about that, and no, I do not think it would affect my ability.
>
> Q. Okay. I mean, would it make any difference to you that you were there that night as opposed to being somewhere else that night? I mean, does it make any difference when you're a juror and you're sitting on this case?
>
> A. No. Like I said, I have given it a lot of consideration and, no, I do not believe it would.

Apx. at Vol. II, p. 767.

Ms. Veesart explained that she never had close ties to Tommy's Bar. In response to a defense question about her brother and brother-in-law, Ms. Veesart testified that the people at Tommy's were just acquaintances, not friends.

> And just let me tell you a little bit that Tommy's is no longer open so that people that I associated with there were just associates. They're not my friends. My boyfriend and I, we don't actually – we don't even relish that any more and who is the bartender. It's not something that I don't have strong ties to Tommy's or anything like that.

Apx. at Vol. II, pp. 780-781.

> ### c. Defense Counsel Reasonably Concluded That Ms. Veesart Would Not Be Biased, And That She Would Be Opposed To The Death Penalty

As discussed above, the voir dire of Ms. Veesart showed her to be a strong-willed woman who was ambivalent about the death penalty. She stated that she was not sure that humans had the right to make these sorts of life and death decisions. "Sometimes I don't think that we as human beings have the right to decide on something so large as someone's life." Apx. at Vol. II, p. 769. She suggested that the only exception would be for the most vile of crimes: "horrendous mass murder stories and just really horrible things[.]" Apx. at Vol. II, p. 769. In addition to her opinions about the death penalty, Ms. Veesart showed considerable resilience and leadership. Thus, in many ways she was an ideal defense juror for a death penalty case involving a straightforward robbery-murder.

At the same time, Ms. Veesart's presence at Tommy's bar on the night of the murder certainly warranted exploration. As discussed above, both the prosecutor and defense counsel *did* explore these issues. Ms. Veesart stated repeatedly and unequivocally that her presence at the bar, and her acquaintance with some of the bar employees would have no effect on her ability to be fair and impartial.

It is well established that the deference accorded to a trial attorney is particularly pronounced in regards to decisions made during voir dire. "Counsel is also accorded particular deference when conducting voir dire[.]" *Hughes v. United States*, 258 F.3d 453, 457 (6th Cir. 2001) (citing *Nguyen v. Reynolds*, 131 F.3d 1340, 1349 (10th Cir. 1997)). Moreover, decisions made during voir dire are considered to be trial strategy. *Id.*

The simple fact is that these issues were addressed in quite some detail, and Raglin's counsel saw enough to conclude that Ms. Veesart would be a good juror for the defense.  Raglin's counsel was not deficient, and Raglin has failed to show prejudice.

## C.  Conceding That Raglin Murdered Michael Bany (First Ground for Relief)

### 1.     Overview

Raglin complains that his trial counsel admitted during the voir dire and opening statements that Raglin had pulled the trigger on the gun when he shot Michael Bany.

### 2.     Last Reasoned State Court Decision

The last reasoned decision was issued by the First District Court of Appeals during post-conviction.  The Court held that this claim was barred by the doctrine of *res judicata*.  It also performed alternative merits analysis, concluding that the statements by Raglin's counsels did not constitute a complete abandonment of advocacy.

> Raglin maintained, in his eighth claim for relief, that his trial counsel was ineffective because, without his consent, he made statements during voir dire and opening argument that, in effect, conceded his guilt. Raglin points this court to the case of *Wiley v. Sowders*, wherein the Sixth Circuit Court of Appeals determined that when a defense counsel plans to utilize a strategy that completely concedes his client's guilt, he must first obtain the client's consent prior to employing the strategy. The *Wiley* court also held that the client's consent must appear in the trial record. Based on this precedent, Raglin contends that his trial counsel was ineffective. He also contends that his evidence dehors the record, which included his own affidavit in which he averred that his trial counsel never obtained his consent, precluded the application of *res judicata*. We disagree.

We first note that *Wiley* is only applicable where defense counsel's statements amount to total and complete concessions of the defendant's guilt, and not just concessions as to one or some of the elements of the offense charged. Although they are perhaps inartful, we do not read the comments cited by Raglin as the complete concessions of guilt contemplated by *Wiley*. However, even if we assume that these comments did amount to complete concessions of guilt so that *Wiley* might apply, Raglin's claim still lacks merit. As we noted, *Wiley* specifically requires that a defense counsel employing the strategy of completely conceding his client's guilt must make a part of the trial record his client's consent to this strategy. No such consent by Raglin is apparent in the trial record. Accordingly, the alleged violation of the rule from *Wiley* was evident in the record and should have been raised on direct appeal. Accordingly, the trial court's dismissal of the claim on the basis of *res judicata* was not in error.

Apx. at Vol. X, pp. 2650-2651; *State v. Raglin*, 1999 Ohio App. LEXIS 2876, *10-12 (1st Dis. Ohio 1999) (footnotes omitted).

### 3.    Procedural Posture

This claim is procedurally defaulted because the last reviewing court held that this claim was barred by the doctrine of *res judicata*. *See Seymour v. Walker*, 224 F.3d 542 (6th Cir. 2000); *Coleman v. Mitchell*, 244 F.3d 533, 538 (6th Cir. 2001); *Byrd v. Collins*, 209 F.3d 486, 520-22 (6th Cir. 2000); *Mapes v. Coyle*, 171 F.3d 408, 421 (6th Cir. 1999).

### 4.    Merits Analysis

This claim is without merit because his legal precedent (1) is not cognizable under AEDPA, and (2) has been superseded by recent United States Supreme Court case law. Raglin bases this claim on *Wiley v. Sowders*, 647 F.2d 642, 650 (6th Cir. 1981). Under the AEDPA, this Court may not examine this issue through the lens of any appellate court cases, nor may it rely on decisions

issued after the conviction became final.  *See Williams v. Coyle*, 260 F.3d 684, 703 (6th Cir. 2001).  Thus, *Wiley* is simply irrelevant to this case.

However, even if this was *de novo* review, this claim would fail.  Under *Florida v. Nixon*, __ U.S. __, 125 S.Ct. 551 (2004), the United States Supreme Court held that trial counsel did not err in a death penalty case when he conceded that "there won't be any question, none whatsoever, that my client, Joe Elton Nixon, caused Jeannie Bickner's death."  *Id.* at 557.  The Supreme Court recognized that in death penalty cases, often the best strategy will be to concede guilt with the expectation that they will vigorously fight at the mitigation phase.  Where the defendant's guilt is clear, "avoiding execution may be the best and only realistic result possible." *Id.* at 562-563 (quoting ABA Guidelines for the Appointment and  Performance of Defense Counsel in Death Penalty Cases §10.9.1, Commentary (rev. ed. 2003), reprinted in 31 Hofstra L. Rev. 913, 1040 (2003)) (punctuation omitted).

The Court explained that a "run-of-the-mill strategy of challenging the prosecution's case for failing to prove guilt beyond a reasonable doubt can have dire implications for the sentencing phase." *Id.* at 563 (quotation and punctuation omitted).

Simply put, the special rules in *Wiley* have been superseded by *Nixon*. There is no requirement for an on-the-record colloquy about trial strategy. "Instead, if counsel's strategy, given the evidence bearing on the defendant's guilt, satisfies the *Strickland* standard, that is the end of the matter; no tenable claim of ineffective assistance would remain." *Id.*

This is clearly the decision that Raglin's counsel made in this case. He forthrightly acknowledged that his client had pulled the trigger of the gun that killed Michael Bany – and later he vigorously fought for Raglin's life during the mitigation phase. Under *Nixon*, this is an entirely appropriate strategy.

On a related note, Raglin argues that his trial counsel engaged in inconsistent arguments when he conceded that his client had pulled the trigger, but later claimed that the State failed to prove an intent to kill. This is not inconsistent – Raglin's attorney admitted that his client committed the acts which led to the death of Michael Bany. He merely argued that one of the elements – an intent to kill – was not proven.

## D.    Not Putting On Evidence To Support A Manslaughter Instruction / Not Hiring a Firearms Expert (First Ground for Relief)

### 1.    Overview

Raglin complains that his trial counsel "failed" to introduce evidence to support his claim that his actions were more akin to that of manslaughter, rather than aggravated murder. Specifically, Raglin suggests that his attorneys should have hired a firearms expert. Because these two arguments are inherently interweaved, the Warden will address them together

### 2.    Last Reasoned State Court Decision

The last reasoned decision was issued by the First District Court of Appeals during post-conviction. The Court held that this claim was barred by the doctrine of *res judicata.*

Raglin's twelfth claim for relief, which alleged that his trial counsel was ineffective for failing to request a jury instruction on the lesser-included offense of involuntary manslaughter until after the defense rested, was res judicata. The claimed error was evident from the record and, thus, should have been raised on direct appeal. Raglin's inclusion of Porter's affidavit as evidence dehors the record was of no assistance under these circumstances. Therefore, the trial court correctly dismissed the claim.

…

Raglin contended, in his sixteenth claim for relief, that his trial counsel was ineffective because he failed to obtain a firearms expert to testify with respect to whether his gun had a hair trigger and whether it was possible to shoot someone without purpose even with a gun that did not have a hair trigger. This claim, which challenged his counsel's trial strategy, should have been brought on direct appeal. It was res judicata. Raglin's inclusion of Porter's affidavit did not obviate this fact. Therefore, the trial court correctly dismissed it.

Apx. at Vol. X, pp. 2652, 2653; *State v. Raglin*, 1999 Ohio App. LEXIS 2876, *13-14, 15 (1st Dis. Ohio 1999).

### 3.    Procedural Posture

This claim is procedurally defaulted because the last reviewing court held that this claim was barred by the doctrine of *res judicata*. *See Seymour v. Walker*, 224 F.3d 542 (6th Cir. 2000); *Coleman v. Mitchell*, 244 F.3d 533, 538 (6th Cir. 2001); *Byrd v. Collins*, 209 F.3d 486, 520-22 (6th Cir. 2000); *Mapes v. Coyle*, 171 F.3d 408, 421 (6th Cir. 1999).

### 4.    Merits Analysis

Raglin asserts that his trial counsel was deficient for "failing" to introduce evidence to support his claims that his shooting of Michael Bany was an accident.

Raglin does not point to any specific evidence that was overlooked, nor does he show whether his attorneys investigated any potential evidence. In other

words, Raglin asks this Court to reverse his conviction because his attorneys might or might not have investigated potential evidence, and they might have found something helpful.

Raglin suggests that his attorneys should have hired a firearms expert. However, he has not provided this Court with any affidavits from any such experts. Thus, Raglin merely speculates that he might have obtained useful information.

In light of Raglin's failure to identify any failures in investigation or any overlooked evidence, this assertion can be summarily rejected.

## E.    Failure to Object To Prosecutorial Misconduct (First Ground for Relief)

### 1.    Overview

### 2.    Last Reasoned State Court Decision

Raglin's twelfth claim for relief, which alleged that his trial counsel was ineffective for failing to request a jury instruction on the lesser-included offense of involuntary manslaughter until after the defense rested, was res judicata. The claimed error was evident from the record and, thus, should have been raised on direct appeal. Raglin's inclusion of Porter's affidavit as evidence dehors the record was of no assistance under these circumstances. Therefore, the trial court correctly dismissed the claim.

…

Raglin contended, in his sixteenth claim for relief, that his trial counsel was ineffective because he failed to obtain a firearms expert to testify with respect to whether his gun had a hair trigger and whether it was possible to shoot someone without purpose even with a gun that did not have a hair trigger. This claim, which

> challenged his counsel's trial strategy, should have been brought
> on direct appeal. It was res judicata. Raglin's inclusion of Porter's
> affidavit did not obviate this fact. Therefore, the trial court
> correctly dismissed it.

Apx. at Vol. X, pp. 2652, 2653; *State v. Raglin*, 1999 Ohio App. LEXIS 2876,

*13-14, 15 (1st Dis. Ohio 1999).

### 3.    Procedural Posture

This claim is procedurally defaulted because the last reviewing court held

that this claim was barred by the doctrine of *res judicata*. *See Seymour v. Walker*,

224 F.3d 542 (6th Cir. 2000); *Coleman v. Mitchell*, 244 F.3d 533, 538 (6th Cir.

2001); *Byrd v. Collins*, 209 F.3d 486, 520-22 (6th Cir. 2000); *Mapes v. Coyle*, 171

F.3d 408, 421 (6th Cir. 1999).

### 4.    Merits Analysis

Raglin asserts that his trial counsel was deficient for "failing" to introduce

evidence to support his claims that his shooting of Michael Bany was an accident.

> Raglin does not point to any specific evidence that was overlooked, nor does he
> show whether his attorneys investigated any potential evidence.  In other
> words, Raglin asks this Court to reverse his conviction because his
> attorneys might

## F.    Failure to Adequately Investigate and Present Evidence of Remorse (Second Ground for Relief)

### 1.    Overview

### 2.    Last Reasoned State Court Decision

The last reasoned decision on this matter was issued by the First District

Court of Appeals in response to Raglin's second post-conviction action.  That

Court concluded that Raglin failed to meet the standards for filing a second or successive post-conviction action, and the state courts were without jurisdiction to hear this case.

> We overrule appellant's fourth and fifth assignments of error upon our determination that the common pleas court properly declined to entertain the appellant's petition for post-conviction relief. The petition represented the appellant's second attempt to secure relief under R.C. 2953.21 et seq., and the appellant filed the petition well after the filing date set by R.C. 2953.21(A)(2). Thus, R.C. 2953.23 precluded the common pleas court from entertaining the appellant's tardy and successive petition, when the appellant neither demonstrated that he had been unavoidably prevented from discovering the facts upon which his petition depended nor predicated his claims upon a new retrospectively applicable federal or state right recognized by the United States Supreme Court since the filing of his first petition.

Apx. at Vol. XII, p. 242.

### 3.    Procedural Posture

This claim is procedurally defaulted because the last reviewing court held that Raglin failed to meet the standards for filing a second or successive post-conviction action. *See Bird v. Hurst*, 2004 U.S. App. LEXIS 16559, *7 (6th Cir. 2004).[3]

### 4.    Merits Analysis

### a.    The Mitigation Evidence That Was Presented

At the outset, it must be emphasized that Raglin's attorneys *did* present mitigating evidence at Raglin's trial. The best start is to look at the Ohio Supreme Court's description of the mitigation evidence. There are two reasons to do this:

---

[3] The Warden further notes that she has moved this Court to dismiss this claim because Raglin filed this claim beyond the statute of limitations. The Warden incorporates by reference the arguments made in her motion to dismiss.

(1) the Ohio Supreme Court provides a neat summary, and (2) the Ohio Supreme

Court's description of the evidence produced constitutes factual findings which

are binding on this Court.  *Bowling v. Parker*, 344 F.3d 487, 497 (6th Cir. 2003).

In mitigation, appellant's two sisters, Tabatha and LaSonya Raglin, and his father, Walter Raglin, Sr., testified concerning the difficult circumstances of appellant's youth.

Testimony established that appellant was born into a stable home environment. However, when appellant was approximately two or three years old, his parents began living apart. Following the separation, appellant and his two older sisters, Tabatha and LaSonya Raglin, lived with their mother during a series of peripatetic moves and travels. Apparently, things remained relatively stable for a brief period of time following the separation, but the mother then began carousing with male acquaintances and using crack cocaine. The mother eventually became heavily involved in a life of drug and alcohol abuse, and appellant's father became involved in a life of crime. On one occasion, the children witnessed an incident where their mother shot and wounded their father during a domestic dispute. During appellant's childhood, his father was incarcerated on several occasions for drug-related offenses. The father was also incarcerated at the time of appellant's trial and testified in the penalty phase (on videotape) from a Kentucky prison where he was serving a twenty-year sentence for possession of cocaine.

Testimony established that during appellant's childhood appellant and his siblings moved with their mother from place to place. The mother had numerous boyfriends and gave birth to two additional children (appellant's younger half-brothers) from liaisons with different men. The housing in which the mother and children lived was deplorable. The homes were characterized by extreme filth and inadequate facilities. Some of the places were infested with mice and insects. When the mother began dating workers at racetracks in Kentucky, she lived with appellant and some of appellant's siblings in tack rooms near the horse stables. The tack rooms were very small and there was no kitchen, electricity, plumbing, or privacy. LaSonya recalled finding the mother in the bathroom at one residence "shooting up" drugs intravenously, causing blood to spatter all over the room, including the ceiling. LaSonya also recalled having attempted to clean the bathroom so that her younger brothers would not be exposed to what their mother had done. Additionally, the mother would often abandon

the children for days or a week at a time and spent some nights in jail for prostitution. While the mother was out "running the streets and getting high," Tabatha and LaSonya were attempting to raise the younger children, none of whom regularly attended school. When appellant was approximately nine years old, the mother allowed him to drink alcohol and smoke cigarettes, and appellant began stealing money at his mother's command. The mother would use the money to support her drug habit. On one occasion, someone fired shots at the family home after appellant, at his mother's direction, stole $700 or $800 from a drug dealer that LaSonya had been dating. The mother also engaged in prostitution and used her monthly ADC checks to purchase drugs. Apparently, during his preteen years, appellant would accompany the mother to drug deals as a form of protection for his mother.

Tabatha, at the age of twenty or twenty-one, obtained custody of appellant, who, at the time, was either twelve or thirteen years old. Tabatha also obtained custody of the two younger boys. However, Tabatha testified, "I was just a sister. He [appellant] was already taller than I was. He never disrespected me, but he just did what he wanted to do." Tabatha also testified, "Whatever I told Walter to do she [the mother] would tell the opposite." Tabatha testified further: "He [appellant] never had nobody to show him the right way. Nobody. My mother always showed him the wrong way." LaSonya and Tabatha also recounted several instances where appellant, as a child, had engaged in self-destructive behavior, including jumping out of windows, putting firecrackers in his shoes, and shooting himself in the leg. On one occasion, when appellant was eleven or twelve years old, he was drunk and put his hand through a glass window. Appellant also spent time in several juvenile facilities in Kentucky and, on one occasion, underwent psychiatric evaluation.

After Tabatha had obtained custody of the children, appellant got in trouble for not attending school and was once again placed in a juvenile facility in Lexington, Kentucky. There, appellant's mother visited appellant and, without permission and unbeknownst to either Tabatha or the authorities, took appellant out of the facility and out of the state. When Tabatha and the authorities discovered that appellant was missing, they assumed that appellant had simply walked away from the facility. The mother then brought appellant to Cincinnati, Ohio, and Tabatha and the authorities did not know of appellant's whereabouts. While in Cincinnati, appellant, who was approximately thirteen or fourteen years old at the time, lived with the mother and her boyfriend. The boyfriend, who was also the mother's former pimp, sometimes would not permit appellant

to live in the house. Thus, appellant would occasionally be forced to live and sleep in a junkyard owned by the boyfriend. It was not until a year later that Tabatha found out where appellant was living.

Appellant also presented the testimony of John Hale, a Kentucky law enforcement officer and a former social worker. Hale first met appellant when appellant was approximately twelve or thirteen years old. At that time, Hale was a social worker in Kentucky and had received a referral concerning appellant from appellant's school or from a state social worker. Hale testified that when he conducted the first home visit at Tabatha's residence, several people were seated around a table smoking marijuana. According to Hale, Tabatha's having custody of appellant was like "a child raising a child." Hale also testified that he was able to form a bond with appellant during appellant's childhood. However, according to Hale, the "lure of the streets" and appellant's "street savvy" caused him to opt for the streets rather than to accept the services that Hale could provide. Nevertheless, Hale testified that "Walter probably has more potential and value than anybody I ever seen." Hale testified further: "He just never was challenged and never believed that he was worth something because one of the greatest needs that we have in life is [the] need to be loved. And I don't think he got the proper love or somebody really to love him for who he is. Not for how tall he was or how smart he was or how street savvy he was. He got fed the wrong information and his behavior just escalated and channeled in the wrong direction." Hale had also promised appellant, during his childhood, that he (Hale) would always be available to appellant whenever he needed help. However, appellant apparently never took full advantage of that offer until after he robbed and killed Bany.

During the mitigation phase, appellant gave an unsworn statement in which he expressed sorrow for the pain and grief he had caused to Bany's family, to society, and to his own family. Additionally, he stated, "Knowing that I took a person's life * * * haunts me every second and every minute of my life. It's going to be with me forever." Appellant also stated, "I don't think I deserve the death penalty. I think I deserve a life sentence." Appellant then repeated that he was sorry for what he had done and for putting everyone "in this situation like this, especially the [Bany] family."

Dr. Kathleen J. Burch, appellant's court-appointed psychologist, testified in mitigation. Burch, a clinical psychologist, first met with appellant in March 1996. Between that time and the time of the mitigation hearing, Burch met with appellant on a number of

occasions, performed psychological testing, interviewed Tabatha and LaSonya Raglin, and reviewed records and other information concerning appellant. Burch noted that appellant had grown up in an "extremely impoverished, extremely frightening, unsupportive and chaotic environment." She also noted that "some of the conditions under which he lived as a young child are sort of like the things you read about going on in Rio [de Janeiro] or Calcutta, so it's pretty extreme circumstances." Burch described appellant as having a very problematic and very insecure relationship with his mother. Burch stated that the major bonding between appellant and the mother during his childhood years centered around alcohol and drug use. Burch also stated that, according to appellant and his sisters, the mother had begun furnishing him with alcohol when he was just nine years old. Burch testified that "according to [appellant] he and his mother would be together [and] she would do her drugs and he would do his." Burch also testified that the relationship between appellant and the mother was obviously very conflicted and unhealthy and that he lacked appropriate parental support, guidance, and nurturing during his formative years.

Dr. Burch performed psychological and neuropsychological testing of appellant. Burch testified that she was able to obtain valid test data despite the fact that, among other things, appellant had initially lied to her to make himself appear less responsible. Burch testified that the results of the psychological testing were consistent with the profile of a person who lacks a well-developed sense of self, who is prone to "problems with impulse control and his thinking that are greatly in excess of those that other people experience," and who has "real difficulties with his mood." Burch also testified that appellant has an overall IQ of eighty-one which, according to Burch, "is at the low end of the low average range and compared to others his age this means that 90 percent of people his age would earn better scores than he would on this test." Burch testified further that the neuropsychological testing yielded results that were consistent with a finding of "some mild deficits in the integrity and functioning" of appellant's brain. Burch stated that this mild brain damage may have been caused by a series of closed-head injuries, such as the "repeated insults to [appellant's] brain over a number of years from automobile accidents which he described to me, from fits, from falls and also very heavy alcohol use."

Burch diagnosed appellant as suffering from adjustment disorder with depressed mood, cognitive disorder, alcohol-related disorder, cannabis-related disorder, borderline personality disorder, and antisocial personality disorder. Burch was asked the following

questions, and gave the following responses, concerning the existence of the R.C. 2929.04(B)(3) mitigating factor:

…

Burch also testified about a variety of other matters concerning appellant's history, background, and psychological composition. Additionally, Burch testified that appellant had stated to her that he never intended to kill the victim. Burch testified further that appellant had expressed regret over the killing.

*State v. Raglin*, 83 Ohio St.3d 253, 267-273 (1998)

The Ohio Supreme Court found that Raglin had established numerous mitigating factors and gave meaningful weight to Raglin's "atrocious" upbringing. The Ohio Supreme Court further found that Raglin had cooperated with police and was remorseful, granting both mitigating factors some weight. Finally, the court concluded that Raglin's mental condition was entitled, at most, to little weight in mitigation. *Id.* at 273-274.

Thus, before looking at the mitigation evidence that Raglin claims was overlooked, it must be kept in mind that his attorneys clearly investigated Raglin's background and produced substantial evidence about his upbringing, and mental status. It should also be kept in mind that Raglin's counsel did present evidence of remorse, both through Raglin's unsworn statement and through the testimony of Dr. Burch.

**b.    The Evidence of Remorse Is Cumulative**

The Warden submits that in light of two factors, this Court can summarily reject Raglin's current claim of ineffective assistance of counsel. First, Raglin's counsel clearly and unmistakably investigated and presented a substantial

mitigation case. Raglin's claim that his attorneys failed to investigate is simply belied by the record.

Second, the evidence of remorse that Raglin wishes had been presented is clearly cumulative to the evidence that he actually presented. As Raglin readily concedes, he presented evidence that he was remorseful during his mitigation phase. *See* Amended Petition at 31-32. Raglin also concedes that the Ohio Supreme Court found that Raglin was remorseful. *See* Amended Petition at 32.

Raglin won the battle, but lost the war. He won the battle by proving that he was remorseful. He lost the war by failing to show that the extensive mitigation that he presented was equal to, or outweighed the overwhelming aggravating circumstances against him.

## G.   Ineffective Assistance of Appellate Counsel (Fourth Ground for Relief)

### 1.   Overview and Legal Standards

Raglin presents the oft-raised argument that his appellate counsel were deficient by failing to raise all meritorious claims. Specifically, Raglin argues that his attorneys should have presented an additional eight legal arguments to the Ohio Supreme Court.

The Due Process Clause of the Fourteenth Amendment guarantees a criminal defendant the effective assistance of counsel on his first appeal as of right. *Evitts v. Lucy*, 469 U.S. 387 (1985). However, it is well-established that the right to appointed counsel extends only to the *first* appeal as of right. *Pennsylvania v. Finley*, 481 U.S. 551, 555 (1987) ("Our cases establish that the

right to appointed counsel extends to the first appeal of right, and no further."). And where there is no constitutional right to counsel there can be no deprivation of effective assistance. *Coleman v. Thompson*, 501 U.S. 722, 752 (1991).

Courts assessing the alleged ineffectiveness of appellate counsel have followed the standards enunciated in *Strickland v. Washington*, 466 U.S. 668 (1984). Thus, to substantiate a claim of appellate ineffectiveness, it must be shown both that appellate counsel failed to meet an objective standard of professional performance, and, but for counsel's unprofessional performance, the result of the proceeding would have been different. *Smith v. Robbins*, 528 U.S. 259, 285 (2000).

The right to effective counsel on appeal requires that an attorney be available to assist in preparing and submitting a brief to the appellate court, and to vigorously advocate the interests of the defendant. *Swenson v. Bosler*, 386 U.S. 258 (1967); *Anders v. California*, 386 U.S. 738 (1967). However, an appellate defense counsel does not have a constitutional duty to raise non-frivolous issues at the request of the defendant if, as a matter of professional judgment, counsel decides not to raise such issues. *Jones v. Barnes*, 463 U.S. 745 (1983). The Supreme Court has held that the "process of winnowing out weaker arguments on appeal and focusing on those most likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." *Smith v. Murray*, 477 U.S. 527, 536 (1986) (quotation omitted).

Where an attorney files an appellate brief, courts must inquire whether the "ignored issues are clearly stronger than those presented." *Smith v. Robbins*, 528

U.S. at 288 (quoting *Gray v. Greer*, 800 F.2d 644, 646 (7th Cir. 1986)).  When a defendant is unable to make this showing, the Court may summarily reject a claim of ineffective assistance of counsel  *Coleman v. Mitchell*, 268 F.3d 417, 430 (6th Cir. 2001).

## 2.    Last Reasoned State Court Decision

The last reasoned state court decision on this matter was issued by the Ohio Supreme Court.  That Court summarily rejected Raglin's application to reopen his appeal due to ineffective assistance of counsel.

> This cause came on for further consideration upon appellant's application for reopening under S. Ct. Prac. R. XI Sec. (5).  Upon consideration thereof,
>
> IT IS ORDERED by the Court that the application for reopening be, and hereby is, denied.

Apx. at Vol. XI, p. 3006.

## 3.    Procedural Posture

This claim is partially procedurally defaulted.  Raglin raised seven of the eight arguments in his petition to reopen.  The Warden concedes that these claims are not defaulted.

Raglin did not raise #6:   "Walter Raglin was denied the effective assistance of counsel when his counsel failed to investigate and present substantial mitigating evidence of remorse during the sentencing phase hearing." *See* Apx. at Vol. XI, pp. 2801-2087.  Because Raglin did not fairly present the legal or factual arguments during any state court proceeding, Raglin has procedurally defaulted this argument.  *Baldwin v. Reese*, __ U.S. __, 124 S.Ct. 1347, 1351 (2004); *Newton v. Million*, 349 F.3d 873, 877 (6th Cir. 2003).

### 4.    Merits Analysis

In the case at bar, Raglin attacks his appellate counsel for failing to raise eight "meritorious" claims in the Ohio Supreme Court on direct appeal.  Raglin did not allege or argue that any one of the supposedly meritorious claims was stronger than the claims actually raised, or more likely to result in relief.  Nor did Raglin allege specifically in what manner or for what reason an effective appellate advocate should have presented such claims.  In stead, he argued simply that counsel must have been ineffective because they did not raise all meritorious issues.  In other words, his application amounted to nothing more than a request to obtain a second round of appeal to consider claims not presented previously.  Respondent respectfully submits, in view of the precedents cited above, that the Ohio Supreme Court's summary rejection of Raglin's request cannot be deemed unreasonable.  Indeed, Respondent is unaware of any case in which the United States Supreme Court has held that an appellate counsel was ineffective for failing to raise "all meritorious" claims.

Moreover, the Warden notes that many of the claims involve ineffective assistance of trial counsel.  These claims require evidence outside the record in order to prevail, and thus, rarely would succeed on direct appeal.  As a result, Raglin's appellate counsel can hardly be faulted for "failing" to raise these arguments.

For all the foregoing reasons, Raglin's claims of ineffective assistance of counsel do not warrant relief in federal habeas corpus.

# VII.  Responses To Raglin's Suppression Claims

## A.    *Edwards v. Arizona* Claim (Sixth Ground for Relief)

### 1.    Overview

Raglin asserts that his confession was invalid because the police continued to interrogate him despite Raglin's request for counsel.  This claim fails because Raglin voluntarily began speaking to the police, despite initially requesting an attorney.

### 2.    Last Reasoned State Court Decision

The Ohio Supreme Court examined this claim on the merits, concluding that Raglin's claim was without merit.

> In Proposition of Law No. 14, appellant contends that his confession was involuntary and that his right to counsel and right against self-incrimination were violated because, according to appellant, police should have informed him before questioning that "the statement he was about to give could be (and would be) used against him in an effort to exterminate him in the electric chair." This court has addressed and rejected similar contentions in a number of our prior cases. *See, generally, State v. Bell* (1976), 48 Ohio St. 2d 270, 278, 2 Ohio Op. 3d 427, 431, 358 N.E.2d 556, 562, reversed on other grounds (1978), 438 U.S. 637, 98 S. Ct. 2977, 57 L. Ed. 2d 1010; and *Garner*, 74 Ohio St. 3d 49, 60-61, 656 N.E.2d 623, 635. Today, we likewise reject appellant's contentions that his confession was involuntary simply because he was not informed by police of the gravity of the possible punishment for the aggravated (felony) murder of Bany.
>
> The second (and far more significant) issue raised by appellant is whether he effectuated a valid -- i.e., voluntary, knowing, and intelligent -- waiver of his rights under the Fifth and Fourteenth Amendments to have counsel present during custodial interrogation. Specifically, appellant contends that the audiotaped confession should have been suppressed and held inadmissible under the rule of *Edwards v. Arizona* (1981), 451 U.S. 477, 101 S. Ct. 1880, 68 L. Ed. 2d 378. We disagree.

Edwards holds that once an accused undergoing custodial interrogation invokes his right to have counsel present during questioning, all further interrogation must cease, and the accused "is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." (Emphasis added.) 451 U.S. at 484-485, 101 S. Ct. at 1885, 68 L. Ed. 2d at 386. We find no violation of *Edwards* here.

Appellant was advised of his *Miranda* rights before any questioning by police. He voluntarily agreed to speak with police and signed a written waiver of his Miranda rights. He then gave a full confession to police, but that confession was not recorded on tape. When asked to repeat his statement on tape, appellant agreed and was once again advised of his Miranda rights. However, at that point, appellant informed police that he wished to speak to an attorney before proceeding further. Therefore, police ceased questioning appellant and turned the recorder off. The record indicates that police offered to get appellant a telephone book and to assist him in obtaining counsel. Appellant told police that he did not want to "put [the police officers] to any trouble," but the officers assured him that his request for counsel was no trouble. Appellant then told police that he had changed his mind concerning counsel and that he wanted to "put it [his confession] on tape," and "get it off his chest." There is no evidence whatsoever that police said or did anything to change appellant's mind, and appellant changed his mind after only two or three minutes. Police then turned the recorder on and proceeded to ask appellant a series of questions regarding his waiver of the right to counsel. In response to these questions, appellant indicated that he fully understood his rights, that no threats or promises had been made to induce or coerce him into confessing, and that he wanted to put his confession on tape without talking to an attorney or having one present during questioning. The record in this case clearly reveals that it was appellant himself who, after invoking the right to counsel, initiated further conversations or communications with police concerning his wish to confess, and that appellant fully understood his right to counsel and voluntarily, knowingly, and intelligently abandoned that right before the custodial interrogation resumed.

The trial court, in denying appellant's pretrial motion to suppress, implicitly determined that appellant's confessions to police were voluntarily given and that appellant had effectuated a voluntary, knowing, and intelligent waiver of his Miranda rights before his

initial (unrecorded) confession to police, and again when he voluntarily confessed on tape after rescinding a request for counsel. The record before us supports the trial court's conclusions in this regard, and we find no error in that court's decision denying the motion to suppress. Accordingly, we reject appellant's fourteenth proposition of law.

*State v. Raglin*, 83 Ohio St.3d 253, 262-264 (1998) (footnote omitted).

### 3.      Procedural Posture

The Warden concedes that this claim is not defaulted.

### 4.      Clearly Established United States Supreme Court Case Law

The Fifth Amendment provides criminal defendants with a right against self-incrimination. In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court held that once an individual in custody invokes his or her Fifth Amendment right to counsel, "the interrogation must cease until an attorney is present," and the defendant must "have [counsel] present during any subsequent questioning" in the absence of a knowing and voluntary waiver of the right to counsel. *Id.* at 474. Once this statement is made, police officer may generally not reinterrogate an accused in custody. *Edwards v. Arizona*, 451 U.S. 477, 485 (1981)

The request for counsel must be express and unambiguous in order to require the cessation of questioning. *Davis v. United States*, 512 U.S. 452, 459 (1994). Moreover, the request cannot be for just any sort of assistance, but for "the particular sort of lawyerly assistance that is the subject of *Miranda*." *McNeil v. Wisconsin*, 501 U.S. 171, 179 (1991). This sort of assistance under the Fifth Amendment has been described as indicating the suspect's "desire to deal with the police only through counsel." *Edwards v. Arizona*, 451 U.S. 477 at 484 (1981).

Once such a statement has been made, the police may not interrogate the suspect "himself initiates further communication, exchanges, or conversations with the police." *Id.* at 484-485.

**5.    Merits Analysis**

At the outset, it should be noted that the Ohio Supreme Court examined this claim through the proper constitutional lens: *Edwards v. Arizona*, 451 U.S. 477 (1981). They correctly described the law in *Edwards* and they applied the law in a reasonable manner.

In this case, the Ohio Supreme Court either concluded or assumed that Raglin had unambiguously asserted his right to counsel. Thus, the Ohio Supreme Court focused on the next issue: did Raglin "initiate further communication, exchanges, or conversations with the police?" The Ohio Supreme Court reasonably found that he did.

After Raglin requested counsel, the police confirmed that those were Raglin's wishes and then obtained a telephone directory for Raglin to call an attorney. Raglin suggests that these statements constitute interrogation. The Ohio Supreme Court reasonably rejected this argument. As the Sixth Circuit has recently recognized, questions regarding *Miranda* and questions "aimed at finding [the suspect] an attorney" do not constitute interrogation. *United States v. Ware*, 338 F.3d 476, 480 (6th Cir. 2003).

The Warden recognizes that the *Ware* case is not clearly established United States Supreme Court case law, but it does constitute evidence of the Ohio Supreme Court's reasonableness. The Ohio Supreme Court's reasonableness is

demonstrated by the fact that its analysis parallels that of the Sixth Circuit's analysis in *Ware. See Clark v. Murphy*, 331 F.3d 1062, 1071-1072 (9th Cir. 2003) (consistency with some federal appellate court cases on "similar facts leads inevitably to the conclusion that the Arizona court's rejection of Clark's claim was not objectively unreasonable.").

Simply put, the Ohio Supreme Court's analysis of this claim was reasonable and the result was sound.

## VIII. Responses To Raglin's Jury Instruction Claims

### A. Legal Standards for Challenging Jury Instruction Claims

Habeas review of a jury instruction claim is limited. In assessing a Fourteenth Amendment Due Process claim involving jury instructions, this Court should determine "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *Cupp v. Naughten*, 414 U.S. 141, 147 (1973). Before a federal court may overturn a state conviction based upon the jury instructions given at trial, it must be determined that the instructions were not merely "undesirable, erroneous, or even 'universally condemned,' but that it violated some right which was guaranteed to the defendant by the Fourteenth Amendment." *Id.* at 146.

In *Estelle v. McGuire,* 502 U.S. 62 (1991), the Court held that errors in state law cannot form the basis for habeas relief. *See also Gall v. Parker*, 231 F.3d 854, 882-83 (6th Cir. 2000) (petitioner's argument that jury instruction violated state law is not reviewable in habeas corpus); *Byrd v. Collins*, 209 F.3d 486, 527 (6th Cir. 2000) (standard applied on habeas review is highly demanding).

Further, the Court held in *Victor v. Nebraska*, 511 U.S. 1, 2 (1994) that an instructional error will only warrant relief where there was a reasonable likelihood that the jury applied the instruction in an unconstitutional manner.

The burden for determining error is higher where a petitioner is complaining about a "failure" to give a jury instruction. As the United States Supreme Court has held, "an omitted, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law." *Henderson v. Kibbe,* 431 U.S. 145, 155 (1977).

## B.    *Beck* Claim (Eighth Ground for Relief)

### 1.    Overview

### 2.    Last Reasoned State Court Decision

The last reasoned decision on this matter was issued by the Ohio Supreme Court on direct review.

> Appellant contends that the trial court erred by refusing to instruct the jury on involuntary manslaughter as a lesser included offense of aggravated murder. We disagree. We have considered similar issues in a number of prior cases and have discussed those issues to exhaustion. The applicable rule is that "[e]ven though an offense may be statutorily defined as a lesser included offense of another, a charge on such lesser included offense is required only where the evidence presented at trial would reasonably support both an acquittal on the crime charged and a conviction upon the lesser included offense." *State v. Thomas* (1988), 40 Ohio St.3d 213, 533 N.E.2d 286, paragraph two of the syllabus. We find no evidence in this case to reasonably suggest that appellant lacked the purpose to kill his victim.

> The facts of this case are clear. Appellant and his accomplice, Darnell Lowery, wandered the streets of Cincinnati looking for a victim to rob. Appellant was carrying a loaded .380 caliber semiautomatic pistol. The men considered two potential classes of

victims to rob, but decided to search for easier prey.  While appellant and Lowery were searching for a defenseless person to rob, appellant's unfortunate victim, Michael Bany, arrived on the scene.  Appellant approached Bany and demanded money.  Bany complied with appellant's demands.  The record clearly indicates that Bany presented no threat to appellant and that appellant and Bany never argued.  Bany never spoke a single word to appellant. While appellant was asking questions concerning Bany's car, Bany bent down and picked up what appellant referred to as a "suitcase," i.e., either the guitar case or the case containing Bany's music equipment.  Bany turned to look at appellant, and appellant looked at Bany. Appellant then pointed the pistol at Bany and shot him in the neck in a manner that was certain to (and did) cause Bany's death.

Appellant told police, "I, I fired the gun at [Bany]. I didn't know where I hit [him] at.  I wasn'[t] tryin' to kill [him]."  Appellant also claimed to have "panicked" at the time he shot and killed Bany. Appellant told police that he had been "scared" by Bany's movements because appellant "didn'[t] know what * * * was in the suitcase."   However, appellant never claimed that the shot had been accidentally or unintentionally fired, and the evidence clearly establishes that the shooting was not accidental or unintentional. Appellant's claims of panic and fright are not reasonably supported by the evidence.  Appellant had a loaded weapon, he was pointing that weapon at Bany, and he fired that weapon into the neck of his defenseless victim.  Appellant told police that he had fired the weapon directly at Bany. He told police that Bany was not trying to "fiddle" with the suitcase or anything of that nature and that Bany had simply "picked it up."  Appellant also admitted to police, "I didn'[t] have to shoot that man."  The direct and circumstantial evidence in this case, and all reasonable inferences to be drawn therefrom, lead to one inescapable conclusion, to wit, appellant purposely killed Bany during the commission of an aggravated robbery when he pointed the gun at Bany and pulled the trigger.

Under any reasonable view of the evidence, the killing of Bany was purposeful.  Thus, we find that the evidence adduced at trial could not have reasonably supported both an acquittal on aggravated murder and a conviction on the charge of involuntary manslaughter.  Accordingly, we hold that the trial court properly rejected appellant's request for an involuntary manslaughter instruction.

*State v. Raglin*, 83 Ohio St.3d 253, 257-258 (1998).

### 3.    Procedural Posture

The Warden concedes that this claim is not procedurally defaulted.

### 4.    Merits Analysis

Raglin is asserting that the Ohio courts ran afoul of *Beck v. Alabama,* 447 U.S. 625 (1980).  Under *Beck*, a defendant charged with a capital offense is entitled to an instruction under a lesser-included offense under certain circumstances.  The clear purpose of *Beck* is to require the state to offer lesser-included offenses where appropriate to reduce the risk of an "unwarranted" conviction where a death sentence was available.  *Id.* at 637.  *See also Bagby v. Sowders*, 894 F.2d 792, 796 (6th Cir. 1990) (en banc) ("According to the [*Beck*] Court, failing to give the jury a 'third option' when it is warranted by the evidence, enhances the risk that a capital defendant will be sentenced to death because of caprice or emotion, and not on the basis of reason.")   The Supreme Court explained in *Spaziano v. Florida* that "[t]he absence of a lesser included offense instruction increases the risk that the jury will convict, not because it is persuaded that the defendant is guilty of capital murder, but simply to avoid setting the defendant free." *Spaziano v. Florida*, 468 U.S. 447, 455 (1984).

Indeed, the Supreme Court has stated that *Beck* was based on the fact that the "death penalty was automatically tied to conviction"  *Hopkins v. Reeves*, 524 U.S. 88, 98 (1998).  As a result, the trial process was distorted because the issue became "whether the defendant should be executed or not, rather than 'whether the State had proved each and every element of the capital crime beyond a reasonable doubt.'"  *Id.* (citation omitted).

Thus, for Raglin to prevail, it is not enough for him to show that he was entitled to a lesser included offense under state law.   He must show that the jury was improperly faced with the "all or nothing" situation that arose in *Beck*.

This claim fails for several reasons.   First, Ohio's sentencing structure means that Raglin was never improperly faced with an "all or nothing" situation.

The Fifth and Ninth Circuits have explained that *Beck* does not apply where the jury is informed that a conviction will not result in an automatic death penalty.

> In the Alabama law at issue in *Beck*, the judge had ultimate authority on sentencing, yet the jury was not told this.  447 U.S. at 639 n.15. Instead, the jury was instructed that it must impose the death sentence if it found the defendant guilty and was thus led to believe, by implication, that its sentence would be final. *Id.* Here, despite its decision to convict Anderson of burglary and felony murder, the jury could have also decided, based on the evidence in the penalty phase, not to sentence Anderson to death. Thus, the extreme choice between a complete acquittal or a sentence of death condemned by the Supreme Court in Beck   was not present in Anderson's case.

*Anderson v. Calderon*, 232 F.3d 1053, 1082 (9th Cir. 2000).  *See also Livingston v. Johnson*, 107 F.3d 297, 313 (5th Cir. 1997) (holding that Beck did not apply because of Texas' bifurcated trial process).

This is the same situation in this case.   Raglin's jury was not required to automatically sentence Raglin to death if they found him guilty.  Indeed, from the very first day of *voir dire*, the trial court told the jury that there would be "two trials."  Apx. at Vol. I, p. 276.  The first would be "a trial on the merits."  Apx. at Vol. I, p. 276.  The second trial would be the mitigation hearing, "where the jury, after listening to the evidence, recommends incarceration or the death penalty."

Apx. at Vol. I, p. 276.  This distinction was repeated throughout the trial.  Simply put, the jury was not put into the "all or nothing" situation found in *Beck*.

Raglin relies on two additional United States Supreme Court cases to buttress his claims.  These cases do not "purport[] to interpret any provision of the Constitution."  *Early v. Packer*, 537 U.S. 3, 10 (2002).  As a result, they do not constitute clearly established case law for AEDPA purposes.  The first case is *Stephenson v. United States*, 162 U.S. 313 (1896).  In *Stephenson*, the Court reversed a federal murder conviction which occurred on Indian territory controlled by the Chickasaw Nation.  The *Stephenson* decision was clearly based on the Supreme Court's supervisory authority over federal convictions and makes no mention of any constitutional principles.   The decision in *Keeble v. United States*, 412 U.S. 205 (1973) also involved a federal conviction from a crime arising in Indian territory.  The *Keeble* Court expressly held that it was *not* basing its decision on statutory grounds – not due process grounds.  *Id.* at 213.

Moreover, even if there was some general constitutional right to a lesser included instruction, no instruction is necessary here.  The Ohio Supreme Court concluded that the trial court did not need to give an instruction for involuntary manslaughter because there was clearly insufficient evidence to support this claim.  The Warden submits that the Ohio Supreme Court's decision was well-thought and quite reasonable.  As a result, there is no violation here.

## C.    The "Purpose" Instruction (Ninth Ground for Relief)

### 1.    Overview

Raglin argues that the instruction on purpose was invalid because it

created a mandatory presumption.

### 2.    Last Reasoned State Court Decision

Appellant contends that the trial court's instructions to the jury in the guilt phase that defined "causation" in terms of forseeability permitted a conviction for aggravated murder without proof of purpose to kill. Appellant makes a similar argument with respect to the trial court's instruction to the jury that "[i]f a wound is inflicted upon a person with a deadly weapon in a manner calculated to destroy life, the purpose to cause the death may be inferred from the use of the weapon." Appellant's arguments are not persuasive. The trial court's instructions to the jury, viewed as a whole, made it clear that a finding of purpose (and specific intent) to kill was necessary in order to convict appellant on the charge of aggravated murder. The jury in this case returned its verdicts in accordance with the overwhelming evidence on the issue. Accordingly, we find no reversible error here.

*State v. Raglin*, 83 Ohio St.3d 253, 257-258 (1998).

### 3.    Procedural Posture

This claim is procedurally defaulted because Raglin failed to properly present this claim to the Ohio courts. While it is true that Raglin raised a challenge to the purpose instruction before the Ohio courts, he did not raise the same legal argument that he is raising here. Before the Ohio Supreme Court, Raglin conceded that the instruction in question was a permissive inference, not a conclusive inference. "The fact that instruction deals with a permissive inference, as opposed to the conclusive presumption ruled unconstitutional in *Sandstrom v. Montana*, *supra*, is not determinative, particularly when it is considered that this instruction was given in tandem with the improper cause/forseeability instruction." Apx. at Vol. VI, p. 919. Raglin then went on to argue that under the specific facts of his case, this instruction was improper under state law.

Raglin has now changed his tune. He is now claiming that the instruction constituted a conclusive presumption, and is unconstitutional. *See* Amended Petition at 44.

Simply put, Raglin is not raising the same argument that he raised to the State court. He has not fairly presented this claim to any Ohio court, and this claim is defaulted. *Baldwin v. Reese*, __ U.S. __, 124 S.Ct. 1347, 1351 (2004); *Newton v. Million*, 349 F.3d 873, 877 (6th Cir. 2003).

### 4.    Merits Analysis

The Warden submits that Raglin's claim is without merit. The jury was instructed that it was to determine whether Raglin acted with the "specific intention to cause the death of Michael Bany." Apx. at Vol. III, p. 1474.

Raglin claims that the jury was improperly instructed that Raglin's use of a firearm created a conclusive presumption that Raglin acted with a presumption to kill. This argument is inherently flawed, and is belied by the record.

The jury was instructed that they **may infer** a purpose to kill. They were not told that there was a conclusive presumption.

> If a wound is inflicted upon a person with a deadly weapon in a manner calculated to destroy life, the purpose to cause the death **may be inferred** from the use of the weapon.

Apx. at Vol. VI, p. 1475 (emphasis added).

Raglin's argument hinges on a statement that purpose "is determined" by several factors. However, the entire sentence makes it clear that this is an innocuous statement that jurors may look to various factors to determine what purpose (if any) Raglin was operating with.

> The purpose with which a person does an act or brings about a result is determined from the manner in which it is done, the means or weapons used and all other facts and circumstances in evidence.

Apx. at Vol. VI, p. 1475.  Indeed, these instructions are reminiscent of the Sixth Circuit's pattern jury instructions for inferring a required mental state.[4]

The Warden submits that these instructions are well within the mainstream of American jurisprudence, and reading the instructions as a whole, the jury was not led to believe that the mere use of a firearm *required* a finding that Raglin had the specific intent to murder Michael Bany.

## D.   The Reasonable Doubt Instruction During Mitigation (Twelfth Ground for Relief)

### 1.    Overview

### 2.    Last Reasoned State Court Decision

Raglin raised a variety of challenges to the jury instructions during the penalty phase.  The Ohio Supreme Court summarily rejected the claims.

> In Proposition of Law No. 9, appellant questions the trial court's penalty phase jury instructions. We have reviewed the jury instructions as a whole and find appellant's objections not persuasive.

*State v. Raglin*, 83 Ohio St.3d 253, 260 (1998).

### 3.    Procedural Posture

---

[4] "But a defendant's state of mind can be proved indirectly from the surrounding circumstances. This includes things like what the defendant said, what the defendant did, how the defendant acted, and any other facts or circumstances in evidence that show what was in the defendant's mind."
*http://www.ca6.uscourts.gov/crim_jury_insts/html/chap2_9.htm*)  Last visited 3/31/05.

This claim is procedurally defaulted because Raglin failed to properly present this claim to the Ohio courts. While it is true that Raglin raised a claim that the definition of reasonable doubt was improper to the state courts, he did not raise this claim as a constitutional claim. Here is the argument that Raglin made to the Ohio Supreme Court in its entirety.

> The trial court defined beyond a reasonable doubt as that state of mind where the jury is firmly convinced of the charge, rather than reasonable doubt is where the jury is not firmly convinced that the aggravating circumstances outweighed the mitigating factors. *State v. Taylor* (1997) 78 Ohio St.3d 15, 676 N.E.2d 82, *cert. den.* (citation unavailable). The defense requested such an instruction, to no avail (R.1766).

Apx. at Vol. VI, p. 863.

The Warden submits that this statement does not fall under any of the four categories which would properly preserve the legal arguments that Raglin is making here – that instruction shifted the burden of proof and that it prevented the jury from making a determination of the appropriate sentence. *See Newton v. Million*, 349 F.3d 873, 877 (6th Cir. 2003) (the four categories are: "(1) reliance upon federal cases employing constitutional analysis; (2) reliance upon state cases employing federal constitutional analysis; (3) phrasing the claim in terms of constitutional law or in terms sufficiently particular to allege a denial of a specific constitutional right; or (4) alleging facts well within the mainstream of constitutional law.")

## 4.    Merits Analysis

Raglin raises the hoary claim that Ohio's statutory definition of reasonable doubt is unconstitutional. Here is the definition of reasonable doubt that the jury heard:

> The State of Ohio seeks a recommendation from you of death as to the count of Aggravated Murder. In order to be entitled to this, the State has the burden of proving by proof beyond a reasonable doubt – that phrase again we'll be defining that – that the aggravating circumstances which the defendant was found guilty of committing is sufficient to outweigh the factors in mitigation.
>
> …
>
> Again, ladies and gentlemen, the phrase reasonable doubt. Reasonable doubt is defined by the Ohio legislature as follows:
>
> "Reasonable doubt" is present when the jurors, after they have carefully considered and compared all the evidence cannot say that they are firmly convinced of the truth of the charge. It is a doubt based on reason and common sense.
>
> Reasonable doubt is not mere possible doubt, because everything relating to human affairs or depending on moral evidence is open to some possible or imaginary doubt.
>
> "Proof beyond a reasonable doubt" is a proof of such character that an ordinary person would be willing to rely and act upon it in the most important of his or her own affairs.

Apx. at Vol. IV, p. 1909, 1910.

The Due Process Clause of the Constitution requires that a defendant must be convicted with evidence beyond a reasonable doubt. *Victor v. Nebraska*, 511 U.S. 1, 5 (1994). However, there is no requirement that trial courts *define* reasonable doubt for juries. *Id.* Nor is there a requirement for any particular wording. "[S]o long as the court instructs the jury on the necessity that the defendant's guilt be proved beyond a reasonable doubt, the Constitution does not

require that any particular form of words be used in advising the jury of the government's burden of proof." *Id.*

Indeed, the language in Ohio's jury instruction on reasonable doubt are taken almost directly from two United States Supreme Court cases. The "reasonable doubt is not mere possible doubt" language parallels language that the United States Supreme Court approved in *Victor v. Nebraska*, 511 U.S. 1 (1994). The "firmly convinced" language is derived from language approved of in *Holland v. United States*, 348 U.S. 121 (1954).[5]

This is not the first time that an Ohio death row inmate has complained about the definition of reasonable doubt. The Sixth Circuit has looked at this issue at least four times in the past several years and concluded each time that there is no constitutional violation. *See Byrd v. Collins*, 209 F.3d 486, 527 (6th Cir. 2000); *Scott v. Mitchell*, 209 F.3d 854, 883-884 (6th Cir. 2000); *Coleman v. Mitchell*, 268 F.3d 417, 436-436 (6th Cir. 2001); *Buell v. Mitchell*, 274 F.3d 337, 366 (6th Cir. 2001).

---

[5] Ohio's definition of reasonable doubt parallels the Sixth Circuit's pattern jury instruction.

> The government must prove every element of the crime charged beyond a reasonable doubt. Proof beyond a reasonable doubt does not mean proof beyond all possible doubt. Possible doubts or doubts based purely on speculation are not reasonable doubts. A reasonable doubt is a doubt based on reason and common sense. It may arise from the evidence, the lack of evidence, or the nature of the evidence.

> Proof beyond a reasonable doubt means proof which is so convincing that you would not hesitate to rely and act on it in making the most important decisions in your own lives. If you are convinced that the government has proved the defendant guilty beyond a reasonable doubt, say so by returning a guilty verdict. If you are not convinced, say so by returning a not guilty verdict.

*http://www.ca6.uscourts.gov/crim_jury_insts/html/chap1_8.htm* Last visited 3/31/05

The situation in this case is even stronger than what occurred in *Byrd*, *Scott* or *Coleman*. Each of those cases are pre-AEDPA. This is an AEDPA case. White will lose if neither the "reasoning nor the result" of the Ohio Supreme Court's analysis was contrary to, or an unreasonable application of, clearly established United States Supreme Court case law. *See Early v. Packer*, 537 U.S. 3, 8 (2002).

To succeed, Raglin must show that the jury was actively misled as to the proper standard for reasonable doubt. Raglin claims that the "truth of the charge" instruction improperly suggested that the mere fact that Raglin was convicted means that he must be sentenced to death. This argument is a stretch – to be charitable.

As noted above, the jury was told that the prosecution bore the burden of proof to show that the aggravating circumstances outweighed the mitigating factors. Apx. at Vol. IV, p. 1909. The jury was later told that they were to sentence Raglin to death if the State met its burden, and to sentence Raglin to a life sentence if the State failed to meet its burden. Apx. at Vol. IV, p. 1916-1917.

Simply put, the "truth of the charge" language was not going to make the jury think that the weighing process did not exist. Raglin has failed to show that the jury would apply the instruction in an unconstitutional manner. *Victor v. Nebraska,* 511 U.S. 1,2 (1994). This claim fails.

## E. Considering All Evidence Submitted During the Guilt Phase (Thirteenth and Twenty-Ninth Grounds for Relief)

### 1. Overview

### 2.    Last Reasoned State Court Decision

### a.    Thirteenth Ground for Relief

Raglin raised a variety of challenges to the jury instructions during the

penalty phase.  The Ohio Supreme Court summarily rejected the claims.

> In Proposition of Law No. 9, appellant questions the trial court's
> penalty phase jury instructions. We have reviewed the jury
> instructions as a whole and find appellant's objections not
> persuasive.

*State v. Raglin*, 83 Ohio St.3d 253, 260 (1998).

### b.    Twenty-Ninth Ground for Relief

The Ohio Supreme Court summarily rejected this claim on the merits.

> The matter raised in appellant's Proposition of Law No. 6 is
> rejected on authority of *State v. DePew* (1988), 38 Ohio St. 3d 275,
> 282-283, 528 N.E.2d 542, 552.

*State v. Raglin*, 83 Ohio St.3d 253, 259 (1998).

### 3.    Procedural Posture

### a.    Thirteenth Ground for Relief

This claim is procedurally defaulted because Raglin failed to properly

present this claim to the Ohio courts.  As with some prior claims, Raglin did raise

a related claim, but did not include any constitutional arguments.  Here is the

argument that Raglin made to the Ohio Supreme Court in its entirety.

> The trial court instructed the jury that they should consider all
> evidence admitted at the guilt-innocence phase of the proceedings,
> including the photos of the body of the deceased, to the
> introduction of which Appellant had objected (R.109, 1911, 1916).
> This was error, *State v. DePew, supra*; *State v. Williams*, *supra*.

Apx. at Vol. VI, p. 863.

The Warden submits that Raglin did not properly present any constitutional claims with this argument.  *See Newton v. Million*, 349 F.3d 873, 877 (6th Cir. 2003).

### b.    Twenty-Ninth Ground for Relief

The Warden concedes that this claim is not defaulted.

### 4.    Merits Analysis

Although Raglin claims that this evidence violated his constitutional rights, he does not identify any clearly established United States Supreme Court case law which forbids trial courts from issuing such an order.  Indeed, it is well established that there is nothing unconstitutional about considering the facts of the murder when determining whether a death sentence is appropriate.  *Tuilaepa v. California*, 512 U.S. 967, 975-76 (1994).

The Warden submits that this is a purely state law claim, and that Raglin has not shown any constitutional violation.

## F.    Not Providing A Definition of Mitigation Evidence, Improper Definition of Mitigation Evidence, Failing to Instruct on Specific Mitigating Factors (Fourteenth, Fifteenth and Nineteenth Grounds for Relief)

### 1.    Overview

Raglin raises three arguments related to the supposed failure to give a proper definition of mitigation.  Because these claims are so closely related, the Warden is addressing them together.

### 2.    Last Reasoned State Court Decision

Raglin raised a variety of challenges to the jury instructions during the penalty phase. The Ohio Supreme Court summarily rejected the claims.

> In Proposition of Law No. 9, appellant questions the trial court's penalty phase jury instructions. We have reviewed the jury instructions as a whole and find appellant's objections not persuasive.

*State v. Raglin*, 83 Ohio St.3d 253, 260 (1998).

### 3.    Procedural Posture

The Warden concedes that these claims are not procedurally defaulted.

### 4.    Merits Analysis

In *Buchanan v. Angelone*, 522 U.S. 269, 277 (1998), the United States Supreme Court reviewed a Virginia death penalty case where the jury was not given a specific definition of mitigation. Indeed, the word "mitigation" never appeared in the jury instructions at all. See *Buchanan*, 522 at 272 n.1.

The *Buchanan* Court rejected an argument that the consideration of mitigating factors must be structured in any specific way. The Court concluded that jurors may be given complete discretion to determine whether a death sentence is warranted.

> But we have never gone further and held that the state must affirmatively structure in a particular way the manner in which juries consider mitigating evidence. And indeed, our decisions suggest that complete jury discretion is constitutionally permissible.

*Buchanan*, 522 U.S. at 276.

Simply put, *Buchanan* held that there is no requirement that juries obtain any specific definition of mitigating evidence – either as a general concept or as to

specific mitigating factors.  The Ohio Supreme Court reasonably rejected this claim.

At the same time, Raglin also complains that the catch-all definition did not give any guidance to the jury.  The Sixth Circuit rejected an identical claim in *Buell v. Mitchell*, 274 F.3d 337, 353 (6th Cir. 2001), concluding that Ohio's statutory mitigation catch-all complies with *Penry v. Lynaugh*, 492 U.S. 302, 328 (1989).

## G. Defining The Killing Itself As An Aggravating Circumstance And Instructing The Jury That It Was To (Sixteenth and Eighteenth Ground for Relief)

### 1. Overview

### 2. Last Reasoned State Court Decision

Raglin raised a variety of challenges to the jury instructions during the penalty phase.  The Ohio Supreme Court summarily rejected the claims.

> In Proposition of Law No. 9, appellant questions the trial court's penalty phase jury instructions. We have reviewed the jury instructions as a whole and find appellant's objections not persuasive.

*State v. Raglin*, 83 Ohio St.3d 253, 260 (1998).

### 3. Procedural Posture

Both claims are procedurally defaulted because Raglin failed to properly present them to the Ohio courts.  As with some prior claims, Raglin did raise a related claim, but did not include any constitutional arguments.  Here is the argument that Raglin made to the Ohio Supreme Court in its entirety.

> The penalty phase instructions were also erroneous in that, in defining aggravating circumstances, the trial court including [sic] the killing itself, having denied a defense motion to instruct the jury that the killing itself was not an aggravating factor (R. 1520; 1764). This is contrary to Ohio law, *State v. Davis, supra, State v.* Henderson, (1988), 39 Ohio St.3d 25, 26, 528 N.E.2d 1237 *cert. den.* 389 U.S. 1072. The defense objection was repeated at the proper juncture. (R.1921).

Apx. at Vol. VI, p. 865.

Raglin likewise asserted that it was improper to consider the nature and circumstances of the offense as potentially mitigating as a purely state law claim.

> The trial court instructed the jurors to consider as a mitigating factor the nature and circumstances *of the offense* although that factor was not advanced by Appellant in mitigation. Present counsel perceive nothing mitigating about the nature and circumstance. The instruction thus violates *State v. Depew, supra.*

Apx. at Vol. VI, p. 866-867.

The Warden submits that Raglin did not properly present any constitutional claims with either argument. *See Newton v. Million*, 349 F.3d 873, 877 (6th Cir. 2003).

### 4.    Merits Analysis

The Warden submits that this is entirely a state law claim. The United States Supreme Court has expressly held that there is nothing unconstitutional about considering the facts of the murder when determining whether a death sentence is appropriate. *Tuilaepa v. California*, 512 U.S. 967, 975-76 (1994).

Moreover, the definition of aggravating circumstances clearly and unmistakably tracks the statutory language of §2929.04(A)(7).

> What is the aggravating circumstance? In this particular case, the specification of aggravating circumstance [sic] in Count 2 is set out as follows:

SPECIFICATION NO.1 IN COUNT 2.

The Defendant, Walter L. Raglin, committed the Aggravated Murder of Michael Baney [sic] in Count 2 while the said Walter L. Raglin was committing, attempting to commit, or fleeing immediately after committing or attempting to commit the offense of Aggravated Robbery, and the defendant, Walter L. Raglin, was the principal offender in the commission of the Aggravated Murder.

Apx. at Vol. IV, p. 1915 (capitalization in original).

Simply put, the jury was not expressly told to weigh the killing itself. They were instructed to weigh the aggravating circumstance: that the murder occurred during the course of an aggravated robbery.

Raglin raises the related argument that the jury was instructed that it was required to examine the nature and circumstances of the offense for any mitigating features. Raglin's claim is purely one of state law, and can be summarily rejected on that basis.

However, even Raglin's interpretation of state law is wrong. During the mitigation phase of trials, jurors are *required* to examine the nature and circumstances of the offense for two purposes: (1) to determine whether the facts of the crime itself contains any mitigating evidence, and (2) to evaluate the facts of the aggravating circumstances to determine how much weight that side of the scale should receive. *State v. Reynolds*, 80 Ohio St.3d 670, 684 (1998); *State v. Myers*, 97 Ohio St.3d 335, 360 (2002).

## H. Instructing The Jury That It Could Conclude That It Had To Reject A Recommendation of Death Before Evaluating A Life Sentence (Seventeenth Ground for Relief)

### 1.    Overview

### 2.    Last Reasoned State Court Decision

Raglin raised a variety of challenges to the jury instructions during the

penalty phase.  The Ohio Supreme Court summarily rejected the claims.

> In Proposition of Law No. 9, appellant questions the trial court's
> penalty phase jury instructions. We have reviewed the jury
> instructions as a whole and find appellant's objections not
> persuasive.

*State v. Raglin*, 83 Ohio St.3d 253, 260 (1998).

### 3.    Procedural Posture

The Warden submits that this claim is procedurally defaulted because

Raglin failed to properly present it to the Ohio courts.  As with some prior claims,

Raglin did raise a related claim, but did not include any constitutional arguments.

Here is the argument that Raglin made to the Ohio Supreme Court in its entirety.

> The trial court in effect instructed the jury that it had to consider,
> and reject, the death sentence before considering either life option
> (R.1917).  While not stating expressly that the jury was required to
> consider death before considering life, that is the clear import of
> the instruction.  This is error sufficient to warrant reversal of the
> death sentence, *State v. Brooks* (1996), 75 Ohio St.3d 148, 159-
> 160, 661 N.E.2d 1030, 1042.  Furthermore,t he trial court failed to
> instruct that one juror could prevent the imposition of the death
> penalty, as required by *Brooks* henceforth from that decision
> (which preceded Appellant's trial by several months), although the
> trial court did instruct the jury that any verdict it returned had to be
> unanimous, and the jury verdict forms also reflected the
> requirement of unanimity (R.1917-1919).

Apx. at Vol. VI, p. 865-866.

The Warden submits that Raglin did not properly present any constitutional claims with this argument. *See Newton v. Million*, 349 F.3d 873, 877 (6th Cir. 2003).

### 4.    Merits Analysis

Raglin asserts that the trial court improperly provide an "acquittal first" instruction (although Raglin does not use that term). This Court can reject this claim because Raglin is basing his claim solely on state law.

It should further be noted that there was no improper instruction in this case. The trial court told the jury that they were to determine whether the State had met its burden of proof. The result of this determination would indicate whether the jury would recommend a death or life recommendation.

> I repeat that the purpose of this proceeding is to have you decide whether the State of Ohio has proven beyond a reasonable doubt that the aggravating circumstance in the count of aggravated murder that the defendant was found guilty of committing is sufficient to outweigh the factors in mitigation of the imposition of death.

Apx. at Vol. III, p. 1914. The judge then instructed on the definition of aggravating circumstances and mitigating factors. Apx. at Vol. III, pp. 1914-1915. Then the judge explained what the jury should do once it has done its weighing.

> If all twelve members of the jury find by proof beyond a reasonable doubt that [the] aggravating circumstance in the count of Aggravated Murder which the defendant was found guilty of committing outweighs the mitigating factors, then you shall recommend to myself a sentence of death.
>
> On the other hand, if after considering all of the relevant evidence admitted at the two trials and the arguments of counsel, you find the State of Ohio failed to prove beyond a reasonable doubt that

the aggravating circumstance in the count of Aggravated Murder which the defendant was found guilty of committing outweighs the mitigating factors, then you will not recommend to the Court the sentence of death.  In that event, you will determine which of the two possible life imprisonment sentences to recommend to the Court as to the count of Aggravated Murder.

Apx. at Vol. III, pp. 1916-1917.

Simply put, the jury was told that it had to weigh the mitigating factors and aggravating circumstances.  Depending on the result of this weighing, the jury was to either recommend a death sentence or a life sentence.  There is nothing unconstitutional about this approach.

Raglin further argues that the jury was instructed that they had to be unanimous.  This claim is a non-starter.  Raglin identifies no clearly established United States Supreme Court case law which forbids unanimity instructions.  On the contrary, the United States Supreme Court has held that instructions encouraging unanimity in verdicts are perfectly acceptable.  *Jones v. United States*, 527 U.S. 373, 381-382 (1999).

## IX.   Juror Bias Claims

### A.   Raglin's Trial Was Structurally Deficient Because Tara Veesart Sat On The Jury  (Twenty-First Ground for Relief)

#### 1.    Overview

#### 2.    Last Reasoned State Court Decision

Raglin has not raised this claim in any state court.  There is no last reasoned decision to rely upon

### 3.    Procedural Posture

Because Raglin did not raise this claim in any state court, this claim is procedurally defaulted. *Harris v. Reed*, 489 U.S. 255, 263 n9 (1989); *Buell v. Mitchell*, 274 F.3d 337, 349 (6th Cir. 2001).

### 4.    Clearly Established United States Supreme Court Case Law

A capital defendant may challenge for cause any juror who would "vote to impose death automatically if the jury found the defendant guilty." *Morgan v. Illinois*, 504 U.S. 719, 728 (1992). As a general rule, a defendant may excuse a juror for cause if "the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Id.* (quoting *Wainwright v. Witt*, 469 U.S. 412, 424 (1985)).  This constitutes a due process violation because "[a] juror who will automatically vote for the death penalty in every case will fail in good faith to consider the evidence of aggravating and mitigating circumstances as the instructions require him to do." *Id.* at 729. "Therefore, based on the requirement of impartiality embodied in the Due Process Clause of the Fourteenth Amendment, a capital defendant may challenge for cause any prospective juror who maintains such views." *Id.*

A qualified juror need not be "totally ignorant of the facts and issues involved." *Murphy v. Florida*, 421 U.S. 794, 799-800 (1975). Instead, "it is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Id.* at 800 (quoting *Irvin v. Dowd*, 366 U.S. 717, 723 (1961)).

A trial court's finding that a juror is impartial is a factual finding that is given a presumption of correctness under 28 U.S.C. §2254(e). *Williams v. Bagley*, 380 F.3d 932, 958 (2004). Even under pre-AEDPA standards, a trial court's findings as to a juror's credibility are entitled to "special deference." *Patton v. Yount*, 467 U.S. 1025, 1038 (1984). The *Patton* Court explained that the reason for this deference is because such a determination is factual. "[When] the partiality of an individual is placed in issue[] [t]hat question is not one of mixed law and fact. Rather it is plainly one of historical fact: did a juror swear that he could set aside any opinion he might hold and decide the case on the evidence, and should the juror's protestation of impartiality have been believed." *Id.* at 1036.

In making these determinations, this Court must affirm the trial court's decision if it is supported by the record. As the United States Supreme Court explained, "the question is not whether a reviewing court might disagree with the trial court's findings, but whether those findings are fairly supported by the record." *Witt,* 469 U.S. at 434. *See also Williams v. Bagley*, 380 F.3d 932, 953 (6th Cir. 2004) (applying *Witt* in Ohio capital case).

The *Witt* Court explained that the reason for this rule is because of the difficulty that appellate courts have in assessing the truthfulness of potential jurors. "Face to face with living witnesses the original trier of the facts holds a position of advantage from which appellate judges are excluded. In doubtful cases the exercise of his power of observation often proves the most accurate method of ascertaining the truth. How can we say the judge is wrong? We never

saw the witnesses." *Id.* (quotations, citations, and ellipses omitted). Simply put, because the trial court is in a better position to gauge the credibility of a witness, the trial court's opinion will stand, so long as it is supported by the record.

### 5.    Merits Analysis

Raglin raises a claim that is closely related to an argument raised in his First Ground for Relief  -- he claims that Tara Veesart should not have been on the jury.  In the First Ground for Relief, Raglin claimed that his attorney was deficient for not asking to have her removed for cause or using a peremptory challenge.  In this claim, Raglin is asserting that the presence of this juror was constitutional error regardless of trial counsel's claims.

Even aside from the independent procedural default, this claim is not a cognizable constitutional claim because there was no objection at trial to Ms. Veesart's presence.  Under *Queenan v. Oklahoma*, 190 U.S. 548 (1902), a defendant must object to a supposedly biased juror (where the basis for the objection was clearly on the record) or they cannot later challenge that juror.  In *Queenan,* the trial court gave the defense attorney an opportunity to make objections after learning of a juror's felonious status.  No objection was made. The *Queenan* Court held that it is the defendant's "duty to object at the time if he was going to object at all.  He could not speculate on the chances of getting a verdict and then set up that he had not waived his rights." Id. at 552.

Regardless, Raglin has not shown that Ms. Veesart was biased.  Ms. Veesart stated that she had been at the bar earlier on the evening of the murder, but did not know any members of the band that played that evening.  Apx. at Vol.

II, p. 766.  The prosecutor asked Ms. Veesart whether her presence at the bar that

evening would effect her ability to be fair.

> Q.    Okay.  Let me ask you this:  And it's not often we get a prospective juror that's near the scene of a crime near the time that the crime was committed.  Would that affect your ability to be fair and impartial in this case?
>
> A.    I've thought about that, and no, I do not think it would affect my ability.
>
> Q.    Okay.  I mean, would it make any difference to you that you were there that night as opposed to being somewhere else that night?  I mean, does it make any difference when you're a juror and you're sitting on this case?
>
> A.    No.  Like I said, I have given it a lot of consideration and, no, I do not believe it would.

Apx. at Vol. II, p. 767.

Ms. Veesart explained that she never had close ties to Tommy's Bar.  In

response to a defense question about her brother and brother-in-law, Ms. Veesart

testified that the people at Tommy's were just acquaintances, not friends.

> And just let me tell you a little bit that Tommy's is no longer open so that people that I associated with there were just associates. They're not my friends.  My boyfriend and I, we don't actually – we don't even relish that any more and who is the bartender.  It's not something that I don't have strong ties to Tommy's or anything like that.

Apx. at Vol. II, pp. 780-781.

Simply put, the record clearly reflects that Ms. Veesart repeatedly testified

that she could be fair and impartial.  It also bears noting that the trial judge, the

prosecutor and the defense counsel all apparently believed that she could be fair.

The United States Supreme Court has concluded in the past that a defense

counsel's decision to object or not object is good evidence of whether a juror is

biased. *See Wainwright v. Witt*, 469 U.S. 412, 431 (1985) (defense counsel's decision not to object to prosecutor's motion to exclude juror or to seek to rehabilitate juror was evidence that the juror was biased beyond redemption).

Raglin is requesting that this Court substitute its judgment of this juror's truthfulness based on a bare record which is replete with Ms. Veesart's assurances that she would be fair and impartial. The record unmistakably supports the trial court's decision not to *sua sponte* strike Ms. Veesart. As noted above, "the question is not whether a reviewing court might disagree with the trial court's findings, but whether those findings are fairly supported by the record." *Id.* at 434 Because the trial record supports the trial court's decision, this claim must fail.

## B. Hamilton County's System of Selecting Grand Jurors, Grand Juror Forepersons and Petit Jurors Is Racially Biased. (Twenty-Fifth Ground for Relief)

### 1. Overview

### 2. Last Reasoned State Court Decision

Raglin has not raised this claim in any state court. There is no last reasoned decision to rely upon

### 3. Procedural Posture

Because Raglin did not raise this claim in any state court, this claim is procedurally defaulted. *Harris v. Reed*, 489 U.S. 255, 263 n9 (1989); *Buell v. Mitchell*, 274 F.3d 337, 349 (6th Cir. 2001).

### 4. Clearly Established United States Supreme Court Case Law

The Sixth Amendment requires that the jury venire from which a jury is selected represent a fair cross-section of the community. *Taylor v. Louisiana*, 419 U.S. 522, 528 (1975). The factors to consider are set forth in *Duren v. Missouri*, 439 U.S. 357 (1979), and are as follows:

> In order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

In capital cases, however, the United States Supreme Court expressly has rejected the allegation that statistical evidence alone is sufficient to establish purposeful discrimination in the capital punishment process. In *McClesky v. Kemp*, 481 U.S. 279 (1987), the United States Supreme Court .addressed a study purporting to show a disparity in imposition of Georgia's death penalty based on race of the victim. The Supreme Court rejected the study's findings, holding that the study was insufficient to support an inference that any of the decision makers in the defendant's case acted with discriminatory purpose in violation of the Equal Protection Clause. *Id*. at 292. The Supreme Court also held that the study did not support an alleged violation of the Eighth Amendment. *Id*. at 312-313.

In *Batson v. Kentucky*, 476 U.S. 79 (1986), the Supreme Court held that a defendant opposing the government's use of a peremptory strike on the basis of race makes out a prima facie case of purposeful discrimination by showing: (1) "that he is a member of a cognizable racial group ... [2] that the prosecutor has

exercised peremptory challenges to remove from the venire members of the defendant's race .... [and 3] that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race." Id. at 96. If the defendant successfully makes a prima facie showing, the burden shifts to the government to come forward with a neutral explanation for its challenges. *See id.* at 97.

### 5.    Merits Analysis

Consistent with the above legal standards, Respondent respectfully submits that a rejections of Raglin's allegations of discrimination claims cannot be deemed unreasonable, given the record presented here. African-Americans are a "distinctive" group for the purposes of the *Duren* analysis. But Raglin fails to show that the jury venire assembled for **his** trial was unrepresentative of his community. Instead, Raglin offers a multitude of "statistics." These statistics are not pertinent to the case at hand, and do not demonstrate that the jury that Raglin was tried before was unconstitutionally selected. Moreover, even assuming, arguendo, that Raglin could show this, he has failed to show that such underrepresentation was the result of a "systematic exclusion" of African-Americans from the jury selection process. Similarly, Raglin points to nothing in the record which indicates that the prosecutor in this case used preemptory challenges to exclude on the basis of race. Again, Raglin again relies on statistics, and fails to meet the prima facie threshold for requiring the state to respond to such allegations in **his** case.

## XI.    Prosecutorial Misconduct Claims

**A.    The Prosecutor's Arguments Violated Raglin's Rights (Twenty-Third Ground for Relief)**

**1.    Overview**

**2.    Last Reasoned State Court Decision**

The last reasoned state court decision on this matter was issued by the Ohio Supreme Court on direct review.  That Court rejected these claims on the merits.

> Appellant raises claims of prosecutorial misconduct, but many of appellant's arguments have been waived.  Additionally, many of appellant's claims of prosecutorial misconduct are simply not supported by a fair and impartial review of the record, such as appellant's various attempts to persuade us that the arguments by the prosecution essentially converted the nature and circumstances of the offense into "a grossly prejudicial nonstatutory aggravating factor."  We have carefully reviewed the record in its entirety and have considered all of appellant's claims of prosecutorial misconduct.    We have found no instance of prosecutorial misconduct that would rise to the level of reversible error.  The instances of alleged misconduct, taken singly or together, did not substantially prejudice appellant or deny him a fair trial.

*State v. Raglin*, 83 Ohio St.3d 253, 259 (1998).

**3.    Procedural Posture**

This claim is partially procedurally defaulted.  Raglin raised a claim of prosecutorial misconduct before the Ohio Supreme Court on direct appeal as his Fifth Proposition of Law.  However, his arguments to the Ohio Supreme Court were limited *only* to the penalty phase.  *See* Apx. at Vol. VI, pp. 844-855.

The Warden submits that the following arguments were not raised before the Ohio Supreme Court, and have not been properly preserved because Raglin's

state court briefing "does not even contain a factual description supporting the claim." *Baldwin v. Reese*, __ U.S. __, 124 S.Ct. 1347, 1351 (2004).

- "the prosecutors made expressions as to what the opinions of Mr. Raglin's counsel might be and denigrated defense counsel with regard to their argument. (Tr. 1447)"

- "The prosecutors frequently stated their opinion as to Mr. Raglin's state of mind during the shooting, without any evidentiary foundation. (Tr. 1450, 1457).

- "The prosecutors also sarcastically mis-characterized[sic] Mr. Raglin's statement that the gun went off accidentally. (Tr. 1451)."

- "Prosecutors also stated that trial counsel was asking them to not follow the law. (Tr. 1896)"

- "The prosecutors made impermissible statements of personal opinion to the jury. (Tr. 1900, 1901, 1904)."

- "The prosecutors consistently substituted emotion for reasoned advocacy in their closing arguments. (Tr. 1419-1420, 1427, 1428, 1457-1460)."

- "The prosecutors also repeatedly referred to Mr. Raglin's silence as well as to facts that were not in evidence. (Tr. 1420, 1450-1454, 1838, 1839, 1896, 1901)."

- "The prosecutors blamed the need for a trial on Mr. Raglin's unwillingness to plead guilty.  (Tr. 1424, 1431)."

- "The prosecutors attempted to reduce the state's burden of proof by arguing that jurors should not 'make this case more difficult than it is.' (Tr. 1444)."

- "The prosecutors assured the jury that the case was that simple and that they could 'sit on a hundred more cases' and they would never find one as easy to decide as this one.  (Tr. 1444-1445)."

- The prosecutors' handling of the murder weapon during the guilt phase closing argument

- "the prosecutor invited the jury to look at Walter Raglin and, with respect to the hours following Mr. Bany's murder 'see him bragging and laughing and about it and bragging about it.' (Tr. 1900).

- "the prosecutor invited the jury to speculate on where Mr. Raglin would have gone or what he would have done if he had escaped from the Hamilton County Justice Center (Tr. 1904). The prosecutor compounded this misconduct by telling the jury that Walter Raglin would have committed more murders if his escape from the Hamilton County Justice Center had been successful…"

The Warden concedes that the rest of Raglin's arguments were properly presented and are not defaulted.

### 4.    Clearly Established United States Supreme Court Case Law

The appropriate standard of review on writ of habeas corpus for a claim of prosecutorial misconduct is "the narrow one of due process, and not the broad exercise of supervisory power." *Donnelly v. DeChristoforo*, 416 U.S. 637, 642 (1974) (quotation omitted).

For relief to be granted, the misconduct must have "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986). In making this determination, this Court must bear in mind that "the touchstone of due process analysis . . . is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982).

Therefore, even if the prosecutor's conduct was "undesirable or even universally condemned," it does not constitute a due process violation unless the conduct was so egregious so as to render the entire trial fundamentally unfair. *Darden*, 477 U.S. at 181 (quotation marks and citation omitted). The basis for this rule arises from the fact that "the aim of due process is not punishment of society

for the misdeeds of the prosecutor but avoidance of an unfair trial to the accused." *Smith*, 455 U.S. at 219 (quotation and citation omitted).

In making these determinations, this Court should not take isolated comments by a prosecutor out of context. *Donnelly*, 416 U.S. at 646-647. Nor should any comments be given their most damaging meaning. *Id.*

Put differently, in order to grant relief for prosecutorial misconduct, this Court must evaluate the prosecutor's actions in the context of the totality of the circumstances, and come to the conclusion that the misconduct rendered the entire trial fundamentally unfair. *Darden v. Wainwright*, 477 U.S. 168, 181 (1986); *United States v. Young*, 470 U.S. 1 (1985); *Donnelly v. DeChristoforo*, 416 U.S. at 645.

## 5.    Merits Analysis

Raglin alleges that comments by the prosecutor concerning his state of mind were improper.  However, the record indicates that the comments in question were prompted by comments by Raglin's defense counsel which opened the door for the prosecutor's to demonstrate that Raglin's conduct was purposeful.  Apx. at Vol. III, p 1493.  Moreover, the prosecutor's comments referred to statements made by Raglin in his confession and, therefore, were supported by the evidence.  Apx. at Vol. III, pp. 1450, 1451, 1457.

Raglin cites two transcript pages for the assertion that "the prosecutors blamed the need for a trial on Mr. Raglin's unwillingness to plead guilty."  This is not an accurate description of what the prosecutors stated.  Rather, Raglin's citations are to two off-handed comments related to Raglin's not guilty plea.

However, these comments did not disparage Raglin or his assertion of constitutional rights.

Raglin argues that the prosecution "attempted to reduce the state's burden of proof by arguing that jurors should not 'make this case more difficult than it is.' . . . .[And] the case was really simple and that they could 'sit on a hundred more cases' and they would never find one as easy to decide as this one."  It is clear, however, that in context, the prosecution was trying to convince the jury to focus on the truly contested issue and not to "read things into the case."  Apx. at Vol. III, Tr. 1444.  The prosecution's full statement was that "you can sit on a hundred more cases and you would never find one that had as few issues to be decided as are left before you in this case to be decided."  Apx. at Vol. III, p. 1444.  Indeed, Raglin's counsel implicitly agreed that there were few issues in real controversy during the guilt phase of the trial.  Apx. at Vol. III, p. 1432.  In short, the prosecution was accurate in describing the guilt phase as involving very few issues in controversy.

Raglin takes issue with the prosecution's demonstration with the murder weapon.  However, Raglin never explains why this demonstration was inappropriate.  Respondent submits that there was nothing wrong with showing how Raglin used the murder weapon to kill Michael Baney.

Raglin attempts to portray the prosecutors as misleading the jury about the valid aggravating circumstances in this case.  However, Raglin does not quote any specific comments.  Respondent has reviewed the transcript and is unable to determine what Raglin feels was misconduct.  The prosecution showed

remarkable restraint in describing the aggravating circumstances. The prosecution consistently used the analogy of a scale to demonstrate how the aggravating circumstance of this case outweighed the mitigating circumstances.

Raglin asserts that the prosecution improperly denigrated Raglin's defense expert. However, Raglin never explains why the prosecution's statements about Raglin's experts were inappropriate. In fact, the prosecution properly pointed out that Raglin's expert: (1) had been hired twenty times in capital cases, (2) had always been hired by the defense and (3) always made a finding of some type of mental disorder. The prosecution also pointed out that Raglin's expert admitted that Raglin had exaggerated answers and had lied about hearing voices in his head. This led the prosecution to properly question Raglin's expert's conclusions. Apx. at Vol. III, p. 1844. In short, the prosecution's attempts to undermine Raglin's expert were appropriate, and thus, not misconduct.

Raglin takes issue with the prosecution's descriptions of Raglin's motivations in attempting to escape from jail while awaiting trial. Raglin cites to the following comment.

> [I]s he going to the Baneys to apologize? Is that why he jumped out that window? He's back on the streets. Back hustling again. He's going to get some more and he's going to do what he has to do to take it.

Apx. at Vol. III, p. 1904. Raglin fails to cite the context of this comment. The prosecution was responding to Raglin's claimed remorsefulness. The comments immediately preceding this paragraph are instructive.

> Well again there's an open window at Talbert House and give me the streets. He even did it in the Justice Center. This guy who is so remorseful, who is so haunted by this day in and day out, the

> minute he sees a chance, boom, out the window.  Where was he going to go, what was he going to do?
>
> You know, he talked about -- is he going to the Baney's to apologize?  Is that why he jumped out that window?  He's back on the streets.  Back hustling again.  He's going to get some more and he's going to do what he has to do to take it.

Apx. at Vol. III, pp. 1903-1904. The prosecution was not trying to scare the jury. The prosecution was showing that Raglin was cold-blooded and felt no remorse for his crime.  This was entirely appropriate in light of Raglin's trial counsel's statement that "I believe that he's accepted blame."  Apx. at Vol. III, p 1883.

In sum, and for the foregoing reasons, Raglin's prosecutorial misconduct allegations do not warrant relief in federal habeas corpus.

## B.    *Brady* and *Giglio* Claims (Thirty-Seventh and Thirty-Eighth Grounds for Relief)

### 1.    Overview

### 2.    Last Reasoned State Court Decision

The last reasoned decision on this matter was issued by the First District Court of Appeals in response to Raglin's second post-conviction action.  That Court concluded that Raglin failed to meet the standards for filing a second or successive post-conviction action, and the state courts were without jurisdiction to hear this case.

> We overrule appellant's fourth and fifth assignments of error upon our determination that the common pleas court properly declined to entertain the appellant's petition for post-conviction relief.  The petition represented the appellant's second attempt to secure relief under R.C. 2953.21 et seq., and the appellant filed the petition well after the filing date set by R.C. 2953.21(A)(2).  Thus, R.C. 2953.23 precluded the common pleas court from entertaining the

> appellant's tardy and successive petition, when the appellant neither demonstrated that he had been unavoidably prevented from discovering the facts upon which his petition depended nor predicated his claims upon a new retrospectively applicable federal or state right recognized by the United States Supreme Court since the filing of his first petition.

Apx. at Vol. XII, p. 242.

### 3.    Procedural Posture

These claims are procedurally defaulted because the last reviewing court held that Raglin failed to meet the standards for filing a second or successive post-conviction action.  *See Bird v. Hurst*, 2004 U.S. App. LEXIS 16559, *7 (6th Cir. 2004).[6]

### 4.    Clearly Established United States Supreme Court Case Law

It is well settled that the State is obligated to disclose evidence favorable to a criminal defendant.  *Brady v. Maryland*, 373 U.S. 83 (1963).  However, the omitted evidence must be material either to guilt or punishment.  *Id.* at 87.  The materiality of the favorable evidence "must be evaluated in the context of the entire record." *United States v. Agurs*, 427 U.S. 97, 112-113 (1976).

"Evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceedings would be different." *United States v. Bagley*, 473 U.S. 667, 676 (1985).  The United States Supreme Court explained, in *United States v. Bagley*, that a "reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* Thus, the

---

[6] The Warden further notes that she has moved this Court to dismiss this claim because Raglin filed this claim beyond the statute of limitations.  The Warden incorporates by reference the arguments made in her motion to dismiss.

issue of materiality boils down to whether, absent the omitted information, the defendant received a fair trial, "resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 115 S. Ct. 1555, 1566 (1995); *Strickler v. Greene*, 527 U.S. 263, 289-90 (1999).

Hence, *Brady* and its progeny do not vest a defendant with broad discovery powers; nor does it create a general constitutional right to discovery in a criminal case. *United States v. Todd*, 920 F.2d 399, 405 (6th Cir. 1990). Rather, the *Brady* doctrine protects the fairness of the proceedings.

There is no *Brady* violation when the state fails to turn over exculpatory evidence, but that evidence is available from another source, or the defendant "knew or should have known the essential facts permitting him to take advantage of any exculpatory evidence[.]" *Byrd v. Collins*, 209 F.3d 486, 517 (6th Cir. 2000).

### 5.    Merits Analysis

Raglin asserts that the prosecutors engaged in misconduct by failing to disclose evidence that Raglin had expressed remorse to two witnesses. This claim is meritless for several reasons. First, this is simply not exculpatory information, because in these statements, Raglin was *confessing* his guilt. By any definition, this is *inculpatory* evidence.

Second, there is no *Brady* violation because Raglin "knew or should have known the essential facts permitting him to take advantage of the information in question." *Hicks v. Collins*, 384 F.3d 204, 221 (6th Cir. 2004) (quotation omitted). As in the *Hicks* case, because Raglin "allegedly uttered these statements, he knew

whether he made them and could have advised his counsel accordingly." *Id.* at 220-221.

Finally, Raglin testified in his unsworn statement that he was remorseful. The Ohio Supreme Court granted weight to this expression of remorse. *State v. Raglin*, 83 Ohio St.3d 253, 273-274 (1998). This evidence would have been cumulative.

On a final note, Raglin attempts to shoehorn this claim into a claim under *Giglio v. United States*, 405 U.S. 150 (1972). This effort fails because testimony cannot be deemed false or perjured simply because it is inconsistent with or contradicted by other evidence. *United States v. Sherlock*, 865 F.2d 1069, 1082 (9th Cir. 1989); *United States v. Griley*, 814 F.2d 967, 971 (4th Cir. 1987). In this case, the prosecutor pointed to the substantial evidence that Raglin was not sincere in his expressions of remorse. There is no *Giglio* violation.

## XII.  Trial Court Error Claims

### A.  The Trial Court Considered Various Errors In Its Sentencing Opinion (Twenty-Seventh Ground for Relief)

In his **Twenty-Seventh** ground for relief, Raglin alleges that the trial court improperly considered and weighed invalid aggravating circumstances. Specifically, Raglin contends that A) The trial court improperly considered an uncharged and unproven statutory aggravating factor in sentencing Raglin to death.; B) The trial court's failure to state reasons why aggravation outweighed mitigation.; C) The trial court failed to consider and weigh valid mitigating

factors presented by the defense.  The Ohio Supreme rejected this exact claim as follows:

> The trial court, in its sentencing opinion, considered and weighed an R.C. 2929.04(A)(3) aggravating circumstance even though appellant was neither charged with nor convicted of an R.C. 2929.04(A)(3) death penalty specification.  **However, this error in the trial court's sentencing opinion, and all other allegations of error raised by appellant in Proposition of Law No. 1, can be readily cured by our independent review of appellant's death sentence.**  *See, generally, State v. Lott* (1990), 51 Ohio St.3d 160, 170- 173, 555 N.E.2d 293, 304-307.  *See, also, State v. Reynolds* (1998), 80 Ohio St.3d 670, 684-685, 687 N.E.2d 1358, 1373; *State v. Gumm* (1995), 73 Ohio St.3d 413, 424, 653 N.E.2d 253, 265; and *State v. Fox* (1994), 69 Ohio St.3d 183, 191-192, 631 N.E.2d 124, 131.

Raglin, 83 Ohio St.3d at 257. (Emphasis Added).

The Warden submits that there is no constitutional violation here because, even assuming that there was an error, the Ohio Supreme Court's independent reweighing cured any error.  As the Sixth Circuit has explained, "no constitutional claim is stated where a state's highest court either concludes that no extra-statutory factors were considered at the trial level (as in *Goode*) or independently reweighs the aggravating and mitigating circumstances without reference to the extra-statutory factor improperly relied upon by the lower state courts (as in *Barclay*)." *Fox v. Coyle*, 271 F.3d 658, 667 (6th Cir. 2001) (citing *Wainwright v. Goode*, 464 U.S. 78 (1983); *Barclay v. Florida*, 463 U.S. 939 (1983)).

## B.    Permitting The Introduction of Rebuttal Evidence During Mitigation (Thirtieth Ground for Relief)

The Ohio Supreme Court provided the last reasoned state court decision on this matter.  It rejected this claim on the merits.

> Appellant contends that he was unfairly prejudiced by the state's presentation of the rebuttal witnesses and that testimony of the corrections officers "injected evidence of a nonstatutory aggravating circumstance, future dangerousness," into the penalty phase. We disagree. The prosecution was entitled to introduce relevant evidence rebutting the existence of any statutorily defined or other mitigating factor first asserted by the defense. *Gumm*, 73 Ohio St. 3d 413, 653 N.E.2d 253, syllabus. Here, that is precisely what occurred. The testimony of the state's rebuttal witnesses was indeed relevant to rebut mitigating evidence that had been offered by the defense that appellant was remorseful for the killing, that he would help or benefit others while serving a term of life imprisonment, and that his life should therefore be spared. The testimony of the state's rebuttal witnesses was not unfairly prejudicial to appellant, was not offered for an improper purpose, and did not inject a "nonstatutory aggravating factor" into the mix.

*State v. Raglin*, 83 Ohio St.3d 253, 261 (1998).

This claim can be summarily rejected because the Ohio Supreme Court concluded "that no extra-statutory factors were considered at the trial level." *See Fox v. Coyle*, 271 F.3d 658, 667 (6th Cir. 2001) (citing *Wainwright v. Goode*, 464 U.S. 78 (1983)).

## C.    Catch-All Trial Court Error Claim (Thirty-Second Ground for Relief)

This claim is procedurally defaulted because these arguments were not presented to the state courts.

To support this claim, Raglin merely lists a litany of alleged errors committed by the trial court. However, Raglin fails to provide any quantum proof of a constitutional violation.

Respondent respectfully submits, consistent with the constitutional standards referenced previously, that the Ohio Supreme Court's rejection of

Raglin's claims of trial error are not contrary to or involve an unreasonable application of U.S. Supreme Court precedents.

## XIII. Miscellaneous Additional Claims

### A. Unconstitutional Application of the Death Penalty (Thirty-Fourth Ground for Relief)

**Procedural Posture:**

The allegations set forth in Raglin's **Thirty-Fourth Ground** for Relief were presented in part on direct appeal and accordingly are preserved in part for merits review in federal habeas corpus. The were rejected summarily by the Ohio Supreme Court.

**Merits Analysis:**

For the reasons that follow, Respondent respectfully submits that rejection of Raglin's allegations of unconstitutionality cannot be deemed contrary to or involving an unreasonable application of governing United States Supreme Court precedents.

In his **Thirty-Fourth** ground for relief, Raglin asserts a litany of challenges to the constitutionality of Ohio's death penalty scheme on its face and as applied to him. Raglin begins by asserting that the death penalty is unconstitutionally arbitrary and capricious. However, in *Gregg v. Georgia*, 428 U.S. 153, 195 (1976), the Court rejected this argument long ago. Raglin contends that random statistics demonstrate that in Ohio the death penalty is applied in a racially discriminatory manner. However, as noted previously, to prevail under the Equal Protection Clause, Raglin must prove that the decision-makers in his case acted with discriminatory purpose. *McCleskey v. Kemp, supra.* He has

failed to do so.    Raglin argues that Ohio's death penalty scheme is unconstitutionally by requiring proof of aggravating circumstances in the trial phase of capital cases.  His arguments are precluded by *Proffitt v. Florida*, 428 U.S. 242 (1976), *Zant v. Stephens*, 462 U.S. 862 (1983), and *Franklin v. Lynaugh*, 487 U.S. 164 (1988). Raglin complains that Ohio's scheme is unconstitutional because "it burdens a defendant's right to trial."   *See United States v. Jackson*, 390 U.S. 570 (1968).  However, the Court subsequently clarified its position in *Brady v. United States*, 397 U.S. 742 (1970) by stating that pleas are not invalid simply because of the possibility of the death penalty.  In so ruling, the Court refused to hold "that a guilty plea is compelled and invalid . . . whenever motivated by the defendant's desire to accept the certainty or probability of a lesser penalty rather than face a wider range of possibilities extending from acquittal to conviction and a higher penalty authorized by law for the crime charged."  *Brady v. United States, supra,* at 751.  Finally, Raglin advances an additional allegation based on a purported constitutional entitlement to proportionality review.   For the reason stated previously, there is no such entitlement.

For all the foregoing reasons, Respondent respectfully submits that Raglin's constitutional claims do not warrant relief in federal habeas corpus.

## B.    Cumulative Error (Thirty-Sixth Ground for Relief)

**Procedural Posture:**

Finally, Raglin alleges in his **Thirty-Sixth Ground** for Relief that his conviction and death sentence are invalid under the federal constitution due to the

cumulative errors in the admission of evidence and instructions, and gross misconduct of state officials. Raglin presented in part his allegations on direct appeal; they were summarily rejected by the Ohio Supreme Court. Accordingly the allegations are in part preserved for merits review in federal habeas corpus.

**The allegations set forth in Raglin's Thirty-sixth ground, insofar as they were not presented in state court, are procedurally defaulted, absent a showing of cause and prejudice**

**Merits Analysis:**

The United States Supreme Court has never recognized "cumulative error" as a separate and distinct ground which may be alleged in support of relief in federal habeas corpus. *See*, *O'Neal v. McAninch*, 513 U.S. 432 (1995). However, assuming the validity of such an alleged ground, it is manifest that the "cumulative effect" of any alleged errors must be deemed to have deprived the petitioner of a fundamentally fair trial. Moreover, it would seem reasonable that a "cumulative error" analysis could should not include the possible effect of procedurally defaulted claims. *See McKinnon v. Ohio*, No. 94-4256, 1995 WL 570918, at *12 (6th Cir. Sept. 27, 1995). In any event, since there can be no "cumulative effect" absent error in the first instance, rejection of Raglin's "cumulative error" claim cannot be deemed contrary to or an unreasonable application of United States Supreme Court precedent.

For the foregoing reasons, Raglin's Thirty-sixth ground does not warrant relief in federal habeas corpus. "

## XIII.  Conclusion

Raglin cannot demonstrate that his convictions and death sentence are in violation of federal law or the United States Constitution.  Respondent therefore respectfully requests that Raglin's Petition for Writ of Habeas Corpus be **DENIED**.

Respectfully submitted,

JIM PETRO
Attorney General for the State of Ohio


/s *Henry G. Appel*
HENRY G. APPEL  (#0068479)
Assistant Attorney General
Capital Crimes Section
30 East Broad Street, 23rd Floor
Columbus, Ohio 43215-3428
Phone:  (614) 728-7055
Fax:      (614) 728-8600

Counsel for Respondent

### CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing *Amended Return of Writ* was served on the following people by operation of this Court's electronic filing system.

James D. Owen, Esq.
CLOUD, KOENIG & OWEN
5354 North High St.  Suite 3D
Columbus, OH  43214


/s *Henry G. Appel*
HENRY G. APPEL  (#0068479)


F:\Capcrime\HENRY\Raglin\Raglin.ROW.Amended.Doc